# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER**, Plaintiff<br><br><br>v.<br><br><br>**UNIVERSITY OF PENNSYLVANIA**, a<br>Pennsylvania nonprofit corporation,<br>Defendant. | **CASE NO.: 02-cv-567** |

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL PLAINTIFF TO SUBMIT TO AN INDEPENDENT MEDICAL EXAMINATION

COMES NOW PLAINTIFF, in the above-styled action, to respond in opposition to Defendant's Motion To Compel Plaintiff To Submit To An Independent Medical Examination, as follows:

### Objection #1: Defendant's Motion Is Untimely And Prejudicial

1.     At the eleventh hour of discovery, Defendant has decided to move for a court-ordered *psychiatric* examination of Plaintiff. Defendant does this after filing its opposition to Plaintiff's motion for an extension of time (incorporated by reference as if fully stated verbatim herein) and stating an intention to complete discovery on time.

2.     Currently pending before this Court is Plaintiff's Second Motion For Appointment Of Counsel And For Reimbursement Of Certain Costs. This motion is still pending, and in the interim, the deadline for submission of expert witness reports (March 14, 2003) has passed. Plaintiff, a man of extremely limited financial means, managed to retain an expert (Nigel Searle) and submit his report on time to Defense Counsel, having delivered it by hand on March 14, 2003. All the while, Plaintiff had no reassurance from

this Court that he could take more time if he needed to, and worked within the constraints

of the Scheduling Order.

3.    As averred in paragraphs 1-2 above, and because discovery of witnesses

who may have information relevant to the disclosure Defendant seeks has closed or is

about to close, to extend the expert report deadline for Defendant after not having done so

for Plaintiff would be prejudicial to Plaintiff.

### Objection #2: No Foundation/No Controversy

4.    In paragraph 4 of its motion, Defendant states that "[t]he results of an

independent medical examination would specifically bear on Parker's allegations of

retaliation and disability discrimination and, as well would be relevant on the question of

remedy." If *relevance* is all Defendant is claiming, the argument is self-refuting.  No less

a body than the United States Supreme Court, in <u>Schlagenhauf v. Holder</u>, 379 U.S. 104

(1964), explicitly stated that mere relevance fails to meet the burden of the highly

intrusive exam Defendant seeks:

> The courts of appeals in other cases[1] have also recognized that Rule 34's good-cause requirement is not a mere formality, but is a plainly expressed limitation on the use of that Rule. This is obviously true as to the "in controversy" and " good cause" requirements of Rule 35. *They are not met by mere conclusory allegations of the pleadings -- nor by mere relevance to the case* -- but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination. Obviously, what may be good cause for one type of examination may not be so for another. *The ability of the movant to obtain the desired information by other means is also relevant.* (Emphasis added).

5.    Regarding the issue of remedy, any remedy for emotional distress or

mental anguish which Plaintiff may seek was not addressed in Defendant's motion; to the

---

[1] Hauger v. Chicago, R. I. & Pac. R. Co., 216 F.2d 501 (C. A. 7th Cir.); Martin v. Capital Transit Co., 83 U. S. App. D.C. 239, 170 F.2d 811; see Mitchell v. Bass, 252 F.2d 513 (C. A. 8th Cir.); Williams v. Continental Oil Co., 215 F.2d 4 (C. A. 10th Cir.); Alltmont v. United States, 177 F.2d 971 (C. A. 3d Cir.).

extent it is addressed, Plaintiff argues that those damages for which he pled are presumed to occur naturally with a finding of discrimination, and sought only redress insofar as these damages are recognized by law. Plaintiff has offered no expert testimony regarding his emotional harm, but merely averred that anyone who suffered the discrimination he alleges would experience both emotional distress and mental anguish. To the extent a court would order any type of examination to measure such damages, Plaintiff would not seek them and instead seek only the other damages he has claimed.

6.    Defendant does not make clear what specifically about Plaintiff's *current* mental condition is "in controversy," or why a psychiatric examination is even necessary when less intrusive means of discovery were available to it yet not availed at any time in the more than thirteen months since this action was commenced. Nothing prior to Defendant's request and motion provides any foundation upon which to justify the relief it seeks.

