# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER**, Plaintiff<br><br>v.<br><br>**UNIVERSITY OF PENNSYLVANIA**, a Pennsylvania nonprofit corporation, Defendant. | CASE NO.: 02-cv-567 |

**ORDER**

AND NOW, this _____ day of ____________________, 2004, and upon consideration of Plaintiff's Motion To Compel Discovery, and any responses thereto, the motion is **granted.**

Defendant shall comply with all outstanding discovery requests within fourteen (14) days of this Order.

The deadline for submitting pretrial memoranda and dispositive motions, and the exchange of exhibits, is now __________________, 2004.

SO ORDERED.

___________________________________
J.

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER**, Plaintiff<br><br>v.<br><br>**UNIVERSITY OF PENNSYLVANIA**, a Pennsylvania nonprofit corporation, Defendant. | **CASE NO.:** 02-cv-567 |

**CERTIFICATE OF SERVICE**

COMES NOW PLAINTIFF in the above-styled action to set forth that the foregoing **Plaintiff's Sur-Reply In Response To Defendant University Of Pennsylvania's Opposition To Plaintiff's Motion To Compel Discovery** has been served on Defendant's attorney via **hand delivery** at the following address:

John M. Myers, Esq.
Montgomery, McCracken, Walker & Rhodes
123 South Broad Street, 28th Floor
Philadelphia, PA 19109

This the 10th day of May, 2004.

Gordon Roy Parker
4247 Locust Street, #806
Philadelphia, PA 19104
(215) 386-7366
E-mail: SnodgrassPublish@aol.com
Plaintiff, Pro Se

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER**, Plaintiff<br><br>v.<br><br>**UNIVERSITY OF PENNSYLVANIA**, a Pennsylvania nonprofit corporation, Defendant. | CASE NO.: 02-cv-567 |

**PLAINTIFF'S SUR-REPLY TO PENN'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY PURSUANT TO FEDERAL RULES 26 AND 37**

Plaintiff in the above-styled action submits this sur-reply to address the points and arguments raised in Defendant University of Pennsylvania's opposition to the instant motion.

**Plaintiff's Third Set Of Interrogatories**

1. Plaintiff restates his argument from the instant motion.

2. There is a factual dispute regarding Plaintiff's faxed resume of July 17, 2001 that makes any evidence which would shed any light on it relevant and admissible.

3. There is a factual dispute regarding a) Penn's hiring process; b) whether or not positions at Penn have been advertised in newspapers; and c) whether or not Plaintiff applied for work through monster.com in 2002 that makes any evidence which would shed any light on it relevant and admissible.

4. Not in dispute for this motion.

5. The term "conflicts with Plaintiff's records" means that Defendant's answer does not agree with Plaintiff's records (i.e., he claims he faxed his resume). That is a factual issue for trial.

6-14. Penn appears to be "denying" relevance. To that extent, Plaintiff restates his arguments from the instant Motion.

**Plaintiff's Fifth Request For Production Of Documents**

1-3. Plaintiff restates his arguments from the instant motion.

**Plaintiff's Second Set Of Requests For Admission**

1. See paragraph (5) above for a definition of "Plaintiff's records."

2. Not in dispute.

3-4. These requests were indeed answered and should have been noted. Plaintiff amends his argument accordingly.

5. Not in dispute.

6. The content of Penn's affirmative-action program is relevant to the claims based on its Affirmative Action Plan.

7. Plaintiff asked whether or not the OFCCP policies supported its plan. Either it does or it does not. Response should be compelled.

8. Plaintiff sought a more definite response in the form of the timeline of Penn's refusal (whether or not it was July 27, 2001, e.g.).

9. This admission is relevant to the issue of whether or not Plaintiff was considered for employment.

10. Plaintiff did not dispute paragraphs 7-10, but merely paragraphs 8-9 (paragraphs 7-10 were grouped by mistake), and amends his argument accordingly.

11. It is not clear if Defendant is denying the admission request or the relevance. Plaintiff presumes it was attempting to deny relevance as per its objection.

**CONCLUSION**

Plaintiff does not seek this discovery in bad faith. He needs this production to properly make his case. The previous denial of his motions to compel was predicated on the gender-discrimination claim being dismissed. Since it was reinstated, this discovery is once again relevant.

WHEREFORE, for the reasons averred herein, the instant motion should be **granted**. The deadline for submitting pretrial memoranda and related documents should also be extended for thirty (30) days to allow for the proper close of discovery.

This the 10th day of May, 2004.

Gordon Roy Parker
4247 Locust Street, #806
Philadelphia, PA 19104
(215) 386-7366
E-mail: SnodgrassPublish@aol.com
Plaintiff, Pro Se

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER**, Plaintiff<br><br>v.<br><br>**UNIVERSITY OF PENNSYLVANIA**, a Pennsylvania nonprofit corporation, Defendant. | CASE NO.: 02-cv-567 |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S SUR-REPLY TO PENN'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY PURSUANT TO FEDERAL RULES 26 AND 37**

**Plaintiff** in the above-styled action submits this Memorandum to address the points and arguments raised in Defendant University of Pennsylvania's opposition to the instant motion.

## I. INTRODUCTION

Defendant points out that this is Plaintiff's third motion to compel discovery, but it is the first motion since the gender-discrimination claims were reinstated. In its Order of November 3, 2003, this Court ruled as follows:

> One of these motions seeks a broad array of information related to Penn employees and affirmative action at Penn (Docket #26), and the other seeks information related to alleged gender disparities at Penn (Docket #34). The first motion is denied because it seeks irrelevant information. ***The second motion is denied because I am dismissing plaintiff's gender discrimination claim and the motion requests information beyond the scope of discovery.***[1]

With this discovery, Plaintiff seeks to establish these gender disparities. He cannot analyze or present evidence of gender disparities without the underlying data. This court has not considered the requests in light of the reversal of its dismissal of the gender-discrimination claim. The discovery should therefore be compelled.

---

[1] See Opinion of November 3, 2003, page 7, fn5.

Defendant attempts to make an issue out of Plaintiffs' resume submission of July 16, 2001:

> Despite having filed three sets of interrogatories, five sets of document requests, and two set of requests for admission, plaintiff still has not asked about the real issue in this case: the fate of his resume when he posted it to the Penn web site in 2001 without applying for a position. He has had the answer, however, for quite some time.[2]

Plaintiff knows of no "issue" regarding the fate of his resume, as Defendant has claimed it resided in a database that, unknown to Plaintiff, was not utilized by Penn in any applicant searches for positions that Plaintiff expressed interest in. Consequently, there was nothing to ask because, as Defendant points out, Plaintiff has their answer. The "real issue" in the case is not simply Plaintiff's resume submission; that is merely one event. The legal implications of that event are not yet clear.

