# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER**, Plaintiff<br><br><br>v.<br><br><br>**UNIVERSITY OF PENNSYLVANIA,**<br>a Pennsylvania nonprofit corporation,<br>Defendant. | **CASE NO.: 02-cv-567** |

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO FEDERAL RULE 12(b)(6)

COMES NOW PLAINTIFF in the above-styled action, to set forth his opposition to Defendant's Motion to Dismiss his Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and in support of same sets forth the following:

### INTRODUCTION

1.      Plaintiff hereby incorporates by reference, as if fully stated verbatim herein, the entire contents of all pleadings in this action, including the Original and Amended Complaints, their exhibits, Defendant's Motion to Dismiss Pursuant to Federal Rule 12(b)(6) and accompanying Memorandum of Law, and their attached exhibits.

2.      On June 17, 2002, Defendant filed a Motion to Dismiss Plaintiff's Amended Complaint *with prejudice* on several grounds outlined in its accompanying Memorandum in support thereof.  Plaintiff sets forth here his opposition to this Motion.

### RULE 12(b)(6) MOTIONS AND THE COURTS

3.      Plaintiff hereby incorporates by reference, as if fully stated verbatim herein, the entire contents of paragraphs 1-2.

4.    A 12(b)(6) motion is a claim by a Defendant that a complaint should be dismissed, usually with prejudice, on the grounds that no cause of action was pleaded, or if one was pleaded, sufficient facts were not pled to support the cause of action. Alternatively, grounds for a 12(b)(6) motion also include failure to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." (Swierkiewicz v. Sorema N.A., 122 S.Ct. 992, 998 (2002).

5.    When considering a motion to dismiss for failure to state a claim for relief under Fed.R.Civ.P. 12(b)(6), the Court will only dismiss a claim if it is clear that the plaintiff could prove no facts which would entitle plaintiff to relief under the law. (Jenkins v. McKeithen, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969)). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. (Shipp v. McMahon, 234 F.3d 907, 911; Campbell v. Wells Fargo Bank, 781 F.2d 440, 442 (5th Cir.), cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L.Ed.2d 721 (1986).)   This is a very low standard for surviving a 12(b)(6) motion.

6.    A motion to dismiss under Rule 12(b)(6) "is viewed with disfavor and is rarely granted." (Shipp, 234 F.3d 907, 911 (5th Cir. 2000); cert. denied _U.S._, 121 S. Ct. 2193, 149 L.Ed.2d 1024 (2001)(quoting Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, 677 F.2d 1045, 1050 (5th Cir. 1982)).

7.    This strict standard of review under Rule 12(b)(6) has been summarized as follows: "The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief."

(5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, §1357 (2nd ed. 1990)).

## DEFENDANT'S ARGUMENT THAT PLAINTIFF HAS NOT GIVEN FAIR NOTICE AND PLAINTIFF'S REBUTTAL ARGUMENTS

8.    Plaintiff incorporates by reference the entire contents of paragraphs 1-7 as if fully stated verbatim herein.

9.    In the Memorandum, Defendant claims that Plaintiff "has failed to allege any discriminatory or retaliatory conduct directed at him." Defendant further claims that Plaintiff "…must, in the least, plead facts in sufficient detail to show that he is entitled to relief and to 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"

10.    Defendant goes on to cite <u>Swierkiewicz v. Sorema NA</u>, 122 S.Ct. 992, 998 (2002), stating: "The Supreme Court concluded that the plaintiff had pled in sufficient detail to 'give [defendant] fair notice of what [plaintiff's] claims are and the grounds upon which they rest,' and to survive a motion to dismiss because '[h]is complaint detailed the events leading up to his termination…and included the ages and nationalities of at least some of the relevant persons involved with his termination." <u>Id</u>. At 999. Defendant then claims that "Even under the permissive pleading allowed under <u>Swierkiewicz</u>, and F.R.C.P. 8(a), [Plaintiff] has failed to state any specific discriminatory or retaliatory conduct directed at him. Thus, he has not given [Defendant] fair notice of what his claim is, or the grounds upon which it rests."

11.    In <u>Swierkiewicz</u>, the Court wrote:

> *This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.* See [Conley v. Gibson, 355 U. S. 47-48 (1957)]; <u>Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit</u>, 507

3

U. S. 163, 168-169 (1993). "The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court." 5 C. Wright & A. Miller, Federal Practice and Procedure §1202, p. 76 (2d ed. 1990). (Emphasis added).

Other provisions of the Federal Rules of Civil Procedure are inextricably linked to Rule 8(a)'s simplified notice pleading standard. Rule 8(e)(1) states that "[n]o technical forms of pleading or motions are required," and Rule 8(f) provides that "*[a]ll pleadings shall be so construed as to do substantial justice.*" Given the Federal Rules' simplified standard for pleading, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U. S. 69, 73 (1984). (Emphasis added).

12.     The Court reaffirmed its general reluctance to dispense justice with a

12(b)(6) motion in all but those cases which are truly without merit or which contain no

legitimate cause of action.  This is not such a case.  In Swierkiewicz, the Court found

that:

> "Petitioner's complaint easily satisfies Rule 8(a)'s requirements because it gives respondent fair notice of the basis for his claims and the grounds upon which they rest. In addition, it states claims upon which relief could be granted under Title VII and the ADEA. Thus, the complaint is sufficient to survive respondent's motion to dismiss.

13.     The above ruling implies that the actual burden for surviving a 12(b)(6)

motion does not require a level of factual assertion equal to that offered in the Complaint.

Plaintiff's Amended Complaint does in fact state claims for relief under Title VII and the

Americans With Disabilities Act of 1990, and offers facts in support of each claim.

14.     An even stronger argument refuting Defendant's motion can be found

again in Swierkiewicz:

> *If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding.* Moreover, claims lacking merit may be dealt with through summary judgment under Rule 56. The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to *focus litigation on the merits of a claim.* See Conley, supra, at 48 ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by

4

counsel may be decisive to the outcome and accept the principle that *the purpose of pleading is to facilitate a proper decision on the merits*") (Emphasis Added).