7.    Defendant claims in paragraph 2 of its motion that Plaintiff "alleges he was twice diagnosed with bipolar disorder...and that this was the basis of adverse employment and hiring decisions." Defendant then quotes paragraphs 27, 30, 31, and 71 of the Amended Complaint in support. As demonstrated below, this is not at all what Plaintiff had alleged:

a.    Paragraph 27 of the Amended Complaint states: "Plaintiff avers that he has twice been diagnosed as bipolar, the last time in 1997."

b.    Paragraph 30 of the Amended Complaint states: "Plaintiff avers that during the course of his employment with the Medical Center, that a general belief

3

developed that he was mentally ill, and further avers that he suffered adverse job actions

because of this medically unqualified belief."

        c.      Paragraph 31 of the Amended Complaint states that "Plaintiff avers

that his disorder has resulted in disability discrimination against him which continues to

this day." This paragraph should be amended to read "perceived disorder," as it was the

perception of his disorder, accurate or not, which resulted in the discrimination.

        d.      In paragraph 71 of the Amended Complaint, Plaintiff states a claim

on the basis of disability discrimination in violation of the ADA/Rehabilitation Act,

based on the perception of disability set forth in paragraph 27.

    8.      In paragraph 12 of its motion, Defendant argues that the perception of

disability and any retaliation stemming thereto justifies a court-ordered psychiatric exam.

Plaintiff disagrees with this reasoning on several grounds:

        a.      Plaintiff's *actual* mental condition has nothing to do with his

*perceived* condition. Plaintiff's mental condition is not relevant to the issue of how those

who perceived him as mentally ill discriminated or retaliated against him. That would

require an exploration of those individuals' mental status rather than Plaintiff's. In Sarco

v. Penn-Dell Directory Company, 170 F.R.D. 127 (E.D. Pa. 1997), the court held:

> *[A] plaintiff may be considered disabled under the ADA if [his] impairment does not substantially limit a major life activity, if [his] impairment "'is treated by a covered entity as constituting such limitation.'"* Kelly v. Drexel University, 94 F.3d 108 (3d Cir. 1996) (quoting 29 C.F.R. § 1630.2(l)(1)). *Such a claim does not focus on the plaintiff's actual abilities, "but rather on the reactions and perceptions of the persons interacting or working with [him]." Id.* at 108-9 (quoting 2 *EEOC Compliance Manual*, § 902, at 902-3 to 902-4).

        b.      The perception of "mental illness" that Plaintiff averred was not

specific to bipolar disorder.

c.    The mental state of anyone perceiving Plaintiff as mentally ill, or

otherwise judging his behavior, would also be called into controversy as a matter of due

process.

### Objection #3: Plaintiff Is Unquestionably Employable

9.    In paragraph 8 of its motion, Defendant states that the exam "will consist

of an examination to determine whether Plaintiff is bipolar, how such condition affects

him and the extent to which that condition effects [sic] his employability." In no way

does Defendant explain or show:

a.    How Plaintiff's condition may affect his employability;

b.    When Defendant determined that Plaintiff's condition might affect

his employability;

c.    Why Defendant did not inform Plaintiff of this at any time prior to

its motion (and request for stipulation) despite its knowledge that Plaintiff wanted to

work for Defendant and that this might be an obstacle; and

d.    Why Defendant did not ask Plaintiff what reasonable

accommodations might make him employable, let alone actually *provide* these

accommodations in an attempt to resolve the issue in the most productive manner.

10.    The issue of damages in this lawsuit is not about Plaintiff's inability to get

any job, but instead to tap into the far superior compensation and benefits structure

offered by the University of Pennsylvania, which includes the following or something

very similar

a.    A salary of between $30,000-50,000 a year;

b.     Four weeks of vacation time within three years, or within one for
higher-level administrative positions;

c.     Up to six *free* credits each year at one of the top institutions of
higher learning in America (Plaintiff dropped out of college at age 19 after one year with
a 4.0 GPA);

d.     Full medical and dental benefits, and life insurance equal to up to
five years' annual salary;

e.     A "special vacation" between Christmas and New Year's, for an
additional week of paid vacation time;

f.     Twelve sick days (some of which accrue from year to year); three
personal days; and several paid holidays;

g.     Assistance with purchasing a house in the neighborhood in which
Plaintiff lives;

h.     Full access to the campus, including libraries and gyms;

i.     Free transportation by bus or van for a substantial portion of each
day.