Defendant then argues:

> Plaintiff now asks about the alleged submission of his resume to the Health Center by fax on July 17 ,2001, a submission that plaintiff failed to mention in either his original or amended complaints ***or at any time before now.*** Notwithstanding the fact that this resume submission is irrelevant to this case, Penn has fully answered plaintiff s discovery requests on that issue. It has no record of having received plaintiff s resume and has supplied a document evidencing this.[3] (Emphasis Added).

Defendant is incorrect: Plaintiff averred this fact in response to Defendant's Motion For Summary Judgment:

> A review of Plaintiff's employment-search records indicates that on July 17, 2001, at or about 5:20 a.m. Eastern Time (according to Plaintiff's records, but the actual time may vary due to timekeeping differentials), he faxed his resume to the telephone number of 215-662-7835, which belongs to the UPenn Health System. The transmission lasted one minute and nineteen seconds (1:19), and consisted of one page (Plaintiff's resume).[4]

This creates a triable issue of fact for which Plaintiff will require discovery, especially since whether or not Plaintiff was "considered for employment" is at issue.

---

[2] See Penn's Response Memorandum, ¶ I, page 2.
[3] Ibid.
[4] See Plaintiff's Response To Defendant's Motion For Summary Judgment, ¶ II, page 4. This document was filed on June 25, 2003.

## II. FACTUAL ALLEGATIONS

Plaintiff's Amended Complaint alleges gender, race, retaliation, and disability discrimination. The disability claim was dismissed with prejudice.[5] The gender discrimination complaint was dismissed on November 3, 2003, but then reinstated on January 5, 2004.[6]

## III. ARGUMENT

### A. Legal Standard

The parties generally are not disputing the legal standard for what should be discovered, other than with regard to claims of confidentiality. In a Title VII case, whether or not the records Defendant claims are confidential should be produced is where there is disagreement on the law.

### B. Scope Of Discovery

Defendant argues that the scope of discovery should be limited to Plaintiff's online resume submission. For the reasons already averred (the faxed resume of July 17, 2001 and the reinstatement of the gender-discrimination complaint), discovery on gender disparities is relevant.

### C. Plaintiff's Requests Are Not Beyond The Scope Of Discovery.

#### 1. Plaintiff's Third Set Of Interrogatories.

Defendant addressed each interrogatory separately. Plaintiff will respond in kind where his argument was not fully expressed. Otherwise, he restates his arguments from the instant motion.:

*Interrogatory #3*. Plaintiff is not improperly trying to obtain discovery after the close of it. This interrogatory was denied because Plaintiff's gender-discrimination

[5] See Order of June 20, 2004 on Defendant's Motion For Sanctions.

[6] See Order of January 5, 2004 on Plaintiff's Motion For Reconsideration Of Orders Of November 3, 2003

claim had been dismissed. He argues for it in light of that reinstatement, and because the gender and racial composition of the Office of General Counsel is relevant to Defendant's affirmative-action plain.

*Interrogatory #6.* Defendant objects on grounds of relevance but states that Plaintiff might attempt to involve other individuals in the litigation. While that is always possible under the rules, Plaintiff was seeking aggregate data and evidence relating to his faxed resume of July 17, 2001. The fate of other faxed resumes most definitely is relevant, contrary to what Defendant argues.

*Interrogatories #8-9.* Defendant states that Plaintiff was not considered for employment after submitting his resume on July 16, 2001, and this addresses Plaintiff's issue raised about whether or not any open positions at the time of Plaintiff's resume submission later on wound up advertised outside of the Penn human-resources system.

*Interrogatory #10.* This Court ruled on November 3, 2003 that:

> The evidence plaintiff will need to prove pretext on the retaliation claim is the same that he will need to prove pretext on the employment discrimination claim.[7]

The details of how Defendant deals with other grievances is necessary for Plaintiff to establish pretext on his retaliation claim. This discovery is "fair game" and should therefore be compelled.

*Interrogatory #11.* Defendant argues:

> This argumentative and otherwise nonsensical interrogatory seeks further information related to Penn's affirmative action policy, which is beyond the scope of discovery. Nov. 3, 2003 Order at 7 n.5. Furthermore, Penn has already produced its affirmative action policy to plaintiff.

Plaintiff was simply asking why Penn's continuing its affirmative-action policy as before, even in light of the legal issues raised by Plaintiff should not be construed as an

[7] See Opinion of November 3, 2003, pages 8-9.

overt endorsement of the policy. This interrogatory is relevant to whether or not Plaintiff was considered for employment, insofar as its policymakers, by considering his grievances, considered Plaintiff for employment in the process. The discovery should therefore be compelled.

***Interrogatory #12.*** Defendant argues that Plaintiff is engaging in a "fishing exhibition" for irrelevant information. This Court's November 3, 2003 order denying discovery (as moot) was the result of the gender-discrimination claim having been dismissed. The claim has since been reinstated. Failure of this court to allow discovery relevant to gender ratios at Penn would prejudice Plaintiff, who has never had the merits of these discovery requests addressed.

***Interrogatory #13.*** Defendant claims that its actions in past legal actions are irrelevant to this case. Plaintiff argues that they are relevant to proving pretext by showing which options were open to Penn when Plaintiff filed his grievance.

***Interrogatory #14.*** This is another request which relates to the gender-discrimination claim which was dismissed on November 3, 2003, but since reinstated.

**2. <u>Plaintiff's Fifth Request For Production Of Documents</u>**

***Request #1.*** Defendant states that it found no documents relating to faxed resumes. It should therefore be inferred that its HR policies do not differentiate from the means of submission outside of the database system.

***Request #2.*** Plaintiff restates his arguments from the instant Motion.

***Request #3.*** Plaintiff argued for this discovery due to the reinstatement of his gender-discrimination claim. Since "outreach" is involved in special-effort searches, this relates to the issue of whether or not Plaintiff was considered for employment.

3. **Plaintiff's Second Set Of Requests For Admission**

***Admission #1.*** Penn has denied this admission request. It is therefore a triable issue of fact.

***Admissions #3-4.*** Plaintiff amended his argument. They were erroneously listed as not answered. Plaintiff apologizes to the Court and Defendant for the oversight.

***Admission #6.*** Defendant did not admit the averment, but stated that the documents "were already in Plaintiff's possession." Plaintiff was seeking authentication of the documents for evidentiary purposes. While Penn did not "admit the quotation was accurate" in its response, it has done so in its Response. That is what Plaintiff was seeking.

***Admission #7.*** Defendant asserts that this admission sought is a matter of law. Plaintiff thus leaves it to the Court to decide.