15.    Defendant, with its extensive citation in its Motion to Dismiss, is arguing that Plaintiff must be able to prove discrimination directed at him in order to sustain his claim. In Roger Reeves v. Sanderson Plumbing Products, Inc. (120 S.Ct. 2097 (2000), the Court held otherwise:

> *A plaintiff's prima facie case of discrimination (as defined in McDonnell Douglas Corp. v. Green, 411 U. S. 792, 802, and subsequent decisions), combined with sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision, may be adequate to sustain a finding of liability for intentional discrimination* under the ADEA. In this case, Reeves established a prima facie case and made a substantial showing that respondent's legitimate, nondiscriminatory explanation, i.e., his shoddy recordkeeping, was false. He offered evidence showing that he had properly maintained the attendance records in question and that cast doubt on whether he was responsible for any failure to discipline late and absent employees. In holding that the evidence was insufficient to sustain the jury's verdict, the Fifth Circuit ignored this evidence, as well as the evidence supporting Reeves' prima facie case, and instead confined its review of the evidence favoring Reeves to that showing that Chesnut had directed derogatory, age-based comments at Reeves, and that Chesnut had singled him out for harsher treatment than younger employees. It is therefore apparent that the court believed that only this additional evidence of discrimination was relevant to whether the jury's verdict should stand. In so reasoning, the court misconceived the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination through indirect evidence. In St. Mary's Honor Center v. Hicks, 509 U. S. 502, 511, the Court stated that, because the factfinder's disbelief of the reasons put forward by the defendant, together with the elements of the prima facie case, may suffice to show intentional discrimination, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional *discrimination*. *Proof* that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive. See id., at 517. *In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.* See, e.g., Wright v. West, 505 U. S. 277, 296. Moreover, once the employer's justification has been eliminated, discrimination may well be the *most likely* alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Cf. Furnco Constr. Corp. v. Waters, 438 U. S. 567, 577. Such a showing by the plaintiff will not always be adequate to sustain a jury's liability finding. Certainly there will be instances where, although the plaintiff has established a prima facie case and introduced sufficient evidence to reject the employer's explanation, no rational factfinder could conclude that discrimination had occurred. This Court need not -- and could not -- resolve all such circumstances here. In this case, *it suffices to say that a plaintiff's prima*

*facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.* Pp. 5-14. [paragraph 18] (Emphasis added).

In holding that the record contained insufficient evidence to sustain the jury's verdict, the Fifth Circuit misapplied the standard of review dictated by Rule 50. The court disregarded evidence favorable to Reeves --the evidence supporting his prima facie case and undermining respondent's nondiscriminatory explanation -- and failed to draw all reasonable inferences in his favor. For instance, while acknowledging the potentially damning nature of Chesnut's age-related comments, the court discounted them on the ground that they were not made in the direct context of Reeves' termination. And the court discredited Reeves' evidence that Chesnut was the actual decisionmaker by giving weight to the fact that there was no evidence suggesting the other decisionmakers were motivated by age. Moreover, the other evidence on which the court relied -- that Caldwell and Oswalt were also cited for poor recordkeeping, and that respondent employed many managers over age 50 -- although relevant, is certainly not dispositive. See Furnco, supra, at 580. The ultimate question in every disparate treatment case is whether the plaintiff was the victim of intentional discrimination. Here, the District Court informed the jury that Reeves was required to show by a preponderance of the evidence that his age was a determining and motivating factor in the decision to terminate him. It instructed the jury that, to show respondent's explanation was pretextual, Reeves had to demonstrate that age discrimination, not respondent's explanation, was the real reason for his discharge. Given that Reeves established a prima facie case, introduced enough evidence for the jury to reject respondent's explanation, and produced additional evidence that Chesnut was motivated by age-based animus and was principally responsible for Reeves' firing, there was sufficient evidence for the jury to conclude that respondent had intentionally discriminated. Pp. 16-19. (197 F. 3d 688, reversed.)

16.    As it relates to Plaintiff's prima-facie claims, Defendant's given reason for

failure to hire – that Plaintiff had not applied for any specific job – is false. Defendant

relies on its centralized database to find applicants, and still overlooked Plaintiff, even

bypassing the entire database to search for candidates through classified advertising

during the period in controversy.  As the Court held in Swierkiewicz, the four-part test in

McDonnell Douglas Corp. v. Green (411 U.S. 792, 802), has been met, even though the

Court further held that this is an evidentiary and not a pleading requirement.  To wit:

a.    Plaintiff is a member of *four* protected classes (gender, race,

disability, and whistleblower/retaliated-against);

      b.    Plaintiff is qualified for the open position(s) in question;

      c.    Plaintiff has suffered the adverse employment actions of not being interviewed or hired due to his class memberships in (a) above, of being retaliated against, and of having to endure others in his worker peer group given favorable treatment independent of Plaintiff; and

      d.    Plaintiff's factual averments, including but not limited to the bias in Defendant's affirmative-action program, are circumstances supporting an inference of discrimination.

17.    Having set forth a prima-facie case and by alleging that Defendant's *only* stated reason for not hiring Plaintiff is invalid, a trier of fact would have within its discretion the ability to rule that Plaintiff has in fact proven discrimination by these inferences as a matter of law. Given this, rulings on this matter of law made prior to trial should be favorable to Plaintiff in any setting which presumes his factual allegations to be true, which would include motions under Rule 12(b)(6) or Rule 50.

18.    Defendant eschewed the option to move for clarification under Rule 12(e), instead preferring to see justice dispensed summarily, **prior to the completion of discovery**, and prior to Defendant obtaining the court-appointed counsel granted to him on February 27. Regarding the issue of discovery, the Court in <u>Swierkiewicz</u> was equally defining in its wording:

> [T]he precise requirements of a prima facie case can vary depending on the context and were "never intended to be rigid, mechanized, or ritualistic." <u>Furnco Constr. Corp. v. Waters</u>, 438 U. S. 567, 577 **(1978)**; see also <u>McDonnell Douglas</u>, supra, at 802, n. 13 ("[T]he specification . . . of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations"); <u>Teamsters v. United States</u>, 431 U. S. 324, 358 (1977) (noting that this Court "did not purport to create an inflexible formulation" for a prima facie case); <u>Ring v. First Interstate Mortgage, Inc.</u>, 984 F. 2d 924, 927 (CA8 1993) ("[T]o measure a plaintiff's complaint against a

particular formulation of the prima facie case at the pleading stage is inappropriate"). *Before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case.* Given that the prima facie case operates as a flexible evidentiary standard, it should not be transposed into a rigid pleading standard for discrimination cases. (Emphasis added).