11.     To use simplistic layman's terms, there is a difference between being
*crazy* and being *driven crazy*. Those who perceived Plaintiff as disabled insisted on
focusing on Axis-I and Axis-II factors, and virtually ignored the all-important Axis-IV,
*stressors*. In a sufficiently stressful environment, anyone can develop the symptoms of
mental illness. Only a removal of the stressors can truly reveal the cause to rest with an
individual or his or her environment. Those who interacted with Plaintiff did not work
for his supervisor and were not privy to the information sought. Any analysis of

Plaintiff's conduct must be viewed in the light of several factors unique to his situation. To apply what occurred in the only permanent employment situation between Defendant and Plaintiff to all of his other employment strains credulity, especially in light of Plaintiff's ability to get hired and perform the functions of similar positions.

12.     Plaintiff refers to himself as "unquestionably employable" for one simple reason, namely that *he is employed now, and was employed steadily prior to and following his employment with the Medical Center*. In support of this claim, Plaintiff offers several facts in this verified pleading:

a.     Prior to his employment with the Medical Center, he was employed for one year by an accounting firm in Center City. Plaintiff was the only administrative employee of the firm, and wore the hats of receptionist, secretary, and accounting assistant. While manning the front desk of the firm and its switchboard, Plaintiff performed all tasks commonly associated with a secretary. He left voluntarily, on excellent terms, and only because he wanted to finish his college education while advancing his career.

b.     After his employment with the Medical Center, Plaintiff was hired for the summer database project at Wharton (where he was *employed* yet again by Penn itself), and saw that project through to its completion. During that project, he worked a part-time (and former full time) concierge job for Alan Klein (where extensive contact with the public was required), subsequently secured a full-time position at a law firm, which he left after six weeks. He then took temporary assignments at several places, including the D.C. 33 Legal Services Plan, where he left on good terms, and two big-Six accounting firms, in one case obtaining a temporary position with responsibilities roughly

7

equivalent to that given to a new college graduate, and for which the job description "required" a college degree. After those assignments ended, he worked a variety of contract and temporary assignments, and then went back to working for Alan Klein while beginning the writing and computer programming projects which would form the basis for his internet company, Snodgrass Publishing Group, in 1998.

       c.    Plaintiff is currently employed as an independent contractor (medical transcriptionist) for an area social worker, earning approximately $20.00 an hour part-time for an average of 6-12 hours a week of work. From July 11 through the end of 2002, Plaintiff billed this individual a total of $2,775.00 for work, and in the past two weeks alone, he has earned $460.00 from this singular source, for only two long days of work. This income is variable and unpredictable, but in combination with Plaintiff's fledgling business venture, it is vital to his existence, hardly indicative of unemployability, and in fact proof to the contrary. Plaintiff has produced all work for this client on time, and the client has expressed nothing but absolute satisfaction with Plaintiff's work.

     13.    Defendant's own words evidence its own belief that Plaintiff is employable:

       a.    Defendant's own Performance Evaluation of Plaintiff in 1993 (attached hereto as Exhibit A and incorporated by reference) included marks of "Commendable" for technical and specialized skills, citing his creation of a procedures manual for the position, and for communications skills, stated that "[Plaintiff] creatively and accurately organizes and edits written communications." Even with the unforgiving nature of the overall evaluation, Plaintiff's supervisor refused to deride his technical

skills, which are most easily objectively measured, and which are most portable to other positions with Defendant. Defendant's own evaluation of Plaintiff indicates that a simple focus on his strengths would positively and absolutely resolve the issue of accommodation.

        b.    Plaintiff attaches hereto as Exhibit B four "rejection letters" sent to him in response to positions for which he applied with Defendant in 2002. The letters from Ms. Speakman and Ms. Ravenell resulted from interviews, while the other two letters from applications. These letters stated, in part:

        1)    "I was impressed with your qualifications" (Speakman letter, line three);

        2)    "[W]e were quite impressed with your credentials," (Ravenell letter, line three);

        3)    "[Y]our qualifications are impressive," (Messenger letter, line two); and

        4)    "[Y]our credentials and experience are very impressive…" (Flack letter from Penn's Office Of General Counsel, paragraph two, line one).

        14.    To equate Plaintiff's inability to satisfy the subjective requirements of one supervisor with unemployability, especially in light of the facts averred herein, would be inappropriate. Plaintiff's employability is simply not now, nor has it ever been, in question.