***Admission #8.*** Defendant answered this admission regarding its general accuracy, but not the timeline, which appears to be crucial. Plaintiff seeks a more specific response about when the OAA became aware.

***Admission #9.*** Defendant says that it can alter its AAP within "certain legal limitations" yet does not state what those limitations are.

***Admission #10.*** This admission was erroneously included and Plaintiff amended his argument accordingly.

***Admission #11.*** Defendant claims that a response to a request for admission of whether or not it paid a fine for fraud in the past is "frivolous and warrants no response" Plaintiff argues that it is relevant to Defendant's character.

## IV. CONCLUSION

For the reasons averred herein, the instant motion should be **granted**. Discovery should be compelled.

This the 10th day of May, 2004.

Gordon Roy Parker
4247 Locust Street, #806
Philadelphia, PA 19104
(215) 386-7366
E-mail: SnodgrassPublish@aol.com
Plaintiff, Pro Se

# EXHIBIT 14

10152 Federal Register / Vol. 69, No. 43 / Thursday, March 4, 2004 / Rules and Regulations

AIR AMS IMPLEMENTATION SCHEDULE

| Date: | Ports in the following locations: |
|---|---|
| August 13, 2004 | Connecticut, Delaware, District of Columbia, Florida, Georgia, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Vermont, Virginia, West Virginia. |
| October 13, 2004 | Alabama, Arkansas, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Mexico, Ohio, Oklahoma, South Dakota, Tennessee, Texas, Wisconsin. |
| December 13, 2004 | Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, North Dakota, Oregon, Utah, Washington. |

Beginning on the dates set forth in the implementation schedule above, CBP will require electronic transmission of advance information for any cargo that arrives in the United States by air at a port of entry within one of the locations specified.

**Technical Requirements**

The technical specifications required for participation in Air AMS are detailed in the CBP publication Customs Automated Manifest Interface Requirements (CAMIR–AIR), currently available on the CBP website at: *http://www.cbp.gov/xp/cgov/import/operations_support/automated_systems/ams/camir_air/*.

Once the changes to Air AMS are introduced, CBP will update CAMIR–AIR with the new technical specifications. Those seeking to develop software based on the new system edits may begin certification testing of such software after May 13, 2004. Existing Air AMS participants and potential Air AMS participants will have until the revised compliance date to complete changes to their software or procure software that is compliant with the new specifications.

Dated: February 27, 2004.

**Robert C. Bonner,**

*Commissioner, Customs and Border Protection.*

[FR Doc. 04–4725 Filed 3–3–04; 8:45 am]

BILLING CODE 4820–02–P

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**29 CFR Part 1607**

**DEPARTMENT OF LABOR**

**Office of Federal Contract Compliance Programs**

**41 CFR Part 60–3**

**DEPARTMENT OF JUSTICE**

**28 CFR Part 50**

**OFFICE OF PERSONNEL MANAGEMENT**

**5 CFR Part 300**

**[OMB Number: 3046–0017]**

## Agency Information Collection Activities: Adoption of Additional Questions and Answers To Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures as They Relate to the Internet and Related Technologies

**AGENCIES:** Equal Employment Opportunity Commission; Office of Federal Contract Compliance Programs, DOL; Department of Justice; Office of Personnel Management.

**ACTION:** Adoption of Additional Questions and Answers to clarify and provide a common interpretation of the Uniform Guidelines on Employee Selection Procedures as they relate to the Internet and related technologies.

**SUMMARY:** The agencies that issued the Uniform Guidelines on Employee Selection Procedures (UGESP or Uniform Guidelines) (43 FR 38290 *et. seq.*, August 25, 1978, 29 CFR part 1607, 41 CFR part 60–3, 28 CFR 50.14, and 5 CFR 300.103(c)) have previously recognized the need for an interpretation of the Uniform Guidelines, as well as the desirability of providing additional guidance to users and enforcement personnel, by publishing two sets of Questions and Answers (44 FR 11996, March 2, 1979; 45 FR 29530, May 2, 1980). These Additional Questions and Answers are intended to provide further guidance in interpreting the Uniform Guidelines with respect to the Internet and related technologies. This document solicits public comment on the information collection requirements in the Additional Questions and Answers.

**DATES:** This document contains information collection requirements that have not yet been approved by the Office of Management and Budget. The Equal Employment Opportunity Commission will publish a document in the **Federal Register** announcing the effective date. Submit written comments on or before May 3, 2004.

**ADDRESSES:** Comments should be submitted to Frances M. Hart, Executive Officer, Executive Secretariat, Equal Employment Opportunity Commission, 10th Floor, 1801 L Street, NW., Washington, DC 20507. The Executive Secretariat will accept comments transmitted by facsimile ("FAX") machine. The telephone number for the FAX receiver is (202) 663–4114. (This is not a toll-free-number.) Only comments of six or fewer pages will be accepted via FAX transmittal. This limitation is necessary to assure access to the equipment. Receipt of a FAX transmittal will not be acknowledged, except that the sender may request confirmation of receipt by calling the Executive Secretariat staff at (202) 663–4070 (voice) or (202) 663–4074 (TDD). (These are not toll-free-telephone numbers.) Copies of comments submitted by the public will be available for review at the Commission's library, Room 6502, 1801 L Street, NW., Washington, DC 20507 between the hours of 9:30 a.m. and 5 p.m.

**FOR FURTHER INFORMATION CONTACT:** Carol Miaskoff, Office of Legal Counsel, U.S. Equal Employment Opportunity Commission at (202) 663–4637.

**SUPPLEMENTARY INFORMATION:** This supplementary information section provides the public with access to the

information it will need to comment on the Additional Questions and Answers. It consists of an Introduction, Background on Internet Recruiting, Additional Questions and Answers, Request for Comments, and Overview of the Collection of Information.

**Introduction**

Because of the number and importance of the issues addressed in the Uniform Guidelines on Employee Selection Procedures, and the dual needs of providing an interpretation and providing guidance to employers and other users and Federal personnel who have enforcement responsibilities, the Equal Employment Opportunity Commission and the other issuing Federal agencies adopted two sets of Questions and Answers (44 FR 11996, March 2, 1979; 45 FR 29530, May 2, 1980) to clarify and interpret the Uniform Guidelines. These UGESP agencies recognized that it might be appropriate to address additional questions at a later date. The Additional Questions and Answers included in this document are intended to clarify how the Uniform Guidelines on Employee Selection Procedures apply in the context of the Internet and related technologies. However, this document does not solicit comments on the Uniform Guidelines.