19.    Plaintiff summarizes his rebuttal to Defendant's fair-notice argument as follows:

a.    Defendant should have first moved under Rule 12(e) for Plaintiff to make a more definitive statement before responding with a Motion To Dismiss.

b.    Plaintiff has stated claims for relief under 42 USC §2000e-2 *et seq.*, 42 USC §2000e2(k)(1)(i), and 42 USC §12112 *et seq.*

c.    It is difficult to define how a pleading should be framed, since each discrimination claim results from a unique set of circumstances. Consequently, no strict standard exists for the framing of pleadings or the alleging of facts which constitute the fair notice.

d.    The "substantial justice" standard of Rule 8(a) favors Plaintiff.

e.    Discovery has not been completed, which given the specific circumstances in this action, make it difficult to define a precise formulation of the required prima-facie case. Any concerns Defendant may have had with Plaintiff's framing of the complaint should have been addressed in a Rule 12(e) motion instead of one filed under Rule 12(b)(6). Further, Plaintiff has alleged facts to support each and every one of his claims in the Complaint, rendering this argument moot.

f.    Any inference that Plaintiff's stated claims lack merit are evidentiary and should be addressed under Rule 56 instead of Rule 12(b)(6).

## DEFENDANT'S ARGUMENT THAT PLAINTIFF HAS ALLEGED NO "SPECIFIC FACTUAL BASIS" AND PLAINTIFF'S REBUTTAL

20.    Plaintiff incorporates by reference the entire contents of paragraphs 1-19 as if fully stated verbatim herein.

21.    Defendant argues in its Memorandum that "[P]laintiff has alleged no such 'specific factual basis' [for his claims for relief]."

22.    The Amended Complaint very clearly states claims for relief under 42 USC §2000e-2 *et seq.*, 42 USC §2000e2(k)(1)(i) (disparate impact: gender, racial, disability, and retaliation discrimination), and 42 USC §12112 *et seq.* (disability discrimination). The issue thus shifts to whether or not Plaintiff has alleged a "specific factual basis" for these claims.

23.    Defendant, in its Argument, claims that "The only conduct [Plaintiff] alleges as to him is [Defendant's] failure to interview or hire him on the basis of his electronically submitted resume. He did not apply for any specific job. Instead, he electronically 'dropped off' his resume."

24.    The internet webpage on Defendant's site at the URL of http://www.hr.upenn.edu/jobs/howtoapply.asp states the following, and provides for a centralized resume submission such as Plaintiff's to result in an interview by a central recruiter:

> Penn accepts resumes electronically via the Internet and stores them in their resume database. ***Recruiters search the resume database and forward your resumes to the Hiring Officers for positions you have expressed interest in if you meet the minimum qualifications. In addition you may be considered for any position for which you are qualified.*** Resumes submitted on-line remain in our database for up to a year. Internal and external candidates are strongly encouraged to submit their resume this way....
>
> ....Highly qualified candidates will be contacted for an interview by the PENN Hiring Officer ***or a central Recruiter.*** At the time of the interview, you will be

> asked to complete a PENN employment application. Penn has many positions
> open. Over 50% are for research-related positions, with others in the fields of
> accounting, office support, information technology, management, facilities,
> security, food service and others. Due to the significant volume of open positions
> and resumes received, we regret that we cannot answer your questions about
> status. You will receive confirmation via mail or e-mail that your application
> arrived.. For general questions, contact (215) 898-7284 from 9AM EST to 4PM
> EST. (Emphasis added).

25. Under the heading "Special Provisions for Internal Applicants," Defendant

sets forth a distinction that allows for direct contact with the hiring officers, an option not

open to Plaintiff:

> Current PENN staff should apply directly to the Hiring Officer. Contact us at
> recruitment@hr.upenn.edu for the name of the contact person. You will receive a
> response (to valid PENN E-mail addresses) within 24 hours. Submit your cover
> letter and resume directly to the Hiring Officer. You should also apply on-line at
> http://www.hr.upenn.edu/jobs to be considered for any position for which you are
> qualified. The hiring department will contact highly qualified applicants for
> interviews.

26. Upon receipt of Defendant's Motion To Dismiss, Plaintiff double-checked

Defendant's website to investigate Defendant's claim that Plaintiff had not applied for

any specific positions.  Plaintiff noticed that while it is possible to apply directly for

positions, in no way does Defendant make this clear on their site.  On June 20, 2002,

Plaintiff searched Defendant's job listings and found forty-eight open administrative

positions.  Of those, only a half-dozen or so contained a link which allowed for direct e-

mail of an applicant's resume to the hiring officer (something Plaintiff had not noticed at

all on July 16, 2001), and on each job listing, a link which said "Submit your resume to

the University of Pennsylvania."

27. Most of the more popular websites for resume-submission (such as

hotjobs.com) offer a specific "apply for this job" link which allows an applicant to apply

for a position with the resume which is already stored in its database.  Defendant's

website is counterintuitive in that the link only says that the resume will be submitted to

10

the University. Once the link is opened, a job-reference number is listed on the submission, but this is the *only* distinguishing characteristic between the general submission to the centralized intake system and the specific submission for each individual permission. For each individual application, for example, the applicant must cut-and-paste his or her *entire* resume, a severe redundancy given that it is technologically possible and standard to submit the resume once and then click the jobs for which one wishes it to be submitted for, and have the submission made automatically without the need for reentering one's entire resume each time.

28.     The issue of Plaintiff's failure to submit his resume for individual positions is rendered moot by his general submission of his resume. Defendant's website states that generally submitted resumes remain active in its human-resources database for up to one year, and that its recruiters search the database for qualified applicants so that they may forward resumes to the hiring officers. To that extent, Plaintiff applied for work with Defendant on July 16, 2001, his resume was active on that day through the present, and Defendant's inability or refusal to grant him even one interview after that point constitutes a rejection of his centralized application. On the day Plaintiff became aware of how to apply directly, he submitted his application and resume to each of the forty-eight administrative positions (save for less than a half-dozen positions which were outdated or for which he was not suited) individually. He has still yet to be called for an interview.