        15.    There are many ways to word a rejection letter that do not require an affirmative statement of the applicant's ability. Falsifying an opinion of Plaintiff's weaknesses, or concealing a belief that Plaintiff is unemployable or otherwise unfit

would serve as a deflective measure designed to obstruct the public interest by inducing

Plaintiff not to consider exercising his civil rights whereas in the absence of such

encouragement, he otherwise might. Especially given that one of the letters came from

Defendant's own counsel's office, and that Defendant was well aware of the situation

regarding Plaintiff, one must again wonder why Defendant would send such mixed

messages and not attempt to mitigate the dispute with greater candor prior to seeking

such an extraordinary intrusion that is not within the normal confines of its own policies

regarding disability.

<u>**Objection #4: Psychiatrist Not Appropriate**</u>

16.    Defendant raises the sole issue of Plaintiff's bipolar disorder.

Consequently, a psychiatric examination is inappropriate, for the following reasons:

    a.    A psychological examination would accomplish the objective

Defendant seeks;

    b.    Plaintiff's physical condition is not in controversy, and a medical

examination would not be called for; and

    c.    Even if the examination were ostensibly psychological in nature, a

trained medical doctor in a clinical setting will view Plaintiff through that prism. By

moving for a psychiatric examination instead of a psychological examination, Defendant

has also requested a medical examination insofar as a psychiatric examination

incorporates a medical examination as well. The <u>Schlagenhauf</u> court specifically

addressed this issue:

> This record cannot support even the corrected order which required one
> examination in each of the four specialties of internal medicine, ophthalmology,
> neurology, and psychiatry.[2] Nothing in the pleadings or affidavit would afford a

basis for a belief that <u>Schlagenhauf</u> was suffering from a mental or neurological illness warranting wide-ranging psychiatric or neurological examinations. ***Nor is there anything stated justifying the broad internal medicine examination.***[3]

17    For these reasons, a psychological and not a psychiatric examination would be the most that Defendant should be entitled to, although Plaintiff argues that for the many other reasons set forth in this opposition brief, it is entitled to neither.

### Objection #5: Examination Is Retaliatory

18.    Defendant's normal procedure for dealing with disabled applicants is to encourage "self-identification" to its human resources department. When self-identification occurs, workers/applicants can ask for reasonable accommodations, at which point Defendant is supposed to provide them as best they could.

19.    The <u>Schlagenhauf</u> Court was confronted with a personal-injury case involving the operation of a motor vehicle, ***where an accident had occurred.***  One could see much more clearly where a psychological or even a physical examination would be in controversy and relevant.  Defendant offers no showing which would support its motion other than cursory remarks and "mere, conclusory allegations."

20.    Defendant's own policy does not support the involuntary and "hostile" psychological examination it seeks. Penn's own "Voluntary Self-Identification Program for Disability and Veteran Status and The Reasonable Accommodation Process For

---

[2] After the Court of Appeals denied mandamus, the order was corrected by the District Court to reduce the number of examinations to the four requested. We agree with respondent that the issue of that error has become moot. However, the fact that the District Court ordered nine examinations is not irrelevant, together with all the other circumstances, in the consideration of whether the District Court gave to the petition for mental and physical examinations that discriminating application, which Rule 35 requires. See pp. 119-122, infra.

[3] Moreover, it seems clear that there was no compliance with Rule 35's requirement that the trial judge delineate the "conditions, and scope" of the examinations. Here the examinations were ordered in very broad, general areas. The internal medicine examination might for example, at the instance of the movant or its recommended physician extend to such things as blood tests, electrocardiograms, gastro-intestinal and other X-ray examinations. It is hard to conceive how some of these could be relevant under any possible theory of the case.

Faculty And Staff With Disabilities" (which can be found at

http://www.upenn.edu/affirm-action/volid.html and which is attached hereto as Exhibit C

and incorporated by reference) states the following:

        a.    "Employers are required to provide reasonable accommodation to an

employee's known disability, unless the accommodation imposes an undue hardship on

the institution."

        b.    **"A person's refusal to provide information on disability will not**

**subject the employee to adverse treatment."** (Emphasis original).

        c.    "Invitations to self-identify may be extended to an applicant *after an*

*offer of employment has been given to the recommended applicant and that applicant*

*has accepted the offer."* (Emphasis added)

        d.    "The self-identification process is *completely voluntary* and

confidential except that with the employee's permission, the immediate supervisor(s) *may*

be informed about reasonable accommodation needed; if necessary, first aid personnel

may be informed about possible emergency medical treatment."

        e.    "Employees with known and documented disabilities have the

following rights…

        1)    "…equal access to all PENN-sponsored benefits, activities and

programs."

        2)    "…employment in a position as long as the employee remains

qualified, meaning that the employee can perform the essential functions of the job with

or without reasonable accommodation."