The Internet and related electronic data processing technologies have enjoyed an exponential expansion since the late 1990s and now are established as important recruiting and job-seeking tools. Characterized by massive amounts of information rapidly transmitted between job seekers and employers, these technologies encourage employers and job seekers to explore the labor market broadly and freely. While the Internet and related technology has transformed recruitment and job hunting in recent years, our country's employment nondiscrimination laws, such as Title VII of the Civil Rights Act of 1964 (Title VII) and Executive Order 11246, as amended, continue to apply to all aspects of employment including recruitment. The advent of the Internet and related technology raises questions about how to monitor employment practices when employers and job seekers use online resources.

In early 1999, concerns about EEO compliance and online recruitment came to focus on the Uniform Guidelines on Employee Selection Procedures.[1] At that time, the Equal Employment Opportunity Commission ("EEOC" or Commission) in conjunction with the other UGESP agencies—the Department of Labor ("DOL"), the Department of Justice ("DOJ"), and the Office of Personnel Management ("OPM")—sought clearance from the Office of Management and Budget ("OMB") for UGESP's recordkeeping requirements under the Paperwork Reduction Act. In 2000, the OMB instructed the EEOC to consult with its sister agencies and address the "issue of how use of the Internet by employers to fill jobs affects employer recordkeeping obligations."[2] The OMB instructed the EEOC, in cooperation with DOL, DOJ, OPM and OMB, to "evaluate the need for changes to the questions and answers accompanying the Uniform Guidelines necessitated by the growth of the Internet as a job search mechanism." This document is the product of that evaluation. Each agency may provide further information, as appropriate, through the issuance of additional guidance or regulations that will allow each agency to carry out its specific enforcement responsibilities.

The Uniform Guidelines on Employee Selection Procedures were issued in 1978 by the EEOC, the Department of Labor, the Department of Justice, and the Office of Personnel Management under Title VII and Executive Order 11246. The UGESP serves two major purposes. First, it addresses certain recordkeeping issues. For example, UGESP describes the evidence that employers should have available to analyze whether their employment selection procedures had a disparate impact on protected groups.[3] Second, UGESP details methods for validating tests and selection procedures that are found to have a disparate impact. Disparate impact is when an employer uses a practice or standard, like a hiring or promotion requirement or an employment test, that has a statistically significant disproportionate negative effect on a protected group, even though the standard or test is not intentionally discriminatory. Such a practice or standard is unlawful under Title VII if it is not job-related and consistent with business necessity.

UGESP states that employers should maintain "records or other information which will disclose the impact which its tests and other selection procedures have upon employment opportunities of persons by identifiable race, sex, or ethnic group."[4] UGESP provides for employer self-analysis for disparate impact based on these records or other information. The Federal agencies that enforce Title VII and/or Executive Order 11246 may use these records or other information to investigate disparate impact charges or litigate cases.

UGESP provides for the maintenance of records or other information on "applicants." A 1979 guidance in Question and Answer format, issued by the EEOC, DOL and sister UGESP agencies, provides a general definition of "applicant."[5] Interpreting the definition of "applicant" in the context of the Internet and related electronic data processing technology is the focus of this document. With this interpretation, the UGESP agencies are providing guidance about when employers should identify the race, gender, and ethnicity of their applicant pool when they use the Internet and related technologies. This document and the UGESP do not alter, in any way, the legal rights and responsibilities of employers, applicants and employees under Title VII and Executive Order 11246, under any legal theory including disparate impact. The right of applicants or employees to file a charge or complaint of discrimination, or to file a lawsuit, are unchanged by UGESP and by this document's discussion of the term "applicant."

The UGESP agencies have collaborated in conducting the evaluation OMB directed in 2000. This evaluation shows that the Internet and related technologies have had the effect of encouraging both job seekers and employers to "scout the possibilities" more freely and casually than in the pre-Internet era due to many factors, including the broad reach and relative anonymity of the Internet, the sophisticated capabilities of online and related data processing tools, and the marginal cost of making more contacts. The scope and speed of this technology is to be encouraged; it advertises employment opportunities to a broad audience. Necessary to the effectiveness of online recruitment, however, is the ability to manage the data that are received. In light of this new technology, which has created a new context for the employment market, the agencies have concluded that they must update the Questions and Answers

[1] 29 CFR part 1607 (2002) (EEOC); 41 CFR part 60–3 (2002) (DOL). For simplicity, citations to UGESP hereinafter are in the form "UGESP, Section ___." Under this format, for example, "UGESP Section 3A," corresponds with 29 CFR 1607.3A (2002) (EEOC) and 41 CFR 60–3.3A (2002) (DOL).

[2] Notice of OMB Action, OMB No. 3046–0017 (July 31, 2000).

[3] This document uses the term "disparate impact" rather than "adverse impact" because the Civil Rights Act of 1991 refers to "disparate impact." *See* 42 U.S.C. 2000e–2(k)(1) (2001).

[4] UGESP, Section 4A.

[5] Question and Answer No. 15, Adoption of Questions and Answers to Clarify and Provide a Common Interpretation of the UGESP, 44 FR 11998 (March 2, 1979). These Questions & Answers were promulgated without notice and comment.

accompanying UGESP. The Questions and Answers below reflect the agencies' considered judgment in light of the historical understanding that "[t]he precise definition of the term 'applicant' depends upon the [employer's] recruitment and selection procedures."[6]

Before summarizing these conclusions, it is important to emphasize the larger legal context of this discussion. Under Title VII and Executive Order 11246, as amended, employers and their recruiters are responsible for ensuring that all aspects of their recruitment and selection processes are nondiscriminatory. An employer's obligation to avoid discriminatory practices attaches regardless of the definition of "applicant." Furthermore, employers must select employees without discriminating "against any individual * * * because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000e–2(a)(1). Under Title VII, it is unlawful for employers to fail or refuse to hire on these bases; for employment agencies to fail or refuse to refer for employment or otherwise discriminate on these bases; and for labor organizations to exclude from membership, fail to refer, or to exclude from apprenticeship programs on these bases. 42 U.S.C. 2000e–2.