29.     Plaintiff's disparate-impact claims relating to the inability to compete on equal footing, including but not limited to biases caused by Defendant's affirmative-

action program, remain intact and are not affected. Plaintiff refers to Paragraph 12 of the

Amended Complaint, citing <u>Saunders v. Wright</u>, DDC Case No. 99-2807b:

> When a plaintiff challenging an allegedly discriminatory governmental policy seeks prospective relief, the plaintiff "need not allege that he would have obtained the benefit but for the [discriminatory policy] in order to establish standing." <u>Northeastern Fla.</u>, 508 U.S. at 666. Rather, the "'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the [discriminatory policy], not the ultimate inability to obtain the benefit." <u>Id</u>. (noting that "in the context of a challenge to a set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract."). See also <u>Adarand Constructors</u>, 515 U.S. at 211 (same). Thus, *for a plaintiff seeking prospective relief to suffer an injury for purposes of standing, he only needs to demonstrate that he is ready and able to apply (or be considered) for a benefit and that a discriminatory policy prevents him from doing so on an equal basis.* <u>Id</u>. Moreover, based on this definition of injury in fact, it is relatively easy for a plaintiff to demonstrate both that the discriminatory policy is the 'cause' of his injury and that a judicial decree directing the government to discontinue its program would 'redress' the injury. See, e.g., <u>Northeastern Fla.</u>, 508 U.S. at 666. [Paragraph 39] (Emphasis added).

> Injury in fact in an equal protection case like this may simply be the existence of a government-erected barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group. *It is not necessary for the plaintiff to show that she would have received the benefit but for the operation of the policy, because the injury is the imposition of the barrier itself.* Here defendants admit favoring long-term over short-term residents, all other qualifications being equal, which by itself is therefore a sufficient demonstration of injury in fact. Because it is clear that defendant's stated policy 'caused' the plaintiff to compete at a disadvantage vis-à-vis long term residents, we have little doubt that, were the district court to award damages, plaintiff's injury would likely be redressed. [Paragraph 43]. (Emphasis added).

> Even if the injury in fact is the actual denial of a benefit rather than the inability to have competed for it on an equal footing, however, *plaintiffs do not have to show—at least in employment discrimination cases--that they would have received the benefit absent the discriminatory policy.* [Paragraph 46] (Emphasis added).

30.    Plaintiff's general resume submission to Defendant's centralized human-

resources database clearly demonstrate that on July 16, 2001, he was ready and able to

apply for work with Defendant, for in fact he did. Any claims by Defendant that this

does not constitute an application for employment would call into question the purpose of

the database. Defendant's website states that recruiters use the database to find resumes; further, open positions at Penn are at times advertised in other publications and on other websites, meaning that for these positions all internal means, including the database, would have to have been exhausted. The volume of positions for which Plaintiff's resume would have been directly considered may have been *reduced* by being located only in the "second tier" of Defendant's system, but it was certainly not nonexistent.

31.     Plaintiff's retaliation claim is also untouched due to the circumstances under which he departed the Medical Center in 1993. One of the primary sources of retaliation against Plaintiff, Cynthia Maurer-Sutton, the Medical Center's Director of Technology Transfer, was mentioned in the original Complaint and omitted from the Amended Complaint for brevity. In the fall of 1992, Ms. Sutton specifically instructed Plaintiff to violate intellectual-property laws by installing *six* copies of Paradox database software and *three* copies of WordPerfect on the department computers, in clear violation of United States copyright law, since the department had only one license for each program. Plaintiff voiced his concern over the theft of intellectual property by reminding Ms. Sutton that there was only one license for each software. Ms. Sutton responded to Plaintiff by saying that each license covered the entire department and not one computer, which was incorrect. Ms. Sutton's position with Defendant included responsibilities for negotiating intellectual-property agreements. This action helped convince Plaintiff's superiors and peers that he was a "troublemaker."

32.     Plaintiff alleges a continuing violation of the retaliation provision of Title VII at the Medical Center, beginning in 1993 and made permanent by its nature. For a plaintiff to show a continuing violation: (1) s/he must allege at least one act of

13

discrimination that occurred within the 300 days, and (2) s/he must show a continuing pattern of discrimination, more than just isolated or sporadic acts of intentional discrimination. Rush, 113 F.3d at 481 (citing West v. PECO, 45 F.3d 744, 754-55 (3d Cir. 1995). *When determining whether there was a continuing pattern of discrimination, a court should consider the subject matter, frequency, and permanence of the discrimination*. Rush, 113 F.3d at 482. (Emphasis added).  Plaintiff contends that the hostility expressed to him by the Penn Medical Center was unquestionably permanent.

33.    Plaintiff submits that, nevertheless, he did apply separately by facsimile in late July of 2001 to the "Penn Health System" for an open position via facsimile. This position could have been with the University proper or the Hospital of the University of Pennsylvania, as the Medical Center contains a mix of employees for both concerns, with different corporate structures, but which are also both considered to be part of the University as a whole.

34.    Although time-barred as the basis for a claim, Plaintiff offers as supporting evidence that the impact of direct application for open positions in the face of institutionalized discrimination of the type Plaintiff alleges is minimal at best.  Plaintiff notes that he tried to escape the hostile, retaliatory environment at the Medical Center in 1993 by submitting *forty-three* transfer applications, which resulted in all of three interviews and no offers of employment.  Plaintiff was loathe to relinquish his seniority, and was hopeful of finding a more positive environment, but eventually the problems became too severe and he could no longer wait for the transfer to materialize.  In that situation, direct applications were of little or no assistance.

14

35.    For the reasons stated hereinabove, Plaintiff has met the relevant standards of having applied via the centralized intake website (direct discrimination), having been ready and able to apply (disparate impact/inability to compete on equal footing), and having been deterred from applying permanently (due to retaliation).

36.    Each of Plaintiff's four stated claims for relief has three distinct elements: direct discrimination, disparate impact, and the "general discrimination" which Plaintiff alleges in the Complaint as partial grounds for his claims in each category. For each element, Plaintiff has alleged a specific factual basis.