3)    "…the provision of reasonable accommodation for the essential functions of the job performed."

f.    "The U.S. Equal Employment Opportunity Commission (EEOC) defines reasonable accommodation as 'a modification or adjustment to a job, the work environment or the way things usually are done that enables a qualified individual with a disability to enjoy an equal employment opportunity.'"

g.    "Once an employee identifies as having a disability, the kind of reasonable accommodation is provided on an individual basis."

h.    "The reasonable accommodation process is an informal, interactive one involving discussion between the managers or supervisors and the employee with a disability who makes the request. The discussion should attempt to identify the precise limitations resulting from the disability and the reasonable accommodation options that might decrease or overcome those limitations, e.g., in terms of job demands, the employee's skills and functional limitations, available technology, and cost. *Reasonable accommodation is determined on an individual basis,* taking into consideration the essential functions of the job." (Emphasis Added).

21.    Defendant has not shown that Plaintiff is incapable of performing the essential functions of the work for which he has applied, it has not followed its own policy in an attempt to alternatively resolve the issue (choosing instead to air the issue in public and attempt to put into the record a psychiatric examination of Plaintiff, while eschewing working with Plaintiff "individually" to resolve the matter), with or without accommodation, while the preponderance of the evidence which is available indicates that Plaintiff is more than capable of performing said functions.

13

22.    Defendant is one of the top universities in the United States, with over 13,000 full-time employees, including clerical, administrative, and technical positions which number in the thousands. Additionally, many departments within Defendant contract out work for which Plaintiff is qualified to perform either through Snodgrass (his business), or on a freelance basis. Defendant has not explored any of these options with Plaintiff in an attempt to mitigate the situation. Such work includes, but is not limited to:

    a.    Medical transcription;

    b.    Dissertations;

    c.    Basic website design and maintenance;

    d.    Word processing;

    e.    Database design/maintenance; and

    f.    Office reorganization (documents, computer files, software, databases, filing system/filing, etc.).

23.    Plaintiff argues that in light of Defendant's own policies for identification of disability and reasonable accommodation, its own recognition of Plaintiff's skills, and the many options for accommodation which are indigenous to Defendant, given its size and the sheer volume of work it provides to the area (it is one of or the largest private employer in the city of Philadelphia), the involuntary, court-ordered psychiatric examination which Defendants seeks is retaliatory in that the only reason it is being sought is that Plaintiff has chosen to file a discrimination charge and lawsuit against Defendant, and because of Plaintiff's previous "whistleblowing." Defendant shows no circumstances other than those involving discrimination plaintiffs (or petitioners) where it would seek an intrusive solution of this type, and there is nothing to indicate that any

other class of workers except those who exercise their legal rights against Defendant are subject to this measure.

## Objection #6: Examination Defendant Seeks Is Not Independent

24.      The term "independent medical examination" is anathema to having it conducted by Defendant's expert. In Schlagenhauf, Justice Douglas (concurring in part and dissenting in part, in a case where the plaintiff sought to compel examination of the defendant) held:

> If he or she is turned over to the plaintiff's doctors and psychoanalysts to discover the cause of the mishap, the door will be opened for grave miscarriages of justice. When the defendant's doctors examine plaintiff, they are normally interested only in answering a single question: did plaintiff in fact sustain the specific injuries claimed? But plaintiff's *doctors will naturally be inclined to go on a fishing expedition* in search of anything which will tend to prove that the defendant was unfit to perform the acts which resulted in the plaintiff's injury. And *a doctor for a fee can easily discover something wrong with any patient* -- a condition that in prejudiced medical eyes might have caused the accident. Once defendants are turned over to medical or psychiatric clinics for an analysis of their physical well-being and the condition of their psyche, the effective trial will be held there and not before the jury. *There are no lawyers in those clinics to stop the doctor from probing this organ or that one, to halt a further inquiry, to object to a line of questioning. And there is no judge to sit as arbiter. The doctor or the psychiatrist has a holiday in the privacy of his office. The defendant is at the doctor's (or psychiatrist's) mercy; and his report may either overawe or confuse the jury and prevent a fair trial.* (Emphasis Added).

25.      Plaintiff has not submitted his own expert psychological testimony, so there is no offsetting bias regarding retained experts to work in his favor. The only possible "independent" examination would therefore have to be conducted by an examiner not chosen by either party.