**Background: Internet Recruiting**

*General Summary*

UGESP and the existing interpretive guidance were promulgated in the late 1970s, when employers and government agencies did not contemplate the extent to which electronic data processing technology would be used as a tool in the job market. Currently, these technologies, most prominently the Internet and the World Wide Web,[7] have been used extensively for recruitment[8] and job hunting.[9]

Online recruitment enjoyed rapid expansion in the late 1990s. This period was characterized by the development of huge third-party databases of resumes and job listings; by 2003, one industry-leader reported having over 22.5 million resumes in its database.[10] In addition, companies as well as many Federal agencies of all sizes now offer career Web pages as part of their Web sites.[11]

Human resource departments and recruiters using these online resources have been "overwhelmed" with resumes.[12] For example, it was reported that a major health care employer received 300,000 online resumes in one year.[13] A smaller Pennsylvania employer reported that it received 6,000 to 8,000 resumes a year before going online, but began receiving about 24,000 resumes a year since it went online.[14]

Software systems that scan, sort and track electronic resumes and related communications are increasingly used to manage this bulk of information. Such systems are available through third-party Internet providers or on a customized basis.[15] Employers and recruiters also are developing new ways to use this technology for more focused recruitment, for example, using corporate Web sites and e-mail to learn more about Web site visitors' interests and experience and then sending targeted e-mails when vacancies arise.[16]

The Internet and its related technologies also have proven to be a useful tool for people who are looking for jobs. Some studies show that the Internet is now the second most-popular way to look for technology and non-technology jobs, with personal networking placing first.[17]

The Internet is conducive to casual exploration of employment opportunities and assessment of the job market. One study shows that seventy-two percent of people who visit corporate career Web sites are already employed.[18] Individuals who visit an employer's career Web site can often submit a resume or personal profile for multiple jobs simultaneously.[19] People also can explore employment opportunities by using services such as job "agents" (*i.e.*, the person identifies the type of job in which he or she is interested and the "agent" e-mails the individual when a match is found); and "metasearches" (*i.e.*, searches that extend beyond the job board to other Web sites).[20] "Passive" job seekers post resumes online and wait to see if recruiters or employers seek them out. Other individuals are discovered by recruiters researching online professional listings and organizational directories. For some positions, typically in retail or service environments, people may submit their information electronically through

[6] *Id.*

[7] With recognition that the Internet and the World Wide Web are different, this document sometimes uses the terms interchangeably for purposes of simplicity.

[8] Online job boards have created a global job market. One industry-leader provides local content in local languages in 22 countries. *Monster's Founder Eyes the Future,* Financial Executive, July 1, 2003, at 20. Fifty-seven percent of companies are choosing to recruit online as opposed to forty-nine percent in 2000. *Getting the Word Out,* Business First, October 25, 2002, at 33. A January 2001 survey by SHRM showed that eighty-eight percent of the HR managers surveyed reported using Internet job postings. *See* Suzanne M. Bruyère & William A. Erickson, Cornell U., *E-Human Resources: A Review of the Literature and Implications for People with Disabilities* 12 (2001).

[9] One job bank reported that its site attracts 2.7 million job seeker visits each month. Alan J. Liddle, *State Restaurant Associations 'Bank' on Power of Internet Recruitment,* Nation's Restaurant News, February 24, 2003, at 8. In 2002, it was reported that more than eighteen million people per year posted resumes on one third party provider. Daniel C. Feldman & Brian S. Klaas, *Internet Job Hunting: A Field Study of Applicant Experiences with Online Recruiting,* 41 Human Resource Management 175 (2002). Millions of resumes are posted on 5,000 smaller job boards. Peter Cappelli, *Making the Most of On-Line Recruiting,* Harv. Bus. Rev., March 2001, at 139, 140; *but cf.* Feldman, *supra,* at 182 (Internet job hunting ranked second in effectiveness to personal contacts and networks).

[10] Greg Sterling, *Click to Open Resume, Hit Delete,* Wired News, *at www. wired.com/news/business/0,1367,57264,00.html* (February 7, 2003). In 2001 it was reported that there were 110 million job listings and twenty million "unique" resumes on the World Wide Web at any given time. Skip Corsini, *Wired to Hire,* Training, June 2001, at 50.

[11] According to a 2003 study, ninety-four percent of the world's largest organizations have "corporate Careers websites." iLogos Research, *Global 500 Website Recruiting 2003 Survey, at www.ilogos.com* (2003). Another researcher estimates that eighty-five percent of companies with more than 500 employees in North America have "rudimentary" or better career sites. Allan Schweyer, *Is Internet Recruiting Working,* Recruiters Network, *at www.recruitersnetwork.com/articles/article.cfm?ID=1400.* (revised May 14, 2003). *See also* Bruyère & Erickson, *supra* note 8, at 20–21 (discussing third-party Internet services that enable small and medium-sized employers to easily create a career site on their own Web site in a few minutes for a cost of $1 for a job posting and $.25 for each resume collected).

[12] When a company with more than 100,000 employees implemented a recruitment campaign in 2002 to increase the number of resumes received electronically, its monthly resume submissions grew to more than 2.3 times the average from the year 2000. Ellen Gilbert, *Recruitment Strategies for a Competitive Marketplace,* Pharmaceutical Executive, November 1, 2002, at 134. After commencing recruitment on the Web, another employer began receiving 20,000 to 40,000 resumes annually, many of which were unsolicited. Bill Roberts, *System Addresses 'Applicant' Dilemma: Web-exclusive Recruiting Process Takes Compliance Burden Off HR's Shoulders,* HR Magazine, Sept. 1, 2002, at 111.

[13] *See* Bruyère & Erickson, *supra* note 8, at 23.

[14] Pat Curry, *Log On for Recruits,* IndustryWeek.com, *at http://www.industryweek.com/CurrentArticles/asp/articles.asp?ArticleID=919* (October 16, 2000).

[15] *See* Cappelli, *supra* note 9, at 141–142. *See also* Roberts, *supra* note 12.

[16] *See* Cappelli, *supra* note 9, at 140–141 (discussing targeted online e-Recruiting and relationship building).

[17] National statistics continue to show that word of mouth is considered the most effective way to find a job. One company's statistics showed that an average of seventy-six percent of jobs nationwide are found through networking and only eight percent through Internet methods. *Getting Out the Word,* Business First, October 25, 2002, at 33. Websites are also valuable recruitment tools. *See* Bruyère & Erickson, *supra* note 8, at 21 ("corporate [w]eb sites have become the primary means students use to research companies and evaluate career opportunities, replacing company brochures and annual reports.")

[18] *See* Bruyère & Erickson, *supra* note 8, at 19.

[19] Job seekers report a preference for application methods that would not require them to re-key resumes. *See* Feldman & Klaas, *supra* note 9, at 188.

[20] Bruyère & Erickson, *supra* note 8, at 18.

onsite computer kiosks provided by the employer.

Job seekers, like employers, complain about the overwhelming amount of data available on the Internet; some job seekers also complain about being unable to focus their job searches because some online listings provide only generalized descriptions of positions.

*Internet and Electronic Data Processing Technologies Used for Recruitment and Selection*

Internet-related technologies and applications that are widely used in recruitment and selection today include:

*E-mail:* Electronic mail allows for communication of large amounts of information to many sources with remarkable ease. Recruiters, employers, and job seekers use e-mail lists to share information about potential job matches. Recruiters send e-mails to lists of potential job seekers. These lists are obtained through various sources of information, such as trade or professional lists and employer Web site directories. Employers publish job announcements through e-mail to potential job seekers identified through similar means. Job seekers identify large lists of companies to receive electronic resumes through e-mail. E-mail allows all of these users to send the same information to one recipient or many, with little additional effort or cost.