37.    Plaintiff states a claim for relief under the racial-discrimination provision of Title VII in paragraph 41 of the Amended Complaint. The claim is based on the following three factual elements:

    a.    *Direct discrimination.* Plaintiff states in paragraph 40 of the Amended Complaint that "minorities with inferior skills have been hired over Plaintiff due to their race." This is a specific factual allegation which supports the racial-discrimination claim.

    b.    *Disparate-impact discrimination.* Plaintiff states in paragraphs 19-25 and paragraph 39 of the Amended Complaint that Defendant's affirmative-action program constitutes disparate-impact discrimination against white administrative and clerical workers, and in paragraph 23 of the Amended Complaint cites the racial breakdown offered by Defendant on its affirmative-action website as supporting evidence. The existence of the biased affirmative-action program, the racial hiring outcomes, and Defendant's liability for misclassifying white workers as an overrepresented racial majority are specific factual allegations which support the racial-

15

discrimination claim. Defendant has been put on fair notice that this factual averment of conduct is what Plaintiff states as the grounds for his action.

      c.    ***General discrimination***. Plaintiff alleges, in paragraphs 14-19 and paragraph 41 of the Amended Complaint, the existence of at least one instance of direct racial discrimination against whites within the administrative ranks at Penn during the period in controversy as the result of Defendant's size and its inability to root out all instances of it from its individual departments (the "poisoned jobs" theory). This is a factual assertion which Defendant attacks as irrelevant as a matter of law, and which can therefore be dealt with more effectively under Rule 50 or Rule 56, which as cited above, the Courts prefer as a vehicle to Rule 12(b)(6).

      38.    Plaintiff states a claim for relief under the gender-discrimination provision of Title VII in paragraph 54 of the Amended Complaint. The claim is based on the following three factual elements:

      a.    ***Direct discrimination***. Plaintiff cites the "Aharon Study" in paragraphs 33-37 of the Amended Complaint, and its definition of the "reward center" response created by men viewing attractive women as a factual basis for his gender-discrimination claim. It should not take a parade of experts to establish that ***men like to stare at, be around, and have sex with pretty women***, a fact which Plaintiff shall aver as obvious, self-evident, and historically proven, even in the absence of the Aharon Study. Plaintiff further states in paragraphs 49-52 of the Amended Complaint that direct discrimination against his active application with Defendant occurred within the Office of General Counsel ("OGC"), and throughout the university. In paragraph 51 of the Amended Complaint, Plaintiff outlines a strong bias against men in support positions at

16

the OGC. It should also be noted that on or about June 10, 2002, Plaintiff applied for a support position at the OGC from *monster.com*, meaning that all internal alternatives, including Plaintiff's active resume in the centralized database, were or should have been exhausted. In fact, Plaintiff received correspondence from Heather Carson of Defendant's human-recourses department stating that he lacked the "3+ years of experience" required for the position. Plaintiff wrote back to Ms. Carson stating that as a historically-discriminated-against gender minority, it was within her authority to forward his resume to the hiring officer as a "creative and imaginative step" of ensuring diversity. In response to his letter, Ms. Carson thanked Plaintiff for his persistence and forwarded his resume, indicating that no such steps in favor of white or male administrative applicants were university policy at the time and had to be initiated by Plaintiff. These are specific factual allegations which support Plaintiff's gender-discrimination claim.

      b.    ***Disparate-impact discrimination.*** Plaintiff states in paragraphs 19-25 and paragraph 53 of the Amended Complaint that Defendant's affirmative-action program constitutes disparate-impact discrimination against male administrative and clerical workers, and states a claim for relief in the following paragraph 54. The existence of the biased affirmative-action program, the racial hiring outcomes, **and** Defendant's liability for misclassifying white workers as an overrepresented **racial** majority are specific factual allegations which support his gender-discrimination **claim.**

      c.    ***General discrimination.*** Plaintiff alleges, in paragra**phs 14-19** and paragraph 53 of the Amended Complaint, the existence of at least one instan**ce of direct** gender discrimination against males within Defendant's administrative ranks **during the** period in controversy as the result of its size and inability to root out all insta**nces of it**

from its individual departments (the "poisoned jobs" theory). He further alleges disparate-impact discrimination, alleging biased gender outcomes via the affirmative-action policy and the Aharon Study in Paragraphs 53-54 of the Amended Complaint. These are factual assertions which Defendant attacks as irrelevant as a matter of law, and which can therefore be dealt with more effectively under Rule 50 or Rule 56, which as cited above, the Courts prefer as a vehicle to Rule 12(b)(6).

39.    Plaintiff states a claim for relief under the retaliation-discrimination provision of Title VII in paragraph 63 of the Amended Complaint. The claim is based on the following three factual elements:

a.    ***Direct discrimination.*** Plaintiff cites continuing retaliation discrimination against him in paragraph 31 of the Amended Complaint ("Plaintiff avers that his disorder has resulted in disability discrimination against him which continues to this day"), and further supports his claim in paragraph 30 of the Amended Complaint by stating that "Plaintiff avers that during the course of his employment with the Medical Center, that a general belief developed that he was mentally ill, and further avers that he suffered adverse job actions because of this medically unqualified belief." In paragraphs 28-29 of this pleading, Plaintiff cites specific retaliation related to his raising concerns over intellectual property theft within the Medical Center, which had been included in the original Complaint and which could be reinserted upon Amendment. These are specific factual allegations which support the retaliation-discrimination claim, with the retaliation continuing to this day as a result of Plaintiff's disability and whistleblowing.

b.    ***Disparate-impact discrimination.*** In support of his claim for retaliation discrimination based on disparate-impact, Plaintiff asserts as a cause

Defendant's refusal to take steps to assist those who have endured historical and general discrimination (inferred). Defendant did not move under Rule 12(e) for Plaintiff to clarify this connection. This is an inferential, factual allegation which Defendant attacks as irrelevant as a matter of law, and which can therefore be dealt with more effectively under Rule 50 or Rule 56, which, as cited above, the Courts prefer as a vehicle to Rule 12(b)(6).

        c.    ***General discrimination***. Plaintiff alleges, in paragraphs 14-19 and 62 of the Amended Complaint, the existence of at least one instance of direct retaliation discrimination within Defendant's administrative ranks during the period in controversy as the result of its size and its inability to root out all instances of it from its individual departments (the "poisoned jobs" theory). This is a factual assertion which Defendant attacks as irrelevant as a matter of law, and which can therefore be dealt with more effectively under Rule 50 or Rule 56, which as cited above, the Courts prefer as a vehicle to Rule 12(b)(6).