## Objection #8: Dismissal Of Action Not Appropriate In Any Circumstance

26.      In its motion, Defendant seeks a wholesale dismissal of this action if Plaintiff did not comply with the proposed Order. Plaintiff disputes this claim, as follows:

    a.    Dismissal of the racial and gender discrimination counts would not be appropriate, as the examination sought is not relevant to either of these counts. In the alternative, the doctrine of "mixed motive" and Plaintiff's public-interest standing as a "private attorney general" makes everything regarding Plaintiff irrelevant.

    b.    Dismissal of the retaliation counts would not be appropriate for the grounds cited in subparagraph a) above (including mixed-motive), and because the retaliation count is based on Plaintiff's overall exercise of his rights and perceived-disability discrimination, to which his mental state is not relevant.

    c.    Dismissal of even the disability count would not be appropriate for the grounds cited in subparagraph a) above (including mixed-motive), and because Plaintiff's mental condition is irrelevant to the issue of perceived discrimination.

## CONCLUSION

WHEREFORE, for the reasons averred herein, Defendant's Motion To Compel Plaintiff To Submit To An Independent Medical Examination should be DENIED WITH PREJUDICE.

This the 24th day of March, 2003.

*[signature]*

Gordon Roy Parker
4247 Locust Street, #806
Philadelphia, PA 19104
(215) 386-7366

Plaintiff, Pro Se

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER**, Plaintiff <br><br><br>v.<br><br><br>**UNIVERSITY OF PENNSYLVANIA**, a <br>Pennsylvania nonprofit corporation, <br>Defendant. | **CASE NO.: 02-cv-567** |

## <u>VERIFICATION</u>

I attest and swear, under penalty of perjury, that the facts averred in the foregoing

Plaintiff's Opposition To Defendant's Motion To Compel Plaintiff To Submit To An

Independent Medical Examination are true and correct to the best of my knowledge and

belief.

_Gordon Roy Parker_
Gordon Roy Parker
4247 Locust Street, #806
Philadelphia, PA  19104
(215) 386-7366

Plaintiff, Pro Se

Dated: March 24, 2003

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER**, Plaintiff | |
| v. | **CASE NO.: 02-cv-567** |
| **UNIVERSITY OF PENNSYLVANIA**, a Pennsylvania nonprofit corporation, Defendant. | |

### ORDER

AND NOW, this _____ day of _____, 2003, in consideration of Defendant's Motion To Compel Plaintiff To Submit To An Independent Medical Examination and Plaintiff's opposition thereto, it is hereby ORDERED that Defendant's motion be DENIED WITH PREJUDICE.

It is further ORDERED that Paragraph 31 of Plaintiff's Amended Complaint shall be amended to read "Plaintiff avers that his *perceived* disorder has resulted in disability discrimination against him which continues to this day."

_____
J.

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER**, Plaintiff <br><br> v. <br><br> **UNIVERSITY OF PENNSYLVANIA,** <br> a Pennsylvania nonprofit corporation, <br> Defendant. | **CASE NO.: 02-cv-567** |

### CERTIFICATE OF SERVICE

COMES NOW PLAINTIFF in the above-styled action to set forth that the

foregoing Plaintiff's Opposition To Defendant's Motion To Compel Plaintiff To Submit

To An Independent Medical Examination has been served on defendant via **hand**

**delivery** at the following address:

> John M. Myers
> Crystal D. Deazle
> Montgomery, McCracken, Walker & Rhoads, LLP.
> 123 South Broad Street
> Philadelphia, PA 19109

This the 24th day of March, 2003

_Gordon Roy Parker_
Gordon Roy Parker
4247 Locust Street, #806
Philadelphia, PA 19104
(215) 386-7366

Plaintiff, Pro Se

# EXHIBIT 2

Print this resume.

 Print      New Annotation     ⊗ Close Window

Preferred Job Category: Other
Objective          Internet, Administrative, Computers, Legal - (Gordon Roy Parker)

Internet, Administrative, Computers, Legal - (Gordon Roy Parker)

Date: Mon, 16 Jul 2001 09:27:46 GMT
From: **Gordon Roy Parker** [ & lt; A HREF=mailto:UPennGuy34@aol.com & gt; UPennGuy34@aol.com & lt; /A & gt; ]
To: University of Pennsylvania upenn@jobnet.com

Internet, Administrative, Computers, Legal - (Gordon Roy Parker)
===========================================
New/Update: NewResume
Received / Updated: 7/16/01
US Citizen or Work Eligibility?: yes
Job Category: Administrative/clerical
My Name: **Gordon Roy Parker**
Email: UPennGuy34@aol.com

Coverletter:

I am seeking a return to college after a 15-year absence, with an eye towards law school one day, and
UPenn offers me the best chance to realize this goal while furthering my current career.