*Resume databases:* These are databases of personal profiles, usually in resume format. Employers, professional recruiters, and other third parties maintain resume databases. Some third-party resume databases include millions of resumes, each of which remains active for a limited period of time. Database information can be searched using various criteria to match job seekers to potential jobs in which they may be interested.

*Job Banks:* The converse of the resume database are databases of jobs. Job seekers search these databases based on certain criteria to identify jobs for which they may have some level of interest. Job seekers may easily express interest in a large number of jobs with very little effort by using a job bank database. Third-party providers, such as America's Job Bank, may maintain job banks or companies may maintain their own job bank through their Web sites.

*Electronic Scanning Technology:* This software scans resumes and individual profiles contained in a database to identify individuals with certain credentials.

*Applicant Tracking Systems/ Applicant Service Providers:* Applicant tracking systems began primarily to help alleviate employers' frustration with the large number of applications and resumes received in response to job postings. They also serve the wider purpose of allowing employers to collect and retrieve data on a large number of job seekers in an efficient manner. Whether in the form of custom-made software or an Internet service, the system receives and evaluates electronic applications and resumes on behalf of employers. For example, an employer could have the group of job seeker profiles from a third party provider's system searched, as well of those received on its own corporate Web site entered into one tracking system. The system would then pull a certain number of profiles that meet the employer-designated criteria (usually a particular skill set) and forward those profiles to the employer for consideration.

*Applicant Screeners:* Applicant screeners include vendors that focus on skill tests and other vendors that focus on how to evaluate general skills. Executive recruiting sites emphasize matching job seekers with jobs using information about the individual's skills, interests, and personality.

*Additional Questions and Answers*

This document solicits public comment on the information collection requirements in the Additional Questions and Answers.

**Additional Questions and Answers**

*(94) Q: Do federal employment nondiscrimination laws apply to employers and other UGESP-covered entities when they use the Internet and related electronic data processing technologies for recruitment and selection?*

A: *Yes.* Title VII and Executive Order 11246, as amended, apply when covered employers use the Internet and related electronic data processing technologies for recruitment and selection. Title VII covers private and public employers, employment agencies, and labor organizations as these terms are defined at 42 U.S.C. 2000e; *id.* at 2000e–16 (Federal Government). Title VII covers discrimination on the bases of race, color, religion, sex, or national origin. Executive Order 11246, as amended, which covers Federal Government contractors, their subcontractors, and their vendors, also prohibits employment discrimination because of race, color, religion, sex, or national origin.

*(95) Q: Is Internet recruitment, like traditional recruitment, exempt from UGESP requirements?*

A: *Yes.* As a business practice, recruitment involves identifying and attracting potential recruits to apply for jobs. Under UGESP, "recruitment practices are not considered * * * to be selection procedures,"[21] and the UGESP requirements geared to monitoring selection procedures do not apply. Just as recruiters traditionally researched paper copies of professional and employer publications and listings to identify potential recruits, so recruiters now search huge bodies of information online—which include new resources such as personal Web sites and a variety of resume databases—for the same purpose. Online recruitment also involves organizing the search results into usable formats.

*(96) Q: For recordkeeping purposes, what is meant by the term "applicant" in the context of the Internet and related electronic data processing technologies?*

A: The term 'applicant' is discussed in the 1979 set of questions and answers promulgated by the agencies to clarify and provide a common interpretation of UGESP.[22] Question & Answer 15 of that publication states:

> The precise definition of the term 'applicant' depends upon the user's recruitment and selection procedures. The concept of an applicant is that of a person who has indicated an interest in being considered for hiring, promotion, or other employment opportunities.[23]

In order for an individual to be an applicant in the context of the Internet and related electronic data processing technologies, the following must have occurred:

(1) The employer has acted to fill a particular position;

(2) The individual has followed the employer's standard procedures for submitting applications; and

(3) The individual has indicated an interest in the particular position.

To elaborate on the three prongs of this test:

(1) *The employer has acted to fill a particular position.*

An example under the first prong is:

Example A: Individuals who register online for Customer Service Representative positions with an Internet and cable television service provider are asked to complete online

[21] UGESP, Section 2C.

[22] Question and Answer No. 15, Adoption of Questions and Answers to Clarify and Provide a Common Interpretation of the UGESP, 44 FR 11998 (March 2, 1979).

[23] *Id.*

personal profiles for the employer's resume database. The company acts to fill two vacancies at its Greater New York Service Center, and identifies 200 recruits from the database who have indicated that they are available to work in the New York area. One hundred of these people respond affirmatively and timely to the employer's inquiry about current interest in the particular New York vacancies. Even if the employer chooses to interview only 25 people for the position, all 100 are UGESP "applicants."

(2) *The individual has followed the employer's standard procedures for submitting applications.*

If everyone who applies online must complete an online personal profile, only those individuals who do so can be UGESP applicants. If job seekers must use an electronic kiosk or contact a store manager to apply for a sales position, only those who do so can be UGESP applicants. If an employer e-mails online job seekers to ask if they are currently interested in a particular vacancy, only those who meet the employer's deadline can be UGESP applicants. These procedures and directions must be nondiscriminatory because recruitment and the application processes are subject to Title VII and Executive Order 11246.

(3) *The individual has indicated an interest in the particular position.*

The core of being an "applicant" is asking to be hired to do a particular job for a specific employer. An individual can only accurately assess her interest in an employment opportunity of which she is aware.

With respect to Internet recruiting, this means that people who post resumes in third party resume banks or on personal Web sites are not UGESP "applicants" for all employers who search those sites. By posting a resume, the individual is advertising her credentials to the world and indicating a willingness to consider applying for new positions that may be brought to her attention. The individual is not indicating an interest in a particular position with a specific employer. If an employer contacts this individual about a particular position after finding her resume or personal profile online, and the individual indicates an interest in that position, then the individual becomes a UGESP "applicant," if she also meets the second prong of the test set forth above. Similarly, if an employer contacts an individual about a particular position in response to an unsolicited resume submitted online, and the individual indicates an interest in that position, then the individual becomes a UGESP "applicant" if she also meets the second prong of the test.

Furthermore, even if the individual expresses an interest in a whole category of positions in response to an employer's solicitation—for example, marketing opportunities—the individual is not an applicant but is identifying the kinds of positions in which she may be interested. She is not indicating an interest in a particular position with a specific employer. It is only with respect to a particular position that an individual can assess her interest and choose whether or not to apply.

If an individual submits a resume or personal profile repeatedly to the same employer (for example, by adding numerous online job listings to her "shopping cart") or simply sends resumes (for example, by using automated online tools that identify job listings and submit resumes), the individual again is identifying the kinds of positions in which she is interested and is not automatically an applicant.