        40.    Plaintiff states a claim for relief under the Americans With Disabilities Act of 1990 (42 USC §12112 *et seq.*) in paragraph 71 of the Amended Complaint. The claim is based on the following three factual elements:

        a.    ***Direct discrimination***. Plaintiff cites continuing disability discrimination against him in paragraph 31 of the Amended Complaint ("Plaintiff avers that his disorder has resulted in disability discrimination against him which continues to this day"), and supports his claim in the previous paragraph by stating that "Plaintiff avers that during the course of his employment with the Medical Center, that a general belief developed that he was mentally ill, and further avers that he suffered adverse job

actions because of this medically unqualified belief." These are specific factual allegations which support the disability claim.

    b. ***Disparate-impact discrimination***. In Paragraph 28 of the Amended Complaint, Plaintiff states that "[Defendant's] current interview process is insufficient to detect mental illnesses, and results in the unintentional discrimination against those with certain mental illnesses, including but not limited to bipolar disorder." This is made relevant by the use of subjective, personality and behavioral characteristics such as "attitude" by recruiting and hiring officers in interviews, but also by secondary considerations such as "the ability to get along with others." These face-neutral policies provide the necessary pretext for destroying the careers of the mentally ill, who may behave differently through no fault or malicious intent of their own, yet who will have that behavior judged adversely by those who are unqualified to determine if the cause is related to mental illness or not. A mentally ill individual is likely to be labeled as an attitude problem by the employer, and in cases where ostracization is a side-effect of the illness, to be thought to get along poorly with one's peers, even if this is the result of peer bias against the mentally ill. To eliminate this disparate-impact, Defendant should either abandon the subjective analysis of worker personality traits and behavior, and not rely on peer evaluations either, or in the alternative, in cases where adverse assessments are made, to consider the possibility of mental illness rather than rushing to judgment and sanctioning the worker. These are factual and inferred allegations regarding Defendant's interview process which support Plaintiff's disability claim. Defendant attacks the assertions as irrelevant as a matter of law, which can be dealt with more effectively under Rule 50 or Rule 56, which as cited above, the Courts prefer as a vehicle to Rule 12(b)(6).

c.    *General discrimination*. Once again, Plaintiff argues in paragraphs 14-19 the existence of "general discrimination" with the relatively simple positing that an employer as large as Defendant will contain the occasional rogue individual who decides he doesn't want to work with any "loonies," "nutcases," or any of the many derogatory terms we as a society often attach to those who are mentally ill, both diagnosed and undiagnosed. Plaintiff is asserting as a matter of fact that this discrimination *exists*, and Defendant is not contesting this assertion. What Plaintiff is also asserting is that this discrimination cannot be fully *located*, because to uncover every instance would require discovery beyond all practicality, and even then, few who discriminate in any fashion are going to be honest regarding their intentions. Defendant attacks the averments as irrelevant as a matter of law, which can be dealt with more effectively under Rule 50 or Rule 56, which as cited above, the Courts prefer as a vehicle to Rule 12(b)(6).

41.    Paragraphs 37-40 of this pleading specify the factual bases and provide fair notice of specific conduct or a specific policy that would entitle Plaintiff to relief from this court for his claims stated in the Complaint. The notice-pleading requirements of Rule 12(b)(6) have therefore been satisfied.

## DEFENDANT'S ARGUMENT THAT PLAINTIFF'S ALLEGATIONS ARE VAGUE AND CONCLUSORY, AND PLAINTIFF'S REBUTTAL

42.    Plaintiff incorporates by reference the entire contents of paragraphs 1-41 as if fully stated verbatim herein.

43.    In the final paragraph of its argument in its Motion to Dismiss, Defendant claims that "[i]n the absence of any specific allegations of discriminatory or retaliatory conduct, [Plaintiff] relies upon what he refers to as 'general discrimination:' [Defendant]

<u>must</u> discriminate because it is so big and hires so many people. If such 'general discrimination,' without more, is sufficient to survive a motion to dismiss, then a 'flood gates' spectre would no longer be hyperbolic. This general claim both fails to state a basis upon which [Plaintiff], as opposed to anyone and everyone, is entitled to relief, and fails to put [Defendant] on notice of any specific conduct against which it must defend as required under <u>Swierkiewicz</u>."

44.     Plaintiff vehemently disagrees with all elements of Defendant's arguments: first, Plaintiff is alleging discriminatory, targeted, and actionable conduct. To call this a vague or conclusory allegation is to misrepresent Plaintiff's assertion that *direct* discrimination against Plaintiff by Defendant occurred during the time in controversy. He is not vaguely asserting that ambiguous behavior is discriminatory without providing specific proof, as might be the case say if he heard his supervisor comment that an applicant was attractive without offering further evidence of gender bias. Instead, he is saying that illegal discrimination against him in all four areas for which he has stated his claims for relief is occurring *with certainty* due to Defendant's size. In *support* of this claim he cites the "general discrimination" concept as an acknowledgment designed to circumvent the need to pry through thousands of employment records to find the specific instance(s) to which Plaintiff refers. To establish a claim, Plaintiff need only prove *one* instance. He is not saying this instance does not exist, or cannot be concluded, but simply that it has not at the time of filing been located for the reasons stated herein.

45.     Defendant argues that if general-discrimination were recognized as valid grounds for stating a claim for relief, that a floodgate would be opened that would allow

"anyone and everyone" to sue, and that Plaintiff has not differentiated his own case. This is not true at all: Plaintiff has suffered *damages* by virtue of his not being hired at all; other applicants who suffer general discrimination and overcome it would not need to sue because they don't have damages to recover. Still other applicants who truly are unqualified would not have standing. The effect on the judiciary would be minimal: few frivolous cases would be filed, and the federal rules are more than equipped to deal with the caseload via its early-disposition provisions in Rules 12(b)(6), 50, and 56.

46.    Regarding any "floodgates" which would open if Plaintiff's general-discrimination argument were accepted, and "no longer be hyperbole," that genie was already let out of the bottle back in 1964, when our legislature decided to pass what is essentially a "mindreading law," where the same conduct (denying a skilled applicant a job) can be legal or illegal, depending on the reason for the conduct given by the employer. Discovery limits preclude Plaintiff being able to fully document every instance of discrimination within Defendant's "hallowed halls," and submits the general-discrimination averment as an alternative to discovery overload. Even the courts have acknowledged the difficulty of obtaining absolute proof of discrimination: "[t]here will seldom be `eyewitness' testimony as to the employer's mental processes," <u>Postal Service Bd. of Governors v. Aikens</u>, 460 U. S. 711, 716 (1983). Statistically, and practically, discriminatory motives are quite often inferred from conduct, as an alternative to finding absolute proof.