I have a lot to offer most any office and would welcome the opportunity to prove myself.

Resume:

Gordon Roy Parker
4247 Locust Street, # 806
Philadelphia, PA 19104
(215) 386-7366
E-mail: UPennGuy34@aol.com

OBJECTIVE
To apply my 90+ wpm typing and extensive array of administrative, technical, and internet knowledge in an
environment where I can help a company streamline and steamline into the new economy and beyond.
Long-term employment in professional industries (i.e., accounting, law) and universities preferred. Salary
Requirements: dollor-15.00/hour (short-term); dollor-32,500.00/year (long-term).
NYC/Atlanta/Chicago/California/Boston: add 50 percent. Relocation requirements: dollor-10,000.00 NYC;
dollor-7,500.00 Atlanta/Boston/Chicago/California; dollor-5,000.00 elsewhere. Will consider any short-term
local on a week-to-week basis.

EXPERIENCE
LAW OFFICES OF JONES & JONES, Albany, GA September 2000-February 2001
Administrator/Paralegal. Provided high-level, contract-based (Snodgrass) administrative and litigation
support to two-attorney, family-run divorce, bankruptcy, criminal, and personal-injury "country law" firm.
Intensive responsibilities included practice development and securing retainers ("rainmaking"), case intake
and management, establishing and maintaining office procedures, ensuring full firm functionality during
business hours at all times, training entry-level support/secretarial staff, research (LEXIS/Westlaw/internet),
internal website creation, and IT functions. Designed document-production and electronic filing system;
converted all firm documents to MS Word from MS Works; drafted and filed pleadings and Ch. 7 petitions;
assisted in post-bankruptcy creditor negotiation; served pleadings; drafted and assisted in the negotiation of
divorce consent decrees. Compensation: dollor-500.00/week (equivalent to dollor-750.00/week in

Print this resume.                                                                Page 2 of 2

[Philadelphia]; dollor-2,500 bonus.

SNODGRASS PUBLISHING GROUP, Philadelphia, PA December 1994-present
Owner. Dual-purpose new-economy firm provides internet support and consulting services to professional firms, and website content for sale or to attract advertising revenues. Projects completed include database management and design, basic web design, ghostwriting, web content management, and general internet consulting. Earnings: mildly profitable since Q1 1999.

ALAN H. KLEIN APARTMENTS, Philadelphia, PA December 1987-October 1998
Concierge. Security/service desk of 248-unit apartment building in University City. Desk functions as liaison between staff, management, tenants, contractors, and emergency personnel. Assisted desk manager. Salary: variable (dollor-6.90-15.40/hour).

LAW OFFICES OF LILIA E. LAWLER, Philadelphia, PA July-December 1994
Administrator/Paralegal. Helped to establish sole-practitioner's office with clients in the areas of divorce, bankruptcy, and workman's compensation. Established computer and filing procedures, created templates, drafted petitions; responsible for client intake/case management, and purchase, installation, and use of legal software. Salary: dollor-9.25/hour.

THE UNIVERSITY OF PENNSLYVANIA, Philadelphia, PA July 1992-September 1993
Administrative Secretary/Database Assistant. Administrative secretary (Sec IV) for the technology-transfer office of the Medical Center (July 1992-June 1993); database assistant for the Wharton Graduate Career Planning and Placement Office (Summer 1993). Administrative work included document production (Word Perfect) and standard office responsibilities; database responsibilities included database creation and management (Paradox). Salary: dollor-22,000/year.

SARDINSKY, BRAUNSTEIN & CO., Philadelphia, PA July 1991-July 1992
Administrative Secretary. Provided sole administrative and technical support to three-accountant CPA firm catering to small business and wealthy individuals. Assisted in preparation of tax returns and financial statements; designed procedures/training manual for future staff. Trained replacement in all aspects of position. Salary: dollor-19,000/year.

THE RESTAURANT SCHOOL, Philadelphia, PA 1989-1991
Word Processor. Responsible for all document production at culinary institute/junior college. Salary: dollor-10.00/hour.

TNTYPE, Philadelphia, PA 1986-1991
Partner. University-located word processing and database management service which catered to area students, faculty, and other individuals, professionals, and businesses. Compensation: 50 percent ownership (average dollor-3250.00/week).