In certain circumstances, however, actions by a job seeker in response to an employer-hosted job listing will display hallmarks of an actual, individual assessment of interest in a particular position that the employer is acting to fill. For example, a job seeker's interest in a particular position becomes evident when the job seeker complies with an employer's procedural requirements that are unique to that position. Thus, completion and submission of an electronic application form, which form is unique for a particular position, indicates that the job seeker has a specific interest in that particular position.

Example B: Game Park is hiring park rangers, who perform specified duties and receive a starting salary within a particular range. Game Park posts an announcement on its Web page stating that it is accepting applications for its next park ranger training class, which starts in six months, and that all people who complete the required forms within one month will be evaluated for entrance into the class. Job seekers are directed to complete a detailed questionnaire asking about their experience in wildlife management, forest fire prevention, firearm safety and first aid. This profile is only suitable for the position of park ranger; it cannot be used for other Game Park positions. When these profiles are compiled into a database, all of the job seekers will be "applicants" if they satisfy the second prong of the above-referenced test.

*(97) Q: Are all the search criteria that employers use subject to disparate impact analysis?*

A: *Yes.* All search criteria used are subject to disparate impact analysis. Disparate impact analysis can be based on Census or workforce data. If a disparate impact is shown, the employer must demonstrate that its criteria are job-related and consistent with business necessity for the job in question. 42 U.S.C. 2000e–2(k).

Example C: An employer has two large printing plants. The company's employment Web page encourages individuals who visit to register to be considered as printers by submitting personal profiles online. Some basic identifying information is required, and one question asks for total years of printing experience.

The employer authorizes the hiring of three new printers at one of the plants. To identify job seekers, Human Resources turns to several resources including its internal database. Even before it identifies those who properly followed the employer's online procedures and who are actually interested in these positions at this time, the employer searches the database to identify job seekers with two years printing experience. The search identifies 120 individuals, of whom only 50 express an interest in the positions and followed all the application procedures. These 50 people are UGESP applicants.

However, the impact of the employer's screen for two years' printing experience can be analyzed using workforce and Census data. For example, the experience requirement could be assessed based on relevant labor force statistics. If a disparate impact on a protected group were shown, then the employer would have to show that two years of experience was job-related and consistent with business necessity for its printing positions.

*(98) Q: Are employment tests, including those administered online, subject to UGESP?*

A: *Yes.* Online tests, including tests of specific or general skills, are selection procedures rather than recruitment under UGESP because the test results are used as "a basis for making employment decisions."[24] Employers and recruiters who use such tests should maintain records or other information "which will disclose the impact which its tests * * * have upon employment opportunities of

[24] UGESP, Section 2C.

persons by identifiable race, sex or ethnic group."[25] If employment tests have a disparate impact, they are lawful only if they are "job-related for the position in question and consistent with business necessity." 42 U.S.C. 2000e–2(k)(1)(A)(i).

*Request for Comments*

The UGESP agencies invite comments about these Additional Questions and Answers from all interested parties, as well as comments enabling the agencies to:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agencies, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agencies' estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses.

*Overview of Collection*

*Collection Title:* Recordkeeping Requirements of the Uniform Guidelines on Employee Selection Procedures, 29 CFR part 1607, 41 CFR part 60–3, 28 CFR part 50, 5 CFR part 300.

*OMB Number:* 3046–0017.

*Type of Respondent:* Businesses or other institutions; Federal Government; State or local governments and farms.

*North American Industry Classification System (NAICS) Code:* Multiple.

*Standard Industrial Classification Code (SIC):* Multiple.

*Description of Affected Public:* Any employer, Government contractor, labor organization, or employment agency covered by the Federal equal employment opportunity laws.

*Respondents:* 865,962 firms are included in the affected public, according to U.S. Census statistics.

*Responses:* 865,962.

*Reporting Hours:* 2,548,573.97.

*Number of Forms:* None.

*Form Number:* None.

*Frequency of Report:* None.

*Abstract:* The recordkeeping issues addressed by UGESP are used by respondents to assure that they are complying with Title VII and Executive Order 11246; by the Federal agencies that enforce Title VII and/or Executive Order 11246 to investigate, conciliate and litigate charges of employment discrimination; and by complainants to establish violations of Federal equal employment opportunity laws.

*Burden Statement:* There are no reporting requirements associated with UGESP. The only paperwork burden derives from the recordkeeping. With respect to paperwork burden, the Additional Questions and Answers would present a solution to problems employers currently face in applying the Guidelines on Employee Selection Procedures in the context of the Internet and related technologies. Therefore, the Additional Questions and Answers would not involve an increase in paperwork burdens associated with attempts to apply existing guidelines to the context of the Internet and related technologies.

Only employers covered under Title VII and Executive Order 11246 are subject to UGESP. For the purpose of burden calculation, employers with 15 or more employees are counted. Based on examination of the latest available U.S. Census Bureau firm data, the number of firms in this category is approximately 865,962. According to figures based on statistics from the U.S. Census Bureau, the total number of employees employed by firms in this category is 117,957,331. Assuming one record per employee, this results in 117,957,331 records. Additionally, statistics from the Bureau of Labor Statistics indicate that the number of individuals, both employed and unemployed, actively seeking employment from all employers, total 14 million. Assuming that each of these individuals submits on average five applications, this results in 70 million potential records from a recordkeeping perspective. Therefore, the total number of records reflecting employees employed by firms and all job seekers is 187,957,331.

From the private employer survey the Commission conducts, it determined that 80 percent of the private employers file their employment reports electronically. From this same survey the Commission also learned that when records are computerized, the burden hours for reporting, and thus for recordkeeping, are about one-fifth of the burden hours associated with non-computerized records. Further, the Additional Questions and Answers apply to the Internet and related electronic data processing technologies, which involves computerized recordkeeping.

The Additional Questions and Answers would clarify how employers should address applicant recordkeeping in the context of the Internet and related technologies. In the absence of such clarification, employers would be faced with significant, additional paperwork burdens based on the rapid expansion of the Internet and related technologies for recruiting. The Commission is unaware of any systematic data to accurately quantify the burdens associated with how employers were attempting to address applicant recordkeeping in the Internet context prior to this clarification. The Commission will be in a better position to assess these issues after the additional Questions and Answers have been implemented. At this time, the Commission assumes that, with this clarification, the basis for the estimate of the cost per record has not changed since the initial burden calculations in 1979. Inflation adjustments would derive a current cost per record (manual recordkeeping) of $0.56 and current cost per record (computerized recordkeeping) of $0.11.

The number of burden hours can be obtained by dividing the total cost of recordkeeping by the hourly cost of labor needed to collect and compile such data.