47.    General discrimination is a concept that even our own government and its courts have not hesitated to embrace. The basis for anti-discrimination laws and what would otherwise be illegal affirmative action is that the classes which are protected by it

have endured historical discrimination. Without this presupposition, anti-discrimination laws would be unnecessary and the affirmative-action programs illegal. It is not a leap across the Snake River canyon of logic to assume that an employer with *several thousand* administrative positions has these four instances of discrimination, or that if a neurological response is causing men to worship pretty women, that at least one of those men would give preferential treatment to one of those women in the administrative ranks, which are overwhelmingly female. Legislation and precedent based on general-discrimination already exist in our society to a significant extent.

48.    Even if Plaintiff were held to the standard of converting his general-discrimination allegations to a specific allegation, discovery can accomplish this with relative ease. Examination of internal and external grievances filed against Defendant can paint an accurate picture of the incidence of reported actionable conduct, while the rulings on these grievances and lawsuits paints yet another picture of their validity. These matters require full discovery to be adjudicated properly

49.    Many inferences can be drawn from the general-discrimination allegation, including for example that if a woman is sexually harassed on the job by her supervisor, that the supervisor had a predisposition against hiring men for the position, and that the environment is hostile to men, which forms the basis for a discrimination claim by men, including Plaintiff, who were ready and able to apply, or who had actually applied. As this concept applies to the Aharon study cited in Exhibit A of the Amended Complaint, the "beauty premium" it cites in several previous studies is accepted as true, and a neurological basis explaining it is explained by the researchers. The root of this behavior is gender-related (and indirectly related to age and disability, as looks deteriorate with

24

either), and results in subtle behaviors which explain the outcome of attractive women earning significantly more than their less visually appealing counterparts for equal work (the "plainness penalty"). Sexual desire by their peers will give them a gender-based advantage in any team-play or getting-along-with-others assessments, and the better treatment they receive will tend to keep their attitude more positive.

50.    Behavior motivated by the beauty premium becomes even more suspect when one considers that in cases where attractive women reject the advances of their superiors, these subjective assessments of their personality will often reverse sharply. The courts and agencies are flooded with cases every year of women who were hired over large numbers of applicants, and who were very popular and praised, but who suddenly were turned against once a sexual advance from someone in power was rejected. Those cases demonstrate specifically that the positive assessments were sexually motivated, with the only significant change being that the supervisor suddenly no longer had the hope of a sexual encounter or sexual relationship materializing. Consider further that in beauty-premium cases, the women themselves benefit financially as long as the bosses do not cross certain lines (i.e., "look but don't touch").

51.    General discrimination is an injustice even worse than the cases of overt discrimination which are easy to document and prove. It is like a cancer which can be shown to exist by the career sickness it causes (i.e., when an obviously qualified worker is inexplicably denied work), yet which doesn't always show up on the CAT scan or x-ray. That a disease cannot be detected by normal medical technology does not mean it does not exist. In 1981, the medical community knew that homosexuals were dying from a disease which appeared to be sexually transmitted, but did not find the means to test for

HIV until four years later. When an employer as large as Defendant thumbs its nose at an

applicant who is qualified for many open positions, we are dealing with a situation

similar to that of a parent returning home to discover a broken-into cookie jar, and four

siblings protesting their innocence where it is obvious that one of them is lying. That a

cookie was stolen is not in dispute, and that it was stolen by one of the siblings is not in

dispute either. In the recent criminal trial of <u>United States v. Arthur Andersen and</u>

<u>Company</u>, the District Judge ruled that the jury need not identify the specific perpetrator

of the obstruction charge levied against the firm in order to determine that the firm had

broken the law, and that was against the higher reasonable-doubt standard. The "missing

cookie" is sufficient to implicate one member of the group of those with access to it.

This again is a factual assertion which is being attacked as irrelevant as a matter of law,

and which would be better suited to a Rule 50 or 56 motion instead of the one brought

under Rule 12(b)(6).

52.    In its Motion to Dismiss, Defendant states that the Court "...should not

accept as true conclusory allegations of law, unsupported conclusions, and unwarranted

inferences." (See <u>Flanagan v. Shively</u>, 783 F. Supp 922, 927 (M.D. Pa. 1992) (citing

<u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)). Plaintiff argues in rebuttal that his

conclusions are supported by the facts averred, and that his inferences are warranted,

leaving the issue of his conclusory allegations of law. Addressing this, Defendant points

out that "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive

issue of law." <u>Thomas v. Ford Motor Co.</u>, 70 F. Supp. 2d 521, 525 (D. N.J. 1999) (Citing

<u>Nietzke v. Williams</u>, 490 U.S. 319, 326-27 (1989). That Rule 12(b)(6) allows the Court

to rule on matters of law does not mean that they must, as the vehicles of trial and Rule

50 or 56 motions are still available and are preferable.

53.    On the issue of conclusory allegations, the Court in <u>Swierkiewicz</u> ruled

even more pointedly:

> Respondent argues that allowing lawsuits based on conclusory allegations
> of discrimination to go forward will burden the courts and encourage
> disgruntled employees to bring unsubstantiated suits. <u>Brief for Respondent</u>
> 34-40. Whatever the practical merits of this argument, the Federal Rules
> do not contain a heightened pleading standard for employment
> discrimination suits. ***A requirement of greater specificity for particular
> claims is a result that "must be obtained by the process of amending the
> Federal Rules, and not by judicial interpretation."*** <u>Leatherman</u>, supra, at
> 168. Furthermore, Rule 8(a) establishes a pleading standard without regard
> to whether a claim will succeed on the merits. "Indeed it may appear on
> the face of the pleadings that a recovery is very remote and unlikely but
> that is not the test." <u>Scheuer</u>, 416 U. S., at 236. (Emphasis added).

54.    Defendant's argument for ruling on matters of law in a 12(b)(6) motion

are substantially weakened by the citation above.

### DEFENDANT'S SPECIAL LEADERSHIP ROLE AS
### AN INSTITUTION OF HIGHER EDUCATION

55.    Plaintiff incorporates by reference the entire contents of paragraphs 1-54

as if fully stated verbatim herein.