PARKER'S OFFICE SERVICE CENTER, INC., New York, NY 1979-1986
Expanded family-owned tape-transcription service to include straight typing, resumes, and mass mailings. Compensation: variable (average dollor-300.00/week). Worked as messenger from 1979-1983.

EDUCATION
STATE UNIVERSITY OF NEW YORK AT ALBANY, Albany, NY 1985
GPA = 4.0/4.0. Intended major: business.

QUINTANO'S SCHOOL, New York, NY 1980-84

=================================================

Profile

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|                            |   |                              |
|----------------------------|---|------------------------------|
| GORDON ROY PARKER          | : | CIVIL ACTION NO. 02-cv-567   |
|                            | : |                              |
| Plaintiff,                 | : |                              |
|                            | : |                              |
| vs.                        | : |                              |
|                            | : |                              |
| UNIVERSITY OF PENNSYLVANIA | : |                              |
|                            | : |                              |
| Defendant.                 | : |                              |
|                            | : |                              |

## AFFIDAVIT OF DONNA SHOWELL-BROWN

Affidavit of Donna Showell-Brown, Manager of Recruitment and Staffing, at the University of Pennsylvania.

1. I make this affidavit in connection with the above-captioned litigation at the request of counsel for the University.

2. I am the Manager of Recruitment and Staffing for the University of Pennsylvania, and I am responsible for the supervision of the University's hiring in all non-faculty positions.

3. The University's web-based job posting and response system is under my supervision.

4. On July 16, 2001 Gordon Parker posted his resume on our website.

5. The resume Mr. Parker submitted is attached as Exhibit 1.

6. At the time of his posting, Mr. Parker did not apply for any specific job.

7. The University's hiring system allows for the possible consideration of an applicant in two different ways: first, one may apply for a specific job, identified on the website; second, if no specific application is made, then the resume simply resides in our database along with thousands of other resumes.

8.    Given the large volume of applicants applying for a specific job, recruiters rarely consider applicants who do not apply for a specific job posting.

9.    As I understand it, Mr. Parker asserts that he "applied" for a position by simply providing his resume for our database.

10.    The database of resumes in which Mr. Parker's resume is found is searchable by our recruiters, using a "key word" type search, should the need arise.

11.    During the several months after Mr. Parker posted his resume, no positions for which Mr. Parker self identifies as being qualified for were filled from applicants found using this data base search capability. This is because qualified applicants were found among those people who actually applied for the specific jobs for which there were vacancies.

12.    There are so many resumes in our database that the "key word" search method, for positions not requiring particularly unique skills or prerequisites, results in so many "matches" that this kind of search is not particularly useful. To illustrate, we ran several searches using various key words taken from Mr. Parker's resume. The chart below shows the results:

| Keyword | Number of Resumes |
|---|---|
| Secretary administrative internet web development design | 1 [Mr. Parker's] |
| Secretary | 10,375 |
| Administrative | 49,144 |
| Internet | 27,607 |
| Web development | 2,101 |
| Web design | 2,578 |

13.    It is not practical or necessary, nor is it the practice, for our recruiters to use the database for filling vacancies in this way.

14.    Each vacancy filled around the time of Mr. Parker's posting to our website was filled from the pool of people who actually applied for a specific job.

15.    Mr. Parker was not interviewed for any job at or around the time of his posting, or prior to his filing of the EEOC complaint that led to this lawsuit.

16.    Mr. Parker did not self identify, in his resume or in any other way, either that he is Caucasian or disabled by virtue of his mental status (or for any other reason). Nor did he provide any information from which a recruiter could believe, whether properly or not, that Parker suffers from any mental or other disability.

17.    Mr. Parker's posting did not include any request for an accommodation because of his mental status.

18.    Mr. Parker's resume posting would have been treated no differently had he self-identified as Caucasian, mentally or otherwise disabled.

19.    Mr. Parker's resume posting would have been treated no differently had he been a female.

20.    The University of Pennsylvania, under its hiring policy and affirmative action plan, gives no preference in hiring to women or non-Caucasians. Our policy is to insure that, in each case, the employer hires the best candidate for the position, regardless of race, gender, or actual or perceived disability.

I make the foregoing affidavit under penalty of perjury pursuant to 28 U.S.C. §1746.


Dated: May 1, 2003

_Donna Showell-Brown_
Donna Showell-Brown