The current cost per hour of personnel for UGESP recordkeeping is $14.75/hr (hourly rate for personnel clerks from BLS compensation survey).

Computerized recordkeepers = (.80) × (187,957,331) × ($0.11) = $16,540,245.12

Manual recordkeepers = (.20) × (187,957,331) × ($0.56) = $21,051,221.07

Total recordkeeping cost = $37,591,466.19

$$\text{Total hours} = \frac{\text{Total recordkeeping cost}}{\text{Cost per hour}} = \frac{\$37{,}591{,}466.19}{\$14.75/\text{hour}} = 2{,}548{,}573.97 \text{ hours}$$

[25] UGESP, Section 4A.

Signed at Washington, DC, on February 24, 2004.

**Cari M. Dominguez,**

*Chair, Equal Employment Opportunity Commission.*

**Victoria A. Lipnic,**

*Assistant Secretary for Employment Standards, Department of Labor.*

**R. Alexander Acosta,**

*Assistant Attorney General, Civil Rights Division, Department of Justice.*

**Kay Coles James,**

*Director, Office of Personnel Management.*

[FR Doc. 04–4090 Filed 3–1–04; 1:53 pm]

BILLING CODE 6570–01–P

## DEPARTMENT OF HOMELAND SECURITY

### Coast Guard

### 33 CFR Part 117

**[CGD09–04–003]**

**RIN 1625–AA09**

### Drawbridge Operation Regulation; Sturgeon Bay Ship Canal, Sturgeon Bay, WI

**AGENCY:** Coast Guard, DHS.

**ACTION:** Temporary final rule.

**SUMMARY:** The Coast Guard is temporarily changing the regulation governing the operation of the Bayview bridge, mile 0.3 over Sturgeon Bay Ship Canal, in Sturgeon Bay, WI. This action was requested by the Wisconsin Department of Transportation (DOT) to facilitate deck repairs on the drawbridge.

**DATES:** This temporary rule is effective 6 a.m. on April 1, 2004, until 6 p.m. on July 1, 2004.

**ADDRESSES:** Documents indicated in this preamble as being in the docket are part of docket CGD09–04–003 and are available for inspection or copying at Commander (obr), Ninth Coast Guard District, 1240 E. 9th St., Room 2019, Cleveland, OH, 44199, between 8 a.m. and 3 p.m., Monday through Friday, except Federal holidays. The telephone number is (216) 902–6084.

**FOR FURTHER INFORMATION CONTACT:** Scot Striffler, Bridge Management Specialist, Ninth Coast Guard District, at (216) 902–6087.

**SUPPLEMENTARY INFORMATION:**

### Regulatory Information

We did not publish a notice of proposed rulemaking (NPRM) for this regulation. Under 5 U.S.C. 553(b)(B), the Coast Guard finds that good cause exists for not publishing an NPRM. The request to revise the operating schedule for this temporary final rule required extensive coordination with known affected marine entities, Wisconsin DOT, and the City of Sturgeon Bay, WI. The final temporary schedule was not finalized in time to publish a NPRM and still have the work start at the best possible time for all affected parties.

### Background and Purpose

Wisconsin DOT requested a temporary change to the operating regulations for the Bayview bridge, mile 0.3 over Sturgeon Bay Ship Canal in Sturgeon Bay, WI, to perform deck maintenance work. The Bayview bridge navigation span provides a vertical clearance of 42 feet above Mean Low Water in the closed to navigation position. The waterway carries commercial, recreational, and public vessel traffic. The bridge is normally required to open on signal for vessels year-round under the general provisions of 33 CFR 117.5. In order to perform the necessary deck replacement work, Wisconsin DOT requested that the drawbridge open on the hour, every three hours, Monday through Friday, between the hours of 6 a.m. and 6 p.m. to minimize disruptions to the contractor. This schedule was not considered reasonable by the Coast Guard and was revised so the bridge would open every hour, on the hour, between 6 a.m. and 6 p.m., Monday through Friday, for recreational vessels. Commercial and public vessels will be requested to provide at least 2-hours advance notice prior to passing during these work hours, and should be passed without delay. The request from Wisconsin DOT also included two separate 3-day periods between April 15 and June 15, 2004, where the bridge would not be required to open for any vessels for concrete pouring and curing. The dates of these closure periods can not, and have not, been identified due to the nature of the work, but Wisconsin DOT is required to provide those dates to the Coast Guard 10–14 days in advance of anticipated closure periods. The Coast Guard will publish a temporary deviation covering those dates when they have been finalized.

### Regulatory Evaluation

This rule is not a "significant regulatory action" under section 3(f) of Executive Order 12866, Regulatory Planning and Review, and does not require an assessment of potential costs and benefits under section 6(a)(3) of that Order. The Office of Management and Budget has not reviewed it under that Order. It is not "significant" under the regulatory policies and procedures of the Department of Homeland Security (DHS). The temporary drawbridge schedule still provides for the passage of vessels during work hours. The unspecified closure periods, which are necessary for some of the repair work, will be published as early as possible in the Ninth Coast Guard District Local and/or Broadcast Notice to Mariners and prior to the work beginning. These conditions and schedules have been approved by known affected marine entities.

### Small Entities

Under the Regulatory Flexibility Act (5 U.S.C. 601–612), we have considered whether this rule would have a significant economic impact on a substantial number of small entities. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000.

The Coast Guard certifies under 5 U.S.C. 605(b) that this rule will not have a significant economic impact on a substantial number of small entities. Passage through the drawbridge will still be available except during the closure periods that have not been scheduled. During the closure periods all entities will be equally affected.

### Assistance for Small Entities

Under section 213(a) of the Small Business Regulatory Enforcement Fairness Act of 1996 (Pub. L. 104–121), we offered to assist small entities in understanding the rule so that they could better evaluate its effects on them and participate in the rulemaking process. None were identified because passage will still be provided for except during the required closure periods.

### Collection of Information

This rule calls for no new collection of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3520).

### Federalism

A rule has implications for federalism under Executive Order 13132, Federalism, if it has a substantial direct effect on State or local governments and would either preempt State law or impose a substantial direct cost of compliance on them. We have analyzed this rule under that Order and have determined that it does not have implications for federalism.

**CERTIFICATE OF SERVICE**

I, Jonathan H. Pyle, do hereby certify that on the 14th day of May, 2004, I caused a true and correct copy of the foregoing The University Of Pennsylvania's Motion For Summary Judgment and Memorandum in Support thereof to be served via U.S. First Class Mail, postage prepaid, upon the following individual at the address indicated:

Gordon Roy Parker
4247 Locust Street, #806
Philadelphia, PA 19104

*Pro Se Plaintiff*

Jonathan H. Pyle