56.    In <u>University of Pennsylvania v. EEOC</u> (110 S. Ct. 577 (1990)), the Court

held as valid Penn's own claim of a special role in society which sets it aside from other

employers.  Although the decision related to a case of discrimination in granting tenure

(which Plaintiff has also averred in his Amended Complaint as an example of affirmative

action gone wrong), Defendant's status as a role model applies here as well:

> We readily agree with petitioner that universities and colleges play
> significant roles in American society....As Congress has recognized, the
> costs associated with racial and sexual discrimination in institutions of
> higher learning are very substantial. ***Few would deny that ferreting out***

*this kind of invidious discrimination is a great, if not compelling, governmental interest.* (Emphasis added).

57.    Put another way, Plaintiff has long held that institutions of higher learning who cannot grasp the fundamentals of civil rights within its own ranks lose credibility as educators. The Court stopped just short of overtly declaring the fight against this discrimination a compelling government interest, and certainly did not reject the notion that it was.

## ARGUMENT

58.    Plaintiff incorporates by reference the entire contents of paragraphs 1-57 as if fully stated verbatim herein.

59.    Plaintiff has explicitly stated claims for relief on the grounds of race, gender, and retaliation discrimination under 42 USC §2000e-2 *et seq*, and for disability discrimination under 42 USC §12112 *et seq*. Incorporated in his claims are disparate-impact violations for all four categories under 42 USC §2000e-2(k)(1)(i).

60.    Defendant has been put on proper and fair notice that its affirmative-action program discriminates against white and male administrative workers for the reasons averred in the Complaint.

61.    Defendant has been put on proper and fair notice that individual discrimination against Plaintiff is causing him to be denied work illegally in each "poisoned job" throughout the its administrative ranks for each of the classes to which he belongs and for which he has stated his claims for relief.

62.    Defendant has been given proper and fair notice that lesser qualified women and minorities are routinely and intentionally being hired over Plaintiff.

63.    Defendant has been given proper and fair notice that its interview process discriminates against the mentally ill because interviews and personality assessments conducted by laypersons are not designed to detect mental illness.

64.    Defendant has been given proper and fair notice that its reliance on peer reviews regarding behavior and attitude lend themselves to the same problems cited in paragraph 63 above, where mentally ill individuals wind up being ostracized without the cause being considered.

65.    Defendant has been given proper and fair notice that individuals within the Penn Medical Center perceived Plaintiff as mentally ill, and that Plaintiff has endured adverse job actions on a continuing basis as a result.

66.    Defendant has been given proper and fair notice that Plaintiff has been retaliated against by the Medical Center and other departments within Defendant's ranks since 1993 because of what transpired when he was employed there, and that individuals within Penn with hiring power were aware of his disability.

67.    Plaintiff has provided factual allegations, summarized in paragraphs 37-40 of this pleading, sufficient to establish his stated claims for relief.

68.    Plaintiff disputes as irrelevant Defendant's claim that Plaintiff has not applied for specific jobs because its recruiters and hiring officers use the centralized database to which he submitted his resume, and in some cases have bypassed even that step to place outside classified advertising, which Defendant's policy states can only be done after all internal applications, including Plaintiff's active resume within its human-resources database, have been considered and rejected. If submission of a resume to the

centralized database is not an application, what is the purpose of the database and why are applicants encouraged to submit their resumes to it?

69.    Matters of law raised in Defendant's Motion To Dismiss should be argued under Rules 50 and 56 rather than Rule 12(b)(6), and Plaintiff should be given the benefit of discovery to expand upon his arguments and support his conclusions of law. Through discovery, Plaintiff shall uncover sufficient evidence to support all of his claims.

70.    Plaintiff has alleged a prima-facie case of discrimination, and alleged that Defendant's only stated reason for not hiring him is invalid, which under <u>McDonnell Douglas</u> is sufficient to permit a favorable ruling from a trier of fact, and which is sufficient to survive Defendant's Motion to Dismiss.

71.    The dismissal with prejudice Defendant seeks is inappropriate, as it neglected to move for clarification under Rule 12(e), and further, because Plaintiff should be granted leave of the court to amend any deficiencies in the Amended Complaint prior to any

72.    such dismissal.

72.    As an institution of higher learning, Defendant has a separate leadership role which elevates its conduct to an even higher standard than normal, creating a great, if not compelling, government interest in seeing it eliminated.

30

## CONCLUSION

WHEREFORE, for reasons averred hereinabove, Plaintiff's Amended Complaint has satisfied all requirements of Rule 12(b)(6), and Defendant's Motion to Dismiss this action on these grounds should be DENIED.

This the 24th day of June, 2002.


*Gordon Roy Parker*
_____
**GORDON ROY PARKER**
Plaintiff, Pro Se
4247 Locust Street, #806
Philadelphia, PA 19104
(215) 386-7366

June 24, 2002 _____
**DATE**

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER**, Plaintiff<br><br><br>v.<br><br><br>**UNIVERSITY OF PENNSYLVANIA,**<br>a Pennsylvania nonprofit corporation,<br>Defendant. | **CASE NO.: 02-cv-567** |

### CERTIFICATE OF SERVICE

COMES NOW PLAINTIFF in the above-styled action to set forth that the

foregoing **Plaintiff's Brief In Opposition To Defendant's Motion To Dismiss**

**Pursuant To Federal Rule 12(b)(6)** has been served on defendant via **hand delivery** at

the following address:

> John M. Myers
> Montgomery, McCracken, Walker & Rhoads, LLP.
> 123 South Broad Street
> Philadelphia, PA  19109

This the 24th day of June, 2002.


_Gordon Roy Parker_

**GORDON ROY PARKER**
Plaintiff, Pro Se

June 24, 2002
**Date**

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER**, Plaintiff<br><br><br>v.<br><br><br>**UNIVERSITY OF PENNSYLVANIA**,<br>a Pennsylvania nonprofit corporation,<br>Defendant. | **CASE NO.: 02-cv-567** |

## ORDER

AND NOW, this _____ day of _____, 2002, upon

consideration of Defendant University of Pennsylvania's Motion to Dismiss, and

Plaintiff's response thereto, it is hereby ORDERED that Defendant's Motion is DENIED.


**BY THE COURT:**


_____
                                                          USDJ