IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **GORDON ROY PARKER** | : | **CIVIL ACTION NO. 02-cv-567** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **UNIVERSITY OF PENNSYLVANIA** | : | |
| | : | |
| **Defendant.** | : | |

## O R D E R

AND NOW this _____ day of _____, 2004, Penn's First Motion in Limine is GRANTED.

The Plaintiff may not produce any evidence, or call any witness to support the facts asserted in his pre-trial memorandum at Paragraphs 3, 5, 8-21, 23-26, 29-35.

Plaintiff shall cause no trial subpoenas to issue without prior approval of this court.

**BY THE COURT:**

_____
Honorable Anita B. Brody, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GORDON ROY PARKER** | : | **CIVIL ACTION NO. 02-cv-567** |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| **UNIVERSITY OF PENNSYLVANIA** | : | |
| | : | |
| Defendant. | : | |
| | : | |

## THE UNIVERSITY OF
## PENNSYLVANIA'S FIRST MOTION IN LIMINE

Penn moves to preclude the issuance of certain trial subpoenas and to bar certain

evidence, as set forth in the attached memorandum.


Dated:  June 3, 2004.                    By:_____

John M. Myers (PA ID. No.16642)
Jonathan H. Pyle  (PA ID. No. 89887)

MONTGOMERY, McCRACKEN, WALKER
    & RHOADS, LLP
123 South Broad Street
Philadelphia, PA  19109
Telephone No.:        (215) 772-1500
Facsimile No.:        (215) 772-7620

Attorneys for DEFENDANT

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **GORDON ROY PARKER** | : | **CIVIL ACTION NO. 02-cv-567** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **UNIVERSITY OF PENNSYLVANIA** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**PENN'S MEMORANDUM OF LAW
IN SUPPORT OF ITS FIRST MOTION IN LIMINE**

The effect of this Court's November ruling is that the sole issue remaining in this case is whether Penn's explanation for its inaction on Parker's emailed resume was pretextual. That is the reason for this motion: trial, if there is one, should *not* be an open forum for the airing – and in several cases, re-airing – of Parker's very broad set of grievances.  It should be limited to the case he filed, and the case as limited by the Court's November order.

Penn seeks here an order precluding Plaintiff's proposed irrelevant evidence.  The Court has the authority to do this, under FRCP 16 and FRE 104. *See* Luce v. United States, 469 U.S. 38, at 41 n. 4, U.S. v. Romano, 849 F.2d 812, at 815 (3d Cir. June 16, 1988)(authorizing use of in limine rulings pursuant to the "district court's inherent authority to manage the course of trials").  Plaintiff's pretrial memorandum is proof that, unless the Court enters the requested order, Plaintiff intends to voice all of his complaints, whether bearing on his claims or not, which have arisen over the past dozen years or so.  In that regard his intended proofs concern several broad categories that are not, and should not be, part of this lawsuit:

1.   His unhappiness with his 1993 employment in the Penn Health System. (Plaintiff Pretrial Memo. ¶¶ 21, 23-26)[1]

2.   His continued belief, notwithstanding a verdict to the contrary in state court, that the Daily Pennsylvanian and a university counsel libeled him. (Plaintiff Pretrial Memo. ¶¶8, 10,30)

3.   His anger at hundreds of people who are said to have libeled or threatened him. (Plaintiff Pretrial Memo. ¶¶ 15-20, 29, 31-35)

4.   His distaste for Penn's hiring and employment practices. (Plaintiff Pretrial Memo. ¶¶ 4, 9, 12-14, 36,37)

None of these matters are relevant.[2] In advance of trial, the Court should bar his various offers of or intended proofs as to each. The Court should not become an open forum for Parker's grievances against the world. Penn should not bear burden of preparing for such a trial.

---

[1] Plaintiff's Statement of Facts, Witness List, and Exhibit List are attached as Exhibits A, B, and C hereto.

[2] Tellingly, Plaintiff offers only two proposed facts actually bearing on what is in dispute: that Penn conducted no "special effort searches" [proposed fact # 22] and that he "had every reason to believe that his resume submission was sufficient." [proposed fact # 28]. The first of these harms his case; the second is belied by his own proposed Exhibit AV [attached to this motion as Exhibit D] which is his download of the 715 open positions that fit his description of himself. As to these positions, the document shows that Penn told him what to do, but he decided not to follow the instructions, or, more likely, decided not to apply for any of the positions. These were his instructions:

"to apply for a particular postion, please click the job title below. A total of 715 positions were found. "

As we know, he ignored the instructions, deciding that he preferred a lawsuit to an application.

## CONCLUSION

For the foregoing reasons, Penn's First Motion in Limine should be granted, and the attached order entered.

Dated:  June 3, 2004.

By:_____
        John M. Myers (PA ID. No. 16642)
        Jonathan H. Pyle (PA ID. No. 89887)

        MONTGOMERY, McCRACKEN, WALKER
            & RHOADS, LLP
        123 South Broad Street
        Philadelphia, PA  19109
        Telephone No.:      (215) 772-1500
        Facsimile No.:      (215) 772-7620
        Attorneys for DEFENDANT

- 3 -

# EXHIBIT "A"

5.    Regardless of whether or not this Court finds that Plaintiff is entitled to judgment as a matter of law, he has standing as a private attorney general to seek a finding that Penn has violated any anti-discrimination law, even if he is not personally entitled to damages.[2]

## II.   BASIC UNDISPUTED FACTS

The instant motion is based on facts which are generally not in dispute, the averments for which are based on documents produced by Penn in discovery.  They include:

6.    On July 16, 2001, Plaintiff submitted a resume to the Penn human-resources website for inclusion in its database.

7.    Penn never responded to Plaintiff's resume submission except with a "form letter" e-mail acknowledgement that said he would be contacted within thirty days if it was felt a personal meeting was necessary, and never contacted Plaintiff for an interview.

8.    In a *Daily Pennsylvanian* ("DP") article of March 20, 2004, Penn associate general counsel Eric Tilles stated that Plaintiff had not applied for a specific job at Penn.  Penn has maintained this position throughout the litigation.

9.    The DP article was the first notice Plaintiff had received from anyone at Penn that it believed he had not applied for a specific job and had therefore not applied to work at Penn.

10.    The OAA receiving notice of Plaintiff's filing of a grievance regarding Penn's Affirmative Action Plan (AAP) with that office on July 27, 2001.

---

[2] Plaintiff argues that he has standing to sue on his own.  This is an alternative argument that this Court denied as moot in its order of November 3, 2003 because it had dismissed Plaintiff's gender-discrimination claim.  Despite the claim being reinstated, this Court did not address this argument in its subsequent ruling reinstating the claim, instead referring to the original Order despite having reinstated the gender claim.  The argument is made here in the event that this Court finds that Plaintiff lacks standing to sue for gender discrimination based on Penn's AAP for any reason.

11.   On July 30, 2001, Linda Satchell wrote a memo to Valerie Hayes of the Office of Affirmative Action which stated that "I located the Gordon Parker file in the 1993 drawer of the case file and gave it to you."[3]

12.   The OAA not responding to Plaintiff's grievance.

13.   All internal correspondence relating to the grievance between Penn employees, including but not limited to Valerie Hayes, Eric Tilles, Esq., Thomas Rambo, and Larry Singer regarding Plaintiff and his grievance.[4]

14.   On or about September 13, 2001, Plaintiff filed a criminal complaint against a Penn student with the pseudonym of "Wintermute" who made threats to him over the internet.[5] Plaintiff was informed a day later by Detective James B. Blackmore of the Penn Department of Public Safety ("Penn DPS") that he told Wintermute to cease and desist, and that he would.

15.   On or about September 15, 2001, Wintermute posted a message to the internet that he was "instructed not to speak to Plaintiff."[6]

16.   On or about November 14, 2001, Plaintiff served Penn with a subpoena for Wintermute's identity.

17.   Penn responded to the subpoena by claiming that it had no information with which to identify Wintermute.[7]

18.   At a hearing to enforce the subpoena of February 12, 2003, Detective Blackmore disclaimed ever having spoken to Wintermute.  Plaintiff avers that this was perjury, given the

---

[3] A copy of the memo is attached hereto as Exhibit B and incorporated by reference as if fully stated verbatim herein
[4] Copies of the relevant documents (bates #s 00064-00089) are attached hereto as Exhibit C and incorporated by reference as if fully set forth verbatim herein.
[5] See the Amended Complaint in Parker v. Learn The Skills Corporation et al., ¶¶ 24-58, pp. 8-17, and exhibits A-1 thru A-11 to that Complaint, which are attached hereto as Exhibit D and incorporated by reference as if fully set forth verbatim herein.
[6] Ibid, ¶¶ 27-28 and Exhibits A-2 and A-3 to that document.
[7] See Exhibit D-2, which is incorporated by reference as if fully set forth verbatim herein.

statement by Wintermute that he had been instructed not to speak to Plaintiff, and the statement by Detective Blackmore to Plaintiff that he had spoken with Wintermute.[8]

19.   According to documents produced in discovery, Plaintiff's former supervisor, Carol S. Grande, told two temporary agencies that she would not rehire Plaintiff because he was more interested in computer work than in secretarial work.[9]

### III.  PLAINTIFF'S AFFIRMATIVE ACTION CLAIMS

20.   Plaintiff incorporates the entire contents of paragraphs 1-19 as if fully stated verbatim herein.

21.   As a federal contractor, Penn is required to construct an Affirmative Action Plan (AAP) that conforms to the regulations of the Office of Federal Contract Compliance Programs (OFCCP).

22.   The OFCCP defines "underutilization" as follows:

> The regulations at 41 CFR 60-2.11(b) define underutilization as "...having fewer minorities or women in a particular job group than would reasonably be expected by their availability." Contractors are required in the AAP to compare availability to incumbency for each job group, and to identify those job groups which are underutilized. In evaluating the acceptability of the method used by a contractor to determine underutilization, EOSs must ensure that the method used conforms to the requirements of the regulations, that it is appropriate, and that it has been accurately applied.[10]

For example, if women comprise 30 percent of incumbents in a job category (say partners at a law firm) where the "relevant workforce in the reasonable recruitment area" is 45 percent female, women are deemed to be underutilized.

23.   In cases of underutilization, OFCCP regulations call for the setting of "goals," as follows:

---

[8] The only way to identify and serve Wintermute with process for his testimony would be to get his identity from Penn. Since Penn refuses to identify him, and since Wintermute himself posted that he was instructed not to speak to Plaintiff, Wintermute's posting should be considered a statement against that interest.

[9] See Exhibit E, Document #UP-00478, ¶ 3, incorporated by reference as if fully set forth verbatim herein.

[10] See Exhibit F, OFCCP "Chapter II: Desk Audit," p. 30 (listed as page "105" of the manual), ¶ 2G06. The document is incorporated by reference as if fully set forth verbatim herein.

Having identified a job group as underutilized for minorities and/or women, the contractor must establish employment goals and exert every good faith effort toward meeting them.[11]

24.   A document from the Penn website entitled "HR Tips – Fall 2001" describes the concept of the "special effort search" as it relates to Penn policy:

> **Special Effort Search: What does it mean?**
> If the Office of Affirmative Action has designated an open position as a *"special effort search"* it means that there is an underutilization of women and/or minorities in that job class. Therefore, special efforts must be taken to obtain a diverse applicant pool. This entails outreach and advertising beyond the Human Resource website. Posting the position on other Internet sites is a good idea. Sites such as Monster.com, HigherEdjobs.com, or ivillage.com are just few possibilities. Remember, this is a good time to think outside of the box. Be creative in your recruitment efforts. Contact Michele for assistance.[12]

25.   Ivillage.com bills itself as "the leading *women's* network."[13]

26.   In its response to #8 of Plaintiff's Third Set Of Interrogatories, Defendant addressed the issue of special effort searches as follows:

> [N]o "special effort searches" were conducted at the University or the Health System between the beginning of L999 and the end of 2003.[14]

27.   Despite Penn's own website being littered with references to all of the "special efforts" it makes to achieve diversity, we now learn that it has not conducted a *single* "special-effort search" for any of its positions in faculty or staff.[15]

28.   It appears, therefore, that the "special efforts" are made only in the form of general rhetoric, but when it comes time to actually fill a position, no formal "special efforts" are made.  Indeed, the documents produced in discovery and cited in Plaintiff's Supplemental Expert

---

[11] Ibid, p. 31 (listed as page "106" of the manual), ¶ 2G06.
[12] See Exhibit G, p.1, col. 1., ¶ 2). The document ("HR Tips") is incorporated by reference as if **fully set forth** verbatim herein.
[13] See Exhibit H, p.1, ¶ 1. The document ("Ivillage Company Info") is incorporated by reference **as if fully set forth** verbatim herein.
[14] See Exhibit A to Plaintiff's outstanding Motion To Compel Discovery, p. 5 of the Responses **to interrogatories**, Response to Interrogatory #8.
[15] See the attached Memorandum, incorporated by reference as if fully set forth verbatim herein, **for specifics.**

Witness Report shows a severe disparity among full-time faculty that, according to Penn, still does not justify a special-effort search:[16]

|  | White Non-Hispanic | Black Non-Hispanic | Total For All Races |
|---|---|---|---|
| Tenured Faculty[17] | 925 (92.31%) | 23 (2.29%) | 1,002 |
| Tenure-Track Faculty[18] | 288 (70.41%) | 10 (2.44%) | 409 |
| Non-Tenure Track Faculty[19] | 1,569 (87.26%) | 44 (2.45%) | 1,798 |
| Total Faculty | 2,782 (86.96%) | 77 (2.41%) | 3,199 |

29.    Unless Penn is prepared to argue that black professors are "utilized" at *barely over two percent* of the total Penn faculty, one has to wonder what it would take for Penn to consider a "special effort search" justified.  This is the "flip side" of the secretarial/staff imbalances outlined in the Supplemental Expert Witness Report.  Since staff is predominantly female, and OFCCP regulations do not work "in reverse" (i.e., males are never deemed to be underutilized), the lack of a special-effort search in those areas is consistent with Penn's AAP (even though Plaintiff argues an equal protection violation regarding those).  In this case, however, there appears to be no justification for not making a special-effort search for Black professors, given the extreme disparity.  For all of its rhetoric about promoting diversity, Penn has chosen to "stand down" and not use its primary weapon, the special effort search, to help rectify it.

30.    Plaintiff avers that the failure of Penn to conduct even a singular special-effort search from 1999-2003 (as stated in its response to the interrogatory) is a violation of OFCCP

---

[16] See Exhibit B of Plaintiff's first Motion For Summary Judgment, i.e., Plaintiff's Supplemental Expert Witness Report., UPenn Documents # 00017-18, lines 86-107, for the raw data.  See also Exhibit B to the Deposition of Nigel Searle (Attached as Exhibit I and incorporated by reference as if fully set forth verbatim herein).

6

regulations to "exact every good faith effort" in correcting underutilization.  The racial disparity among the faculty is the logical result of this lack of effort.

31.   A review of the racial disparity that incorporates gender into the equation shows an even stronger disparity among Black males.

|  | Blacks (M/F) | Whites (M/F) | Total (M/F) |
|---|---|---|---|
| Tenured Faculty | 13/10 (56.52% M) | 775/150 (83.78% M) | 837/165 (83.53% M) |
| Tenure-Track Faculty | 5/5 (50% M) | 197/91 (68.40% M) | 280/119 (70.17% M) |
| Non-Tenure Track Faculty | 19/25 (43.18% M) | 1,178/391 (2.45%) | 1,340/458 (74.52% M) |
| **Total Faculty** | **37/40 (48.06% M)** | **2,150/632 (77.28% M)** | **2,457/742 (76.81% M)** |

32.   Put another way, faculty at Penn is divided as follows:

a.   Total faculty is 76.8 percent male;

b.   White faculty is 77.28 percent male

c.   Black faculty is 48.06% male.

33.   While men outnumber women almost three to one among all faculty and white faculty, among *Black* faculty, women outnumber men slightly, although Blacks are a miniscule percentage of the Penn faculty to begin with.

34.   Penn's AAP states that:

For most job groups at Penn, an apparent mathematical under-utilization alerts Penn to potential problem areas for which it must pay special attention to determine whether or not in each selection decision made at the school and center level is consistent with Penn's non-discrimination policy.

*In other job groups, however, women and minorities are mathematically over-represented but yet the mathematical calculation of labor market availability and the*

---

[17] Ibid, line 92
[18] Ibid, line 99
[19] Ibid, line 106

*required comparison between that availability and the contractor's workforce seem to suggest that goals must be set in this case as well.* Penn recognizes that the mathematical existence of under-utilization may suggest a "manifest imbalance" and that it must set placement goals in even these cases. In all good faith, Penn instead may concentrate its review on those job groups and management levels within the organization where there is a dearth or few minorities and women.

Additionally, *in some job groups where no apparent mathematical under-utilization of women and minorities exists, yet in reality there is few to no representation of women and minorities in those job groups,* Penn may again concentrate its review in these areas.[20]

35.   Plaintiff avers that the last paragraph quoted in paragraph 27 above is an admission by Penn that it goes beyond the mandates of the OFCCP and incorporates "diversity" into its Affirmative Action Plan, despite having no legal basis for doing so as per OFCCP regulations. Without underutilization, there is no mandate from the OFCCP to take steps to increase incumbency. Affirmative action was designed to achieve parity with the relevant workforce, not the general workforce or general population.

36.   The first two paragraphs quoted in paragraph 27 acknowledge the central thesis and conclusion of Plaintiff's Expert Witness Reports, namely that the formula for determining underutilization is fatally flawed, because a) women can be deemed utilized in job categories where they are underrepresented in terms of the general population;[21] and b) conversely, women can be deemed underutilized in job categories where they comprise an overwhelming majority.[22]

37.   The Deposition of Plaintiff's Expert Witness, Nigel Searle and its incorporated Expert Witness reports, highlights the problems with the underutilization formula further (all emphasis original):

Q.   In Section IV of your first Expert Witness Report (line 1 of the first table, page 5), did you or did you not state that if 1) current female incumbency in a category is 6.9 percent; and 2) the percentage of females in the relevant workforce for this category is

---

[20] See Exhibit A, excerpts from Penn's AAP, document #UP-00952, bottom three paragraphs.
[21] Ibid, document #UP-00955, second paragraph, where "Nonclassified Professional Staff" are considered utilized at 26.5 percent incumbency (they are 68.9 percent of incumbents, but if they were only 26.5 percent, utilization would be achieved).
[22] Ibid, last paragraph, where secretaries comprise 89.8 percent of incumbents, but are nevertheless "underutilized," and a "goal" of 97.6 percent is mandated by the OFCCP formula.

also 6.9 percent, *regardless of the percentage of females in the overall area workforce*, that women in this category *are not* underutilized?

A.    "I did so state."[23]

Q.    In Section IV of your first Expert Witness Report (line 4 of the first table, page 5), did you or did you not state that if 1) current female incumbency is 85 percent; and 2) the percentage of females in the relevant workforce for this category is 97.5 percent, *regardless of the percentage of females in the overall area workforce*, that women in this category *are* underutilized?

A.    "I did so state."[24]

Q.    In section IV, paragraph A (p.5) of your first Expert Witness Report, did you or did you not state the following:

*A diverse or majority class can be underutilized.* In examples 3 and 4 above, women are considered underutilized even when they comprise 50.0 or 85.0 percent of the incumbent workforce. In example 3, women are underutilized even though diversity has been achieved. Affirmative action steps taken in the name of achieving utilization in this case will have the impact of making the employee class *less diverse.* This will occur anytime a majority class is underutilized.

A.    "I did so state."[25]

Q.    In section IV, paragraph B (p.5) of your Expert Witness Report, did you or did you not state the following:

*Underutilization can be eliminated without coming close to achieving diversity.* In [the] examples…above, utilization is achieved with the paltry percentages of 6.9 or 15.0 for women, which by no measure is diverse, and for which the odds of an absence of bias are astronomical.

A.    "I did so state."[26]

Q.    Is it an accurate reflection of your opinion, based on your expertise, to state that it is possible, under current OFCCP regulations as defined in the report, for a race or gender class to be "utilized" (as per OFCCP regulations) even if the same class would not be considered statistically diverse if measured against the overall population?

A.    "Yes."[27]

Q.    Is it an accurate reflection of your opinion, based on your expertise, to state that it is possible to hinder the aim of diversity (relative to the overall area workforce population) while achieving utilization (relative to the relevant workforce population), and that it is also possible to hinder utilization while achieving diversity?

---

[23] See Exhibit I, p.3, ¶ 6(a).
[24] Ibid, p.4, ¶ 6(d).
[25] Ibid, p.4, ¶ 7 (a).
[26] Ibid, p.5, ¶ 7 (c).
[27] Ibid, p.5, ¶ 7 (d).

A.   "Yes."[28]

Q.   In section IV, paragraph D (p.5) of your Expert Witness Report, did you or did you not state the following (answer each subquestion separately):

[D].   *Differences between diversity and underutilization.* Utilization is a threshold to be met or exceeded. Diversity is a target to be hit as closely as possible. There are three important differences between the concepts and definitions of underutilization and diversity:

**Response:** "I did so state."[29]

1.   Underutilization compares the workforce with the relevant area's available population (meaning those with adequate skills), whereas diversity compares the workforce with the relevant area's total population.

**Response:** "I did so state."[30]

2.   The goal of eliminating underutilization involves meeting or exceeding a target, whereas achieving diversity involves hitting a target, without exceeding it.

**Response:** "I did so state."[31]

3.   By definition, if a workplace is diverse because the percentage of women is the same as the percentage of women in the relevant area's total workforce population, then the percentage of men in the workforce must also be the same as the percentage of men in the relevant area's total workforce population. *If women or men are over-represented, then the other is necessarily underrepresented.*

**Response:** "I did so state."[32]

4.   When women are overutilized, men are not considered to be underutilized, because - *by the terms of its definition - the concept of underutilization does not apply to men.* There is no legitimate statistical basis for this distinction.

**Response:** "I did so state."[33]

Q.   Is it an accurate reflection of your opinion, based on your expertise, to state that when you say there is "no legitimate statistical basis" for never considering men to be underutilized, that you believe that it would be mathematically sounder to have a

---

[28] Ibid, p.5, ¶ 7 (f).
[29] Ibid, p.6, ¶ 7 (g).
[30] Ibid, p.6, ¶ 7 (g)(1).
[31] Ibid, p.6, ¶ 7 (g)(2).
[32] Ibid, p.6, ¶ 7 (g)(3)
[33] Ibid, pp .6-7, ¶ 7 (g)(4).

gender-neutral definition of utilization (i.e., one that allows men to be considered underutilized), than to use the current standard that says they are not underutilized?

A.   "Neither the inclusion, nor the exclusion, of men, is a statistical decision. But a "statistics neutral" rule would include men.[34]

Q.   Is it an accurate reflection of your opinion, based on your expertise, to state that the odds that the overall gender ratio among the clerical/secretarial class at Penn is the result of random distribution are "google" to one, or 22.6 standard deviations from the norm?[35]

A.   "I did so state."[36]

Q.   "When considering *all* factors which influence secretarial employment at Penn, whether or not those factors were caused by Penn or by any bias unrelated to Penn, if you were a gambler whose goal was to win his bets, and you were told that you were going to meet a randomly selected secretary from Penn, would you wager (at even odds) that you were going to be meeting a male or a female?"

A.   "Female."[37]

Q.   "Did you or did you not state the following in your Supplemental Expert Witness Report, section III (p.6):"

> There is nothing in the new hire data to indicate that statistically significant reversals of historical gender trends at Penn are occurring, to the extent that one would expect these changes to be reflected in the new-hire data.

A.   "I did so state."[38]

Q.   "Is it an accurate reflection of your opinion, based on your expertise, to state that your comparison of the new-hire data with the incumbent data did not reveal any substantial statistical change in the new-hire data that would indicate a change in diversity or utilization at Penn?"

A.   "Yes."[39]

Q.   "Did you or did you not state the following in your Supplemental Expert Witness Report, section IV (p.6, incorporating Table IV-A):

> Table IV-A below shows, in accordance with the statistical evidence and the accepted premise that diversity and affirmative-action steps help those they target as intended, how this assistance should be provided, and to whom:

---

[34] Ibid, ¶ 7(h).
[35] A "google" is one followed by 100 zeroes, or 10,000,000,000,000,000,000,000,000,000,000,000,000,000,000,000,000,000,000,000,000,000,000,000,000,000,000,000,000
[36] See Exhibit I, p.8, ¶ 8(a).
[37] Ibid, p.8, ¶ 8(b).
[38] Ibid, p.9, ¶ 9.
[39] Ibid, p.9, ¶ 10.

11

Table IV-A: Which Genders Need Help To Achieve Diversity?

| Annual Salary Range | Total Men | Total Women | Percentage of Men | Who Needs The Help? |
|---|---|---|---|---|
| All Faculty | 2,457 | 742 | 76.81 | Women |
| All Staff | 2,442 | 4,124 | 37.19 | Men |
| Executive/Mgr/Admin (all) | 455 | 628 | 42.01 | Men |
| Executive/Mgr/Admin (>=$75k) | 182 | 126 | 59.09 | Women |
| Executive/Mgr/Admin (< $75k) | 273 | 502 | 35.23 | Men |
| Other Professionals | 744 | 1,628 | 31.36 | Men |
| Technical/Paraprofessionals | 197 | 400 | 33.00 | Men |
| Clerical And Secretarial | 284 | 1,137 | 19.99 | Men |
| Skilled Crafts | 222 | 13 | 94.47 | Women |
| Service/Maintenance | 540 | 318 | 62.94 | Women |
| Total | N/A | N/A | N/A | N/A |

As the table clearly demonstrates, with the exception of faculty, top-level executive positions, skilled crafts, and service/maintenance, a substantial majority of the incumbents are female. Therefore, any steps taken in the name of reducing the disparity within a given category should focus on providing assistance to women in the categories which are exceptions, but in all other categories, assistance should be provided to men."

A.    "I did so state."[40]

Q.    "Is it an accurate reflection of your opinion, based on your expertise, to state that you believe that the best way to achieve *diversity* at Penn (as defined in both reports, i.e., statistical parity with the area workforce population) would be to provide "help" (in increasing incumbency) to males (instead of helping females similarly or being neutral) in the "Clerical And Secretarial" job category?"

A.    "Yes."[41]

Q.    "[Did you or did you not state in Sec. IV, p.6 of your Supplemental Expert Report that] *Gender/Glass Ceiling Disparity Among Staff, By Category:* Women comprise 62.81 percent of all Penn staff, an outcome *20.8 standard deviations* from the mean, with odds of a disparity at least this large occurring at 1 in 1e95 (one followed by 95 zeroes). There also appears to be a strong "glass ceiling" disparity in all three categories."

A.    "I did so state."[42]

Q.    "[Did you or did you not state in Sec. IV, p.6 of your Supplemental Expert Report that] The "Clerical/Secretarial" category is the most lopsided of the large staff categories, with women comprising 80.01 percent of the incumbents, an outcome which is *22.6 standard deviations* from the mean, and where the odds of an outcome this extreme or greater occurring are "google" to one (a **google** is one followed by one hundred zeros). Gender and salary range within this position

---

[40] Ibid, p.9, ¶ 11.
[41] Ibid, p.9, ¶ 12.
[42] Ibid, p.10, ¶ 13(4).

12

appear correlated, as the odds of the outcomes for each salary range occurring are only 1 in 7.7.

A.   "I did so state."[43]

Q.   [Did you or did you not state in Sec. IV, p.6 of your Supplemental Expert Report that] *Should Affirmative Action/Diversity Steps Be Taken For Men As Well As Women?* If one accepts the premise that these steps help to increase incumbency among the gender they are targeted at, there is no reason not to believe that the steps would be any more or less effective for one gender than for another.  To the extent one accepts that these "special effort" steps achieve their stated objective, applying the concept of utilization to men would eliminate the problem of underutilized majority classes (where utilization steps decrease diversity), and would help to achieve diversity more quickly than if these steps were not taken on behalf of males as well as females.

A.   "I did so state."[44]

Q.   "[Did you or did you not state in Sec. IV, p.6 of your Supplemental Expert Report that] *Penn's Education Benefits:* To the extent that Penn offers a tuition benefit to its full-time staff, these benefits will be made available to women far more often than men, as women comprise the vast majority of Penn full-time staff.  To the extent that education benefits increase one's opportunity, and to the extent that each gender is equally likely to make use of the benefit, it is accessible to many more females than males."

A.   "I did so state."[45]

38.   Dr. Searle sums up the problem with Affirmative Action as it is presently

calculated:

Q.   "Is it an accurate reflection of your opinion, based on your expertise, to state that using underutilization as the basis for affirmative action (as the OFCCP does) provides for greater assistance to those classes of workers who have experienced the *least* historical discrimination?"

A.   "Yes."[46]

39.   It should be clear by now from the evidence that the formula for determining

underutilization is hopelessly flawed, and does not achieve the stated ends.  Indeed, all the

formula does is cement existing biases.  In the case of secretaries, where the "goal" is 97.6

percent women, even 90 percent incumbency is not sufficient to reach utilization, while in the

---

[43] Ibid, p.11, ¶ 13(4)(e).
[44] Ibid, p.12, ¶ 13(7).
[45] Ibid, p.12, ¶ 13(8).
[46] Ibid, p.13, ¶ 14.

case of construction workers, where the "goal" has been 6.9 percent females on-site for two decades (citation omitted), once that goal is reached, OFCCP regulations say that there is no need to improve. Penn's own AAP expresses similar sentiments, which is why it pursues goals where women and minorities are truly underutilized (and not because)

### Title VII Principles And Diversity

40.  OFCCP regulations state that:

> It is OFCCP policy, in conducting analysis of potential discrimination issues under the Executive Order, to follow *Title VII principles.* (Emphasis Added)[47]

41.  As averred, Penn's AAP recognizes the need for following "Title VII principles" whenever women suffer from their failure to do so: loading up the secretarial ranks further with women is not a goal of their diversity policies, and neither is stopping short of population diversity when the goal is anemic, such as with construction or say engineering (where women comprise roughly 10-30 percent of that industry).

42.  Once Penn crosses the line into diversity policies which are not mandated by the OFCCP, it is acting on its own accord, and that is when its relative treatment of the genders becomes relevant. Penn is not required to aid women or minorities further than is required by the OFCCP, but it is obviously not satisfied with the results when the flaws of the utilization formula do not help women sufficiently.

43. It is when that Penn steps in with its one-way diversity policies that assist women and minorities in achieving population diversity, even when it does not have to do so that it runs afoul of Title VII by providing assistance for women and minorities that it refuses to provide to similarly situated males, whites, or white males. Its lopsided collection of policies and initiatives add up to its expression of the belief that white men are somehow never discriminated against. Indeed, it is not likely that any employer in this country could "focus" on assisting whites and

---

[47] See Exhibit F, p. 50 (page 125 on the document), Chapter 2M00.

males in finding employment (even in secretarial work) without being sued for discrimination, and losing. This is an outdated mindset.

44. Even if this or a higher Court refuses to see Affirmative Action regulations as unconstitutional, Penn's AAP (and related diversity policies) are sufficiently illegal under Title VII that a finding expressing so much would leave affirmative-action intact while still addressing the unnecessary and illegal steps Penn takes to further its cause beyond government mandates in the name of "diversity." These steps would be legal and even commendable if they were applied equally to whites and males in traditionally female and minority-dominated professions as they are to women and minorities in white-male dominated professions. Adherence to "Title VII principles" would mandate that Penn take the same steps for its male secretaries as it takes for its female construction workers or engineers, including conducting special-effort searches for all categorical minorities, in the event Penn ever begins conducting them again.

## Constitutionality of Affirmative Action

45. Without question, the OFCCP regulations violate the Equal Protection Clause because it provides benefits to women and minorities that it does not provide to men. The question is whether or not there is a compelling government interest in doing so. Plaintiff obviously argues that there is no compelling interest in keeping the status quo, and in fact there is a compelling state interest in changing it.

46. Without true equality in government-mandated AAPs or employer-initiated diversity programs, we will wind up with a society where all of the employment problems wind up fixed for women and minorities, while left intact for men. This will almost certainly result in an erosion of opportunity for men, as "his jobs" will become "our jobs" while "her jobs" will remain "her jobs." At this rate, women will dominate many professions while achieving equality

in others (except those professions involving work they do not wish), giving themselves the freedom to choose their lot in employment, while men fight for ever-decreasing scraps.

## IV.  PLAINTIFF'S RETALIATION CLAIMS

47.  Plaintiff incorporates the entire contents of paragraphs 1-46 as if fully stated verbatim herein.

48.  The first time Plaintiff was retaliated against by Penn was in 1993, when his supervisor, Carol S. Grande, took the adverse employment actions against him of an oral performance warning on April 12, just a few weeks after he formally complained to her supervisor, Cynthia Maurer-Sutton, about what he considered to be abusive working conditions.

49.  The next adverse action taken by Ms. Grande occurred when on or about June 1, 1993, she gave Plaintiff a negative performance evaluation and placed him on probation.  Rather than remain a "sitting duck" for what he considered unfair supervision, Plaintiff gave 90 days notice and resigned.  He shortened that notice to two weeks on June 8, 1993 over a dispute regarding a trip to the dentist (Ms. Grande didn't want him to go), and quit his position on June 22, 1993.[48]

50.  While Plaintiff was employed by Penn, Ms. Grande was going through a great deal of personal strife: she had just relocated to Pennsylvania from Texas, apparently had gone through a divorce, was in therapy, and was prone to making negative comments about herself. One paper from a group that Plaintiff was told to file for Ms. Grande included the following commentary on her participation in a self-help type of group:

> ½ hour snoring
> behavr: sat, not introduce self
> feelings: fear, lost, not know anyone
> embarrass...fat, ugly[49]

---

[48] See Exhibit J, incorporated by reference as if fully set forth verbatim herein.
[49] See Exhibit K, incorporated by reference as if fully set forth verbatim herein.

51.   While perusing the voluminous production in response to his discovery requests in this lawsuit, Plaintiff learned that Ms. Grande had told two temp agencies that she would not rehire Plaintiff (see paragraph 18 of this Motion).

52.   After leaving Penn in 1993, Plaintiff applied to work there sporadically through 2001, when he finally decided that he had an inability to compete on equal footing due to Penn's AAP and "diversity" policies.  Nevertheless, he decided to submit his resume to the human resources database for consideration, as per the HR website, and received the e-mail acknowledgement averred in paragraphs 5-6.[50]

53.   The webpage located at http://www.hr.upenn.edu/jobs/howtoapply.asp stated the following during the time in controversy:

> **Contact With Penn - Interviews**
> Highly qualified candidates will be contacted for an interview by the PENN Hiring Officer or a central Recruiter. At the time of the interview, you will be asked to complete a PENN employment application. Penn has many positions open. Over 50% are for research-related positions, with others in the fields of accounting, office support, information technology, management, facilities, security, food service and others.

54.   Because Penn had "many positions open" and stated that they would contact "highly qualified candidates"[51] for an interview, Plaintiff had every reason to believe that his resume submission was sufficient.  When he did not hear back as of September 10, 2001, he went to the EEOC and made an appointment to file a charge, which was then filed on October 23, 2001.  On December 28, 2001, he received his right-to-sue letter.[52]

### Wintermute And Edward Zawadzki

55.   As averred, Plaintiff was threatened on or about September 12, 2001 by a Penn student (at the time) who went by the internet name of "Wintermute."

---

[50] See Exhibit L, incorporated by reference as if fully set forth verbatim herein.
[51] See Exhibit M, where the notation "overqual" was written on an application for an administrative position.  The document is incorporated by reference as if fully set forth verbatim herein.
[52] See Exhibit A to the Amended Complaint.

56.   If Penn's position is to be believed, they were unable to identify the author of a dozen separate messages, one of which was posted less than a week prior to their being served with a subpoena.  They claimed that it is possible for users to log in anonymously to the PennNET system.  This was despite the statement by Detective Blackmore that he had talked to Wintermute, and the message by Wintermute of September 15, 2001 which said that he had been "instructed not to speak to Plaintiff." (see ¶ 6)

57.   Following is a list of the messages in controversy, the dates they were posted, and from which IP address (computer location) at Penn:[53]

| DNS/IP Address | Date | IP Address |
|---|---|---|
| wlt-102-199.greeknet-student.upenn.edu | 09/11/2001 | 199.102.123.165 |
| wlt-102-199.greeknet-student.upenn.edu | 09/26/2001 | 199.102.123.165 |
| wlt-102-224.greeknet-student.upenn.edu | 02/19/2002 | 165.123.102.224 |
| dhcp0006.wlt.greeknet.group.upenn.edu | 08/06/2002 | 165.123.197.36 |
| dhcp0006.wlt.greeknet.group.upenn.edu | 08/13/2002 | 165.123.197.36 |
| dhcp0006.wlt.greeknet.group.upenn.edu | 11/14/2002 | 165.123.197.36 |
| wlt-102-199.greeknet-student.upenn.edu[54] | 09/15/2001 | 199.102.123.165 |
| School of Engineering And Applied Science | 10/24/2001 | 158.130.22.103 |
| dhcp0006.wlt.greeknet.group.upenn.edu | 04/22/2003 | 165.123.197.36 |

58.   For Penn's story to make any sense, the IPs would generally have to be "dynamic" rather than "static."  As stated in paragraph 42 of the Amended Complaint in Parker v. Wintermute et al.:

> If these IP addresses were randomly assigned, or if Wintermute had not been using his own computer, it is extremely unlikely that messages posted more than three months apart (08/13/2002-11/14/2002) would have carried the same IP or host.  In discovery, Penn did not produce *any* information regarding the user (Wintermute), the computer used to make the postings (the same IP would mean the same workstation), or even which part of GreekNet (i.e., which fraternity or sorority) the postings came from.

59.   Penn's motivations for obstructing justice and covering up Wintermute's identity is obvious enough, as it would be a black mark on the University, but it also wants to cover up the conduct of its male students, especially those "pickup artists" who use controversial methods

---

[53] See Exhibit D, ¶ 42, p. 12
[54] This IP address appears to be the same as the first two, only backwards.

to attempt to seduce or "play" women on campus.  In this case, Wintermute posted a picture of him and one of his "conquests" who also happens to be a current Penn student.  If he were identified, she would learn of what was done to her picture, and she might take action against Wintermute and/or Penn for invasion of privacy and/or any obstruction by Penn.  Plaintiff also might be able to establish further liability if discovery revealed any connection between Wintermute's conduct and any higher-ups at Penn.[55]

60.    Since the subpoena was issued, Wintermute has revealed a great deal about himself in addition to the picture.  He has posted messages to the internet which revealed his graduation date, major and minor, height, weight, and hometown.  This information is more than sufficient for Penn to identify him, yet they have repeatedly chosen to "stand down" even though Plaintiff needs his identity to prosecute him criminally and/or serve him with a civil suit.  Since the threats were made over the internet, and since Wintermute has defamed Plaintiff in his employment while trying to interfere with his livelihood, the Sarbanes-Oxley Act (18 USC §1513(e)) and Witness Protection Act (18 USC §1513(a-d)) may very well have been violated.  Violations of this section of the United States Code are not only RICO predicate acts, but also felonies in and of themselves punishable by up to ten years in prison.

61.    On January 2, 2002, Defendant downloaded pages from a "hate website" known as "RayFAQ" that is the Centerpiece of Parker v. Learn The Skills Corp. Defendant was looking for "dirt" on Plaintiff and thought they had struck paydirt.  This is why they changed course midstream in this case and went from claiming that Plaintiff had simply not applied for a job at Penn to claiming he was unemployable.  It is also why they have begun repeating the defamation over which Plaintiff now sues, under the protection of the immunity that comes with using pleadings as a defamation weapon.  In doing so, however, Penn has been careless, and

---

[55] See Exhibit D, ¶ 45, pp. 13-14.

mischaracterized the nature of Plaintiff's internet business and his beliefs. For example, in the

Joint Pretrial Statement in <u>Parker v. Tilles</u>, Tilles and the DP claimed that Plaintiff:

> Plaintiff publishes sexually explicit material on the Internet concerning the
> seduction of women, and his misogynist views, including the use approval of
> hypnosis to obtain sexual favors.

62.   The reality of the situation is that Plaintiff's views, while definitely "male

oriented," are far less "misogynist" than the views of the website endorsed by Wintermute,

www.fastseduction.com.   Penn also mischaracterized Plaintiff's views on hypnosis and "sexual

favors."  Wintermute is a practitioner of "NLP seduction" (covert hypnosis disguised as normal

conversation), and has posted detailed reports of his exploits with the opposite sex at

fastseduction.com and other places around the internet.[56]  By contrast, Plaintiff posts a benign

website with his views on women and seduction, and teaches men to become "anti-players" who

hold their ground when women choose the "badboys" over the "nice guys."  Part of the anti-

player approach is to enlighten women about what the Wintermutes of the world are about.  The

"players" get very angry at being exposed as liars, and the results are lawsuits like <u>Parker v.</u>

<u>LTSC</u>.

63.   In addition to Wintermute, a current Penn employee from the College of General

Studies (previously Wharton) named Edward Zawadzki used to post to www.fastseduction.com,

many times during business hours (Penn records can verify if he actually supposed to be

working at those times).  Following are some excerpts from his posting history (the entire history

involves many more posts), with dates and times:

> a.   There is this TOTALLY hot secratery in one of the departments where I worked who
> was giving me some vibe... went out with her once or twice...( Fri, 29 Jun 2001
> 09:14:23 -0400)[57]
>
> b.   My GF, my Roommate and I all went out in costume last night I was Hugh Hefner
> (maroon silk smoking jacket, black velvet lounge pants, pipe, hair dyed grey) and my

---

[56] <u>Ibid</u>, ¶¶ 24-58, pp. 8-17, and exhibits A-1 thru A-11 to that Complaint.
[57] <u>See</u> Exhibit N, p. 1.

GF was my playboy bunny (the whole 9 yards, right down to the cottontail...) (Wed, 31 Oct 2001 09:08:26 -0500)[58]

c.  Art shows are (at least in my experience) a GREAT place to meet HBs. I live in Philadelphia, and there is an art show downtown on the first Friday of every month... very chill event, all the galleries along a 2-3 block stretch open their doors, and people just walk around browsing the galleries. there's some pretty nice stuff, but what really amazed me is the amount of HBs there by themselves!!! (Wed, 31 Oct 2001 09:08:26 -0500)[59]

d.  My GF and I love to watch porn together, and her BJ technique has improved by leaps and bounds since... Although you have to be careful, a lot of the stuff in porn is done just for show and isn't really as good as it looks when you try it yourself :-) anyway as to getting your girls to watch porn it shouldn't be that hard. I've found that MOST chicks like porn as much as guys. (Thu, 08 Nov 2001 11:14:00 -0400)[60]

e.  I've had the best experience talking about it afterwards. We all know that chicks love to cuddle and shit after sex, so use that as an opportunity to talk about stuff. She will be in a very relaxed and receptive state. (Thu, 08 Nov 2001 11:25:00 -0400)[61]

f.  Yeah, homemade porn is great, best is when it's you making it :-) I gotta get my camcorder fixed, my GF and I were going to make some of our own... (Sat, 10 Nov 2001 17:34:00 -0400).[62]

g.  I don't remember which direction corresponds to which brain section off the top of my head, but I'll look it up and post it... (it's in one of my NLP books...) (Wed, 14 Nov 2001 09:53:00 -0400)[63]

h.  One thing I have found to work extremely well is as follows: When I have set up a meeting with a chick (usually for coffee) AS SOON AS SHE SHOWS UP, I will stand up to greet her with a big smile, and instead of shaking hands or some traditional bullshit like that, I will but my hand on the small of her back, and kiss her on the cheek. This serves two purposes- firstly it immediately establishes me as a physical/sexual being in her mind, and secondly it sets the precedent for more kino throughout the evening. (Wed, 14 Nov 2001 10:13:00 -0400).[64]

i.  I think you may have a new acronym: IK = Immediate Kino... (eg. "we met, I laid on some IK, and went directly into the 'our world' pattern...) (Wed, 14 Nov 2001 14:15:00 -0400).[65]

j.  Kino for me goes as follows: (this is in the context of a "coffee shop" style meeting) initially: cheek kiss opener (read alphahot's thread for more detail on this) then, as the conversation goes with some fluff, I will BRIEFLY touch her leg or forearm whenever I make her laugh (to anchor, and establish a precedent) then, as the convo turns to more serious matters (talk of passion, emotions, incredible connection, etc...) I will

---

[58] Ibid, p. 2.
[59] Ibid, p. 3.
[60] Ibid, p. 4.
[61] Ibid, p. 5.
[62] Ibid, p. 6.
[63] Ibid, p. 7. Note the reference to NLP, which is a form of covert hypnosis used to obtain sexual favors (what Defendant accused Plaintiff of).
[64] Ibid, p.9.
[65] Ibid, p.10.

keep my hand on her longer and longer (holding hands etc...) as I judge that her emotions are being aroused (reading body language is CRITICAL) this basically plays into EVERY chicks fantasy: being swept off her feet, holding hand, and sharing an intimate moment of passion/emotion with someone... and you NEED kino for this... it heightens the emotional connection you are establishing. (Wed, 14 Nov 2001 15:12:00 -0400).[66]

k.  Don't forget, chicks have caller IDs, and can KNOW if you call... Best thing is to leave a tantalizing phone message that she won't be able to resist... One suggestion I like is to start leaving a message about "something fascinating/interesting you need to tell her" and then just hang up in the middle of a sentence, as if the line went dead... She WILL call you back... never underestimate the power of curiosity...( Thu, 15 Nov 2001 09:18:00 -0400)[67]

l.  Here's a naked guy story for you- totally true, too- happened to me 2 weeks ago...My GF and I were in Vegas for the weekend after Halloween, some friends have this annual tradition of throwing this WILD Halloween party in Vegas every year. It was pretty out of control- they had a penthouse suite in the MGM grand hotel- 40th floor over the strip, 2000+square feet, full terrace, and they key part: two Jacuzzis!!! so anyway, it's still pretty early in the evening, people are just starting to arrive-there's maybe 30 or so people out on the terrace, getting acquainted (lots of first timers...) drinking, dancing etc... all of a sudden, this guy walks out onto the terrace.  Not sure who he was, I don't think anyone knew him, and just starts taking his clothes off!!! everyone pretty much stops what they are doing, watching this guy.  He very nonchalantly strips butt-naked, and gets into the hot tub, continuing a conversation with this other guy like nothing... everyone was kind of puzzled, and he was simply known as "naked guy in the hot tub" for the rest of the night... (there were PLENTY of naked people in the hot tub by the end of the night)... the night only got wilder from there, including my first <almost> foursome... maybe I'll post details... :-) (Thu, 15 Nov 2001 10:16:56 -0500).[68]

m.  I've found that women have an almost universal fantasy of this "one special/passionate moment/kiss"  In other words, how there was this "one magical moment" when he just "looked deep into her eyes" and then this "incredibly passionate kiss" and feeling of deep emotion and connection..."  I've never met a chick who didn't have this fantasy, SO it's actually pretty easy to play off it... first off, you need to build up her emotional level, using routines, talk of passion and adventure  etc... (IC pattern is perfect) all the time gradually increasing kino.  Then, when she is sufficiently DDB, look DIRECTLY into her eyes, no blinking, and take her face in your hands, draw it toward you, and without a word, slowly kiss her, all the time cradling her cheek with your hand.  I PROMISE you, she will FUCKING MELT into you... and you WILL fuck her. (Thu, 15 Nov 2001 14:59:00 -0400).[69]

n.  gabriel wrote:

<snip>

> Sorry if ive waffled, Im bored at work and hey, even Pick up artists have
> to grin occasionally.

---

[66] Ibid, p.13.
[67] Ibid, p.14.
[68] Ibid, p.16.
[69] Ibid, p.17.

ROTFLMAO. I hope you're proud of yourself. Now I've got coffee all over my keyboard.
-SlickEddieZ, fellow techie/network admin. (Fri, 16 Nov 2001 00:58:00 -0400).[70]

o.    I don't even know any of the "canned" patterns. Since I understand the HOW and WHY they work, I find it more useful to simply make them up on the spot- imagine having a "pattern" for any topic at hand, wouldn't that be great! (Fri, 16 Nov 2001 11:52:00 -0400).[71]

p.    Try this: when/if the subject of you having a GF comes up, say something along the lines of "There are girls that I am seeing, but I haven't yet met anyone worth of being my actual GIRLFRIEND..." this accomplishes several things- 1. it shows social proof (you have chicks) 2. it shows you have high standards 3. it provides a challenge to her (if she wants to be your "GF" she'll have to "prove herself") I personally will be quite frank with a woman. I'll tell her that I am not a monk, and that I have women, but I am just looking for one good enough to make me forget the rest... chicks love this angle b/c they all want to be the one who "reforms the player" (Fri, 16 Nov 2001 16:29:00 -0400).[72]

q.    > What is IRL ? couldn't find it on Common Acronyms on FastSeduction.

In Real Life... In my opinion, there is no substitute... best way to learn is to get out there and DO IT...( Mon, 19 Nov 2001 15:18:00 -0400).[73]

r.    Bareback for me... Pull-out method for contraception, and condom if I want to come inside her.. (Tue, 20 Nov 2001 00:57:00 -0400).[74]

s.    3. (my personal favorite option) have her as a LTR, and open her up to the idea of 3somes, swinging etc... LOTS of fun... best part is- you can go PU chicks TOGETHER!!! (Tue, 20 Nov 2001 00:49:00 -0500).[75]

t.    I OPENED a conversation the other week with a group of chicks in a bar by going up to them and saying "excuse me, I need some female opinions on this: which do you think is hotter, a threesome with 2 girls and a guy or with 2 guys and a girl..." no fluff talk, no bullshit we all just started talking about sex and threesomes, and this one chick in particular telling me about her 3some experiences. (Tue, 20 Nov 2001 13:36:00 -0500).

u.    I was doing some research the other night on bipolar psychotic disorders, specifically Paranoid Schizophrenia, (for a research project) and while thinking about it, I realized something very interesting... The primary symptoms of Paranoid Type Schizophrenia (according to the DSM-IV criteria) are:

Delusions (specifically persecutory, grandiose and religious...) Disorganized speech (including: associative loosening, tangential replies, illogical thinking or language, and derailment) Disorganized or Catatonic behavior Negative Symptoms

In addition, some of the primary social/psychological effects of the prodromal and

---

[70] Ibid, p.18.
[71] Ibid, p.19.
[72] Ibid, p.20.
[73] Ibid, p.22.
[74] Ibid, p.24.
[75] Ibid, p.25.

active phases of the disease are: More likely to remain single... Have lower socioeconomic status (eg. unemployed, living at home with parents) Downward drift (of socioeconomic status) increased suicide attempts/rate cognative impairment also, specifc to Paranoid type (as opposed to others) is - preoccupation with one or more delusions (such as a persecutory complex- eg. delusions of being threatened/stalked etc...) - often prone to anger/outbursts during interpersonal relations/discussions... Hmmm.... Interesting... take it as you will...( Wed, 27 Jun 2001 11:42:57 -0400).[76]

64.    Three or four years, ago, Mr. Zawadzki lived in the same building as Plaintiff.

## Unclean Hands And Pretext

65.    In its order of November 3, 2003, this Court stated that:

Defendant has stated a legitimate, non-retaliatory reason for failing to hire plaintiff: that his application was never reviewed. Plaintiff now must prove that defendant's stated reason is pretextual.

66.    Defendant's proffered reason is most definitely pretextual.  In paragraph 53, Plaintiff has already shown that Defendant's own website states that an applicant may be called upon to fill out an employment application *after* a telephone interview initiated by Penn.  That is clear evidence that Penn takes an initiative to contact applicants when it *wants* to.  Additionally, discovery in this case also yielded an affirmative-action compliance form (for Plaintiff's which listed as the referral source as "through a *friend in human resources*."[77]  If this Court is going to entertain the notion for even one second that there is not an informal network that gets people jobs at Penn, Plaintiff will take his chances in the Third Circuit or the United States Supreme Court and fully expect this case to wind up back here with instructions to rule "consistent with their reversal."  Even if it did entertain the notion, Plaintiff has shown the real reasons he was not hired: Penn simply does not want a whistleblower working there.

67.    The doctrine of "unclean hands" is bedrock to the judicial system: it says, simply, that a party cannot benefit from wrongful acts.  The classic case is when a child who murders his

---

[76] Ibid, p.28. Note: this message was posted to USENET, where e-mail addresses are revealed. The e-mail for this posting was "edwardz@dont.you.dare.spam.me.wharton.upenn.edu (the "dont.you.dare.spam.me" part is not the e-mail address but a SPAM deflector. This was a subject started by Plaintiff; note the many references to Plaintiff's bipolar condition and his living arrangements (with his family).
[77] See Exhibit O, last paragraph. The Exhibit is incorporated by reference as if fully set forth verbatim herein.

or her parents begs for mercy on the grounds that s/he is an orphan. In this case, Penn's hands are unclean because it was well aware as of at least July 27, 2002 that Plaintiff was trying to find work at Penn, and it did *absolutely nothing* to correct his mistaken impression.

68.   If one is to believe that Penn has no animosity towards Plaintiff, and cheerfully encourages even Title VII litigants against it to find work there, one also has to ask why Penn never took the simple step of informing Plaintiff of what contradicts its statements on its website and e-mail acknowledgement that Plaintiff would be contacted for interviews. Indeed, once Plaintiff was made aware by the DP article that Penn was going to argue that he did not apply, he submitted between 90-100 applications for specific jobs at Penn, got four interviews, and four rejection letters (two of which were post-interview).[78] Each of the letters praised Plaintiff's skills and qualifications (just as the application from 1993 which said he was "overqualified"), but did not contain a job offer.

69.   Because of Penn's unclean hands with regard to Plaintiff allegedly not applying for a specific job, and because of the corrective steps taken by Plaintiff once he learned of Penn's policies regarding "general" resume submissions, Plaintiff should be recognized as having applied for work at Penn. Even without any "equitable tolling" of his job application, the fact remains that the powers that be at Penn were fully aware of the situation, did not rectify it, and appear to have incorporated keeping Plaintiff in the dark into their defense strategy, all the while doing everything they could to *not* avoid being sued.

70.   The unclean-hands doctrine should apply equally to the race and gender claims.

---

[78] See Exhibit P. The Exhibit is incorporated by reference as if fully set forth verbatim herein.

## Osgaldor Storm's Threats On Plaintiff's Life And Claims That Penn Was Involved

71.   Osgaldor Storm (and/or his wife, Judy) was revealed to be Defendant John Doe #10 in <u>Parker v. Learn The Skills Corporation et al.</u>.[79]  In April 2003, Dr. Storm posted a series of highly threatening messages to Plaintiff, his turn to "carry the ball" and be the "loose cannon" who threatens Plaintiff (part of the alleged strategy of the RICO enterprise in case is to use rotating attackers so no one attacker appears to be crossing the line).[80]

72.   On or about April 15, 2003, Dr. Storm posted a message which Plaintiff found disturbing and startling.  It contained the following statements, which Plaintiff will repeat with apologies for the length:

> ROTFLMAO!!!!!  God you get me SO FUCKING HOT, Gordon!  Knock yourself out!  File and list every single poster to this group because that seems to be the scope of the people who believe you are genuinely mentally ill!  And have another beer while you're at it because the judge is going to have some very interesting things to say to you right before he orders you remanded for psych evaluation!  When it happens, I will GLADLY fly over from the UK to present *MY EVIDENCE that you are A DISGUSTING FRAUD, A CHILD MOLESTING ALCHOLIC who has threatened me repeatedly, and who poses a continuing and ongoing threat to himself and others!*  When WAS your last suicide attempt, Ray?  And you never told me if it was Tegretol or Stelazine.
>
> Oh no, wait a moment.  Gordon, I have to confess something to you.  In all fairness, you should know that I have previously been ruled "Non compos mentis" and I really can't testify to anything.  I'm just too mentally unstable, and with my history of violent outbursts, I'm afraid I'm not welcome in many courtrooms.  Can you *really* be sure that I'm NOT hiding in your closet when you go to bed tonight?  But what do I know?  I'm just some loser who's read a couple a' books.  *I used to work for U Penn and it was actually them who put me up to joining this newsgroup.*  But then, I think it's possible that certain people may have already paid DOZENS of people to go after you, meticulously, methodically, and WITHOUT MERCY.  Isn't it true that you are aware that your house is under surveillance?  But you aren't yet aware that there are people following you?  *Have you noticed your computer is not acting quite "right" recently?  Do you know how easily an anonymous person from overseas can get into your computer while you're online?  And you'd never even have known about it until it's way too late, isn't that what they say.  Virus and history kill software don't prevent people of spoofing IP's and easily slipping into your system without even the slightest hint of your detection.*  Look above you Ray.  What do you see that could easily have a concealed camera in it?  Have you noticed how easy it is to find people here who wish you ill, people who are close enough that it would be a simple matter to "visit" your home?  Your mom is a nice lady, and she's very forthcoming with polite young ladies who ask seemingly innocuous "survey questions".  Did you know there may be people RIGHT HERE ON THIS LIST who may know people WHO HAVE BEEN *INSIDE* YOUR HOUSE?  It's true!  There may very well be such people.  Of course, I'm just writing about a general topic, not writing about anyone specific, I wouldn't want to seem disingenuous, that would

[79]  See Exhibit Q, the production from Alltel Communications, Inc. to Plaintiff in response to a subpoena for his identity.
[80]  See Exhibit D, ¶¶ 184-197, pp. 47-52 and Exhibits F-1 thru F-3.

be AN INEXCUSABLE FAILURE on my part to *be a responsible member of this online community*.

Btw, Gordon, you never answered ANY of my questions. Why is that? Could it be that I already know the answers, and you KNOW that I know? I'm a little surprised that you haven't gotten my phone number yet, Gordon. How can you insult me if you don't do your homework?

Or are you afraid of what you will find at the other end of that telephone? You really needn't fear the inevitable, Gordon. You really needn't.  ;-D

*And thank you for being so entertaining during your remaining days, you SEXY BEAST you!*

Now run along and file your lawsuits and leave these nice people alone. :-D

*24 days, Gordon. Can you feel it? ;-)*[81]

73.  On April 13, 2004,[82] Plaintiff called Defense counsel and notified them that he had obtained Dr. Storm's identity and authenticated the postings through Alltel (his internet provider), and that if they wanted to sue him for libel, he would provide the information. Attorney Myers stated simply: "Penn has no need for that information."  Plaintiff knows of no civil actions for libel filed by Penn against Dr. Storm, and this is just another example of Penn being more than happy to let others threaten Plaintiff and invoke their name.

## V.  CONCLUSION

Rather than address Plaintiff's grievances, Defendant terminated them prematurely, did not provide Plaintiff with the means to correct any flaws in his job application, and for the express purpose of attempting to create a fatal defect in this lawsuit.  Penn has also chosen to cling to an affirmative-action and misguided, one-way "diversity" policy which simply *presumes* that women and minorities are oppressed in all work situations, even when the evidence is overwhelming that they are not, and they refuse to provide the same assistance to white males seeking employment in Penn's female and minority-dominated professions that they freely provide when the situation is reversed.  The underlying OFCCP regulations we call "affirmative

---

[81] Ibid, ¶ 186, pp. 47-48.
[82] The statute of limitations for libel in Georgia is one year.  See, e.g., Lee v. Gore, 221 Ga. App. 632, 472 S.E.2d 164, 1996.

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER**, Plaintiff<br><br>v.<br><br>**UNIVERSITY OF PENNSYLVANIA**, a Pennsylvania nonprofit corporation, Defendant. | **CASE NO.: 02-cv-567** |

## PLAINTIFF'S SCHEDULE OF WITNESSES

Plaintiff submits his schedule of witnesses.  Pursuant to Defendant's statement on Page 4, paragraph 3 of its Memorandum In Opposition To Plaintiff's Motion To Compel Discovery, all witnesses other than Nigel Searle (Plaintiff's Expert Witness) can be contacted in care of Defense counsel's address.[1]  To the extent that a witness is not produced via this address, Plaintiff will argue that they are unavailable as declarants and seek admissibility for any related evidence.  Plaintiff also reserves the right not to call these witnesses as circumstances or resources dictate.

To the extent any of these employees is no longer with Penn, and to the extent that the knowledge is tied to the office rather than the officeholder, Plaintiff expects that the current jobholder will be produced for trial instead.

All witnesses will be testifying regarding liability.

### Schedule of Witnesses

1.  Nigel Searle, Ph.D.
    2533 Alesio Avenue
    North Port, FL  34286
    (941) 429-1797

---

[1] c/o John M. Myers, Esq., Montgomery, McCracken, Walker & Rhoads, 123 South Broad Street, 28th Floor, Philadelphia, PA  19109.

NOTE: Plaintiff intends to use his Deposition By Written Questions of Nigel Searle as evidence at Trial.[2]  Dr. Searle has stated that he will be available by telephone should the need arise.  He is more than 100 miles from the courthouse and therefore cannot be compelled to appear without an order of this Court.

2.   Dianne Hannah-Wilson (or current occupant of her old position).

3.   Heather Carson (Penn Department of Human Resources).

4.   Valerie Hayes (or current OAA director).

5.   David Millar (ISC).

6.   Detective James B. Blackmore (DPS).

7.   Terri Dunn (CTT Business Manager).

8.   Carol S. Grande (Plaintiff's Former Supervisor).

9.   Eric Tilles (or his successor, OGC).

10.  John M. Myers, Esq. (Defense counsel).

11.  Thomas Rambo (Penn employee).

12.  Larry Singer (current Penn employee).

13.  Edward Zawadzki (Penn employee).

14.  Cynthia Maurer-Sutton (current or former Penn employee).

15.  Kim Harris (current or former Penn employee).

16.  Patricia Speakman (current Penn employee).

17.  Linda Satchell (current or former Penn employee).

This the 14th Day of May, 2004.

Gordon Roy Parker, Pro Se
4247 Locust Street, #806
Philadelphia, PA  19104
(215) 386-7366
E-mail: SnodgrassPublish@aol.com

---

[2] See Plaintiff's Trial Exhibit A from his Schedule of Trial Exhibits.

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER**, Plaintiff<br><br>v.<br><br>**UNIVERSITY OF PENNSYLVANIA**, a<br>Pennsylvania nonprofit corporation,<br>Defendant. | **CASE NO.: 02-cv-567** |

## CERTIFICATE OF SERVICE

I, Gordon Roy Parker, Plaintiff Pro Se in the above-styled action, have served a true and

correct copy of the foregoing Plaintiff's Schedule of Witnesses on Defendant University of

Pennsylvania through its undersigned counsel, by **hand delivery:**

John M. Myers, Esq.
Crystal D. Deazle, Esq.
Montgomery, McCracken, Walker & Rhoads
123 South Broad Street, 28th Floor
Philadelphia, PA  19109

This the 14th Day of May, 2004

Gordon Roy Parker
Plaintiff, Pro Se
4247 Locust Street, #806
Philadelphia, PA  19104
(215) 386-7366

# EXHIBIT "C"

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER**, Plaintiff<br><br>v.<br><br>**UNIVERSITY OF PENNSYLVANIA**, a<br>Pennsylvania nonprofit corporation,<br>Defendant. | **CASE NO.: 02-cv-567** |

## PLAINTIFF'S SCHEDULE OF TRIAL EXHIBITS

Plaintiff submits his list of trial exhibits, while sending one copy to Defendant and two copies to the Court, with three copies of the schedule to the Court as well.

### Schedule of Exhibits

**Exhibit A:**   Deposition of Nigel Searle, Ph.D. (Plaintiff's Expert Witness).[1]

**Exhibit B:**   Plaintiff's First Expert Report

**Exhibit C:**   Plaintiff's Supplemental Expert Witness Report

**Exhibit D:**   Excerpts from Penn's Affirmative Action Plan ("AAP").

**Exhibit E:**   Document entitled "HR Tips – Fall 2001"

**Exhibit F:**   Curriculum Vitae of Nigel Searle

**Exhibit G:**   Gender Equity Report, 2001

**Exhibit H:**   Gender Equity Report, 2003 (Full issue of *Penn Almanac, Volume 50 umber 16,*

**Exhibit I:**   Amended Complaint, <u>Parker v. Learn The Skills Corp. et al.</u>, E.D.Pa. Civil Action #03-cv-6936.

**Exhibit J:**   Internet postings by Edward Zawadzki, listed as a current employee of the College of General Studies.

---

[1] Plaintiff is in possession of the original Deposition in its sealed envelope for opening at trial or when otherwise directed by the Court.

*Exhibit K:*    Penn document entitled "Policy on the use of PennNET IP address space."[2]

*Exhibit L:*    Penn document entitled "Assignments 2.0.1 Reference Manual."[3]

*Exhibit M:*    Chapter II: Desk Audit[4]

*Exhibit N:*    Trial transcripts, Parker v. Tilles, Case #02-1068, September Term 2002, Philadelphia Court of Common Pleas.

*Exhibit O:*    Documents produced in response to subpoena to Alltel Communications, Inc. in Parker v. Learn The Skills Corp (E.D.Pa. #03-cv-6936).

*Exhibit P:*    Penn document entitled "Staff Affirmative Action Compliance Process." Documents #UP-00096-00102 produced by Defendant in discovery.

*Exhibit Q:*    Penn document entitled "Resources For Women" from the Dept. of Engineering website.[5]

*Exhibit R:*    Defendant's response to Plaintiff's Fifth Request For Production Of Documents, Third Set of Interrogatories, and Second Set of Requests For Admission.

*Exhibit S:*    Corrected Joint Pretrial Statement of Eric Tilles and Defense Exhibit 24 (Documents From "RayFAQ")

*Exhibit T:*    Penn document entitled "Affirmative Action Program Summary."

*Exhibit U:*    Documents related to subpoena to UPenn in Parker v. Wintermute.

*Exhibit V:*    Study entitled "Beautiful Faces Have Variable Reward Value."

*Exhibit W:*    US Government document entitled "Facts on Executive Order 11246 – Affirmative Action."

*Exhibit X:*    Plaintiff's EEOC charge.

*Exhibit Y:*    Penn document entitled "How to apply to the University of Pennsylvania."

*Exhibit Z:*    Affidavit of Donna Showell-Brown.

*Exhibit AA:*   Penn Document entitled "About The Office of Affirmative Action and Equal Opportunity Programs."

---

[2] From the Penn website at the URL of http://www.net.isc.upenn.edu/policy/approved/20000124
[3] From the Penn website at the URL of http://www.upenn.edu/computing/assignments/manual/index.html
[4] PDF file downloaded from the official OFCCP website. These are the "affirmative action" regulations.
[5] Text of http://www.seas.upenn.edu/staff/wr.html

**Exhibit AB:** *Almanac* article entitled "From the President and Provost: Gender Equity: Penn's First Annual Report."

**Exhibit AC:** *Almanac* article entitled "Appendix IV-D: University of Pennsylvania Gender Equity Study."

**Exhibit AD:** Fall 1999 statistical employment breakdown (documents #UP-00009-00019).

**Exhibit AE:** Defendant's motion to compel Plaintiff's independent medical examination.

**Exhibit AF:** pp. 1-9 of Defendant's Memorandum in opposition to Plaintiff's motion to compel discovery.

**Exhibit AG:** Letter from defense counsel declining rebuttal to Plaintiff's expert witness report.

**Exhibit AH:** Letter to Plaintiff from Sharon Moore Harris dated June 8, 1994 finding no cause for his grievances.

**Exhibit AI:** Seminar notification document with handwritten scribblings of Carol S. Grande.

**Exhibit AJ:** Document #UP-00478: reference to Carol S. Grande's statements to two temporary agencies that she would not rehire Plaintiff.

**Exhibit AK:** Internal Penn documents relating to Plaintiff's being threatened by Wintermute, grievance with the OAA, and charge with the EEOC. Documents UP #00064-00089 and #00103.

**Exhibit AL:** Plaintiff's electronic resume submission and acknowledgement by Penn of receipt of same.

**Exhibit AM:** E-mail from July 30, 2001 from Linda Satchell informing Valerie Hayes that she found Plaintiff's file from 1993.

**Exhibit AN:** Recommendations and findings relating to Plaintiff's 1993 Grievance relating to his employment (dated 06/08/94). Documents #UP 00472-00474.

**Exhibit AO:** Employee transfer application from Plaintiff from 1993 for position #04087 (AA II, Development, President's office). Documents #UP 00253 and 00230.

**Exhibit AP:** Affirmative Action Compliance Form for Plaintiff's replacement search in 1993 showing phone interview given to "friend of HR representative" at Penn.  Document #UP 00489.

**Exhibit AQ:** Employee transfer application from Plaintiff from 1993 for position #03051AR (Med/Tech Secretary).  Document contains notation "Overqual" for Plaintiff.  Document #UP 00790.

**Exhibit AR:** Page 7, memorandum in support of defendant's motion for sanctions.

**Exhibit AS:** Pages from "RayFAQ" downloaded January 2, 2002.  Documents #00056-00063.

**Exhibit AT:** Company information document from Ivillage.com.

**Exhibit AU:** Four rejection letters received by Plaintiff relating to his 2002 job search at Penn.

**Exhibit AV:** Job search results listing open positions on July 16, 2001.

**Exhibit AW:** Penn document entitled "The policy of Equal Opportunity, Affirmative Action And Nondiscrimination At The University of Pennsylvania."

This the 14th Day of May, 2004.

Gordon Roy Parker
4247 Locust Street, #806
Philadelphia, PA  19104
(215) 386-7366
E-mail: SnodgrassPublish@aol.com
Plaintiff, Pro Se

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER,** Plaintiff <br><br> v. <br><br> **UNIVERSITY OF PENNSYLVANIA,** a Pennsylvania nonprofit corporation, Defendant. | **CASE NO.: 02-cv-567** |

### CERTIFICATE OF SERVICE

I, Gordon Roy Parker, Plaintiff Pro Se in the above-styled action, have served a true and

correct copy of the foregoing Plaintiff's Schedule of Trial Exhibits on Defendant University of

Pennsylvania through its undersigned counsel, by **hand delivery:**

>John M. Myers, Esq.
>Crystal D. Deazle, Esq.
>Montgomery, McCracken, Walker & Rhoads
>123 South Broad Street, 28th Floor
>Philadelphia, PA  19109

Pursuant to Judge Brody's policies, three copies have been provided to the Court.

This the 14th Day of May, 2004

Gordon Roy Parker
4247 Locust Street, #806
Philadelphia, PA  19104
(215) 386-7366
E-mail: SnodgrassPublish@aol.com
Plaintiff, Pro Se

# EXHIBIT "D"

Jobs@Penn: Search Results                                    *Plaintiff's Trial Exhibit AV*

| Home | Jobs@Penn | Calendar | Contact | News | Forms | Policy Manual | Course Cat |



UNIVERSITY OF PENNSYLVANIA
**HUMAN RESOURCES**

**Print View**

- Jobs@Pe:
- Search O Positions
- How To A
- The Penn
- Benefits /
- About Ph
- Campus Informati

# Jobs@Penn: Search Results

Based on the criteria that you entered, the University of Pennsylvania currently has the following open positions. For more information about a particular position, or to apply for a particular position, please click the job title below. A total of 715 positions were found.



| Job Title | Reference Number | School/Center | Department |
|---|---|---|---|
| ACAD. COORD FOR PENNCAP | 01037336LL | STUDENT SERVICES | ACADEMIC SUPPORT PROGRAMS |
| ACADEMIC COUNSELOR | 01057806LL | STUDENT SERVICES | ACADEMIC SUPPORT PROGRAMS |
| ACCOUNTANT B | 01047593LL | DIVISION OF FINANCE | RESEARCH SERVICES |
| ACCOUNTANT B/GRANTS COORD | 00106638OM | SCHOOL OF MEDICINE | PS-PSYCHIATRY ADMINISTRATI |
| ACCOUNTANT C | 01068133OM | SCHOOL OF MEDICINE | EB-CENTER FOR CLINICAL BIO |
| ACCOUNTANT C | 00086150LL | FACILITIES MANAGEMENT | FACILITIES MANAGEMENT ADMI |
| ACCOUNTANT/FIN ANALYST | 01078297DS | SCHOOL OF NURSING | NURSING FINANCE |
| ACCOUNTANT/FIN ANALYST | 01037446LL | WHARTON SCHOOL | WHARTON FINANCE AND ADMINI |
| ACCOUNTING CLERK SR | 01068217LL | DIVISION OF FINANCE | CENTRAL GIFTS PROCESSING |
| ACCOUNTING CLERK SR | 01037451LL | DIVISION OF FINANCE | COMPTROLLER'S OFFICE |
| ADMIN ASST A | 01047572LL | GRADUATE SCHOOL OF EDUCATION | GRAD SCH OF EDUCATION |
| ADMIN ASST A | 01078252LL | GRADUATE SCHOOL OF EDUCATION | GRAD SCH OF EDUCATION |
| ADMIN ASST A | 01037443OM | SCHOOL OF MEDICINE | BT-CENTER FOR BIOETHICS AD |
| ADMIN ASST A | 01068248MG | PROVOST'S CENTER | CTR UNDERGRAD RES & FELLOWSHIP |
| ADMIN ASST A | 01068068DS | SCHOOL OF DENTAL MEDICINE | DENTAL MEDICINE (CENTER SU |
| ADMIN ASST A | 01078278MG | RECREATION & ATHLETICS | RECREATION AND ATHLETICS |
| ADMIN ASST A | 01068257JH | SCHOOL OF ARTS AND SCIENCES | MATHEMATICS |
| ADMIN ASST A | 01068045OM | SCHOOL OF MEDICINE | SOM-SCHOOL OF MEDICINE SUR |
| | | SCHOOL OF ARTS | |

Jobs@Penn: Search Results

| ADMIN ASST A | 01068116JH | AND SCIENCES | SAS EXTERNAL AFFAIRS |
|---|---|---|---|
| ADMIN ASST A | 01078273OM | DEVELOPMENT & ALUMNI RELATIONS | GIFT ADMINISTRATION |
| ADMIN ASST A | 01057774OM | SCHOOL OF MEDICINE | PS-PSYCHIATRY ADMINISTRATI |
| ADMIN ASST A | 01068123LL | GRADUATE SCHOOL OF EDUCATION | GRAD SCH OF EDUCATION |
| ADMIN ASST A | 01057930MG | PROVOST'S CENTER | REGULATORY AFFAIRS |
| ADMIN ASST A | 01057846DS | DEVELOPMENT & ALUMNI RELATIONS | SCHOOL/CENTER DEVELOPMENT |
| ADMIN ASST A | 01068136DS | SCHOOL OF NURSING | NURSING SCHOOL (CENTER SUR |
| ADMIN ASST A | 01078290LL | GRADUATE SCHOOL OF FINE ARTS | GSFA DEAN'S OFFICE |
| ADMIN ASST A | 01068137DS | SCHOOL OF NURSING | NURSING FINANCE |
| ADMIN ASST A | 01057836LL | PRESIDENT'S CENTER | SECRETARY'S OFFICE |
| ADMIN ASST B | 01068189LL | BUSINESS SERVICES | DAY CARE CENTER |
| ADMIN ASST B | 01068148OM | SCHOOL OF MEDICINE | PA-PATHOLOGY |
| ADMIN ASST B | 01068205LL | DEVELOPMENT & ALUMNI RELATIONS | DEVELOPMENT PROGRAMS |
| ADMIN ASST B | 01078250LL | GRADUATE SCHOOL OF EDUCATION | GRAD SCH OF EDUCATION |
| ADMIN ASST B | 01078247OM | SCHOOL OF MEDICINE | DM-CARDIOLOGY DIVISION ADM |
| ADMIN ASST B | 01068115MG | INTERNATIONAL PROGRAMS | INTERNATIONAL STUDENT AND |
| ADMIN ASST B | 01027174OM | SCHOOL OF MEDICINE | BB-BIOCHEMISTRY AND BIOPHY |
| ADMIN ASST B | 01078226LL | WHARTON SCHOOL | LEGAL STUDIES |
| ADMIN ASST B | 00096368OM | SCHOOL OF MEDICINE | PS-UNIT FOR EXPERIMENTAL P |
| ADMIN ASST B | 01068063DS | SCHOOL OF VETERINARY MEDICINE | VET ANIMAL BIOLOGY |
| ADMIN ASST B | 01016953OM | SCHOOL OF MEDICINE | RA-ADMINISTRATION |
| ADMIN ASST B | 01068072LL | FACILITIES MANAGEMENT | OPERATIONS AND MAINTENANCE |
| ADMIN ASST B | 01068098OM | SCHOOL OF MEDICINE | SOM-SCHOOL OF MEDICINE SUR |
| ADMIN ASST B | 01068206LL | DEVELOPMENT & ALUMNI RELATIONS | PRINCIPAL GIFTS |
| ADMIN ASST B | 01078281JH | SCHOOL OF ARTS AND SCIENCES | ENGLISH LANGUAGE PROGRAM |
| ADMIN ASST B | 01047697OM | SCHOOL OF MEDICINE | PH-PHARMACOLOGY ADMINISTRA |
| ADMIN ASST B | 01078271LL | STUDENT SERVICES | CAREER PLANNING AND PLACEM |
| ADMIN ASST B | 00085972OM | SCHOOL OF | PS-PSYCHIATRY |

Job@Uni. Search Results

| | | MEDICINE | ADMINISTRATI |
|---|---|---|---|
| ADMIN ASST B | 01078285LL | UNIVERSITY LIBRARY | UNIVERSITY LIBRARY |
| ADMIN ASST B | 01057801LL | ANNENBERG SCHOOL | ANNENBERG SCHOOL FOR COMMU |
| ADMIN ASST B | 00075868LL | EXECUTIVE VICE PRESIDENT | CENTRAL ADMINISTRATION |
| ADMIN ASST B | 01068036DS | DEVELOPMENT & ALUMNI RELATIONS | SCHOOL/CENTER DEVELOPMENT |
| ADMIN ASST B | 01057969LL | DIVISION OF PUBLIC SAFETY | PUBLIC SAFETY ADMINISTRATI |
| ADMIN ASST TO EXEC. DIR. MED CTR DEV & AR | 01047644DS | DEVELOPMENT & ALUMNI RELATIONS | SCHOOL/CENTER DEVELOPMENT |
| ADMIN ASST/DONOR RELATIONS PROGRAM | 01078332LL | LAW SCHOOL | LAW SCHOOL (CENTER SURROGA |
| ADMIN COORDINATOR | 01047716LL | GRADUATE SCHOOL OF EDUCATION | GRAD SCH OF EDUCATION |
| ADMIN COORDINATOR | 01057891OM | SCHOOL OF MEDICINE | SOM-SCHOOL OF MEDICINE SUR |
| ADMIN COORDINATOR | 01068198JH | SCHOOL OF ARTS AND SCIENCES | ENGLISH LANGUAGE PROGRAM |
| ADMIN COORDINATOR | 01057847LL | WHARTON SCHOOL | MARKETING |
| ADMIN COORDINATOR | 01037390DS | SCHOOL OF VETERINARY MEDICINE | SMALL ANIMAL HOSPITAL |
| ADMIN COORDINATOR | 00106598OM | SCHOOL OF MEDICINE | DM-GERIATRICS ADMINISTRATI |
| ADMIN COORDINATOR | 01078276LL | STUDENT SERVICES | ACADEMIC SUPPORT PROGRAMS |
| ADMIN COORDINATOR | 01057913LL | EXECUTIVE VICE PRESIDENT | CENTER FOR TECHNOLOGY TRAN |
| ADMIN COORDINATOR | 01037441OM | SCHOOL OF MEDICINE | AN-ANESTHESIA ADMINISTRATI |
| ADMIN COORDINATOR | 01047562LL | WHARTON SCHOOL | DEVELOPMENT AND ALUMNI AFFAIRS |
| ADMIN COORDINATOR | 01068012OM | SCHOOL OF MEDICINE | PS-PSYCHIATRY ADMINISTRATI |
| ADMISSIONS OFFICER A/B | 01068159MG | PROVOST'S CENTER | ADMISSIONS |
| AIRCONDTNG REFRIG MECH | 01068005LL | FACILITIES MANAGEMENT | OPERATIONS AND MAINTENANCE |
| AREA COORDINATOR FOR COLLEGE HOUSE SVCS | 01068191LL | CAMPUS SERVICES | RESIDENTIAL LIVING SURROGA |
| ASSISTANT ARBORIST | 01057978LL | MORRIS ARBORETUM | MORRIS ARBORETUM (CENTER S |
| ASSISTANT COACH INTERN, SOFTBALL | 01057985MG | RECREATION & ATHLETICS | RECREATION AND ATHLETICS |
| ASSISTANT COACH INTERN, WOMEN'S GYMNASTICS | 01068141MG | RECREATION & ATHLETICS | RECREATION AND ATHLETICS |
| ASSISTANT DIRECTOR OF OUTREACH PROGRAMS | 01068087JH | SCHOOL OF ARTS AND SCIENCES | MIDDLE EAST CTR |
| ASSISTANT MANAGER B | 01067989LL | WHARTON SCHOOL | WHARTON FINANCE AND ADMINI |

## CERTIFICATE OF SERVICE

I, John M. Myers, do hereby certify that on the 3d day of June, 2004, I caused a true and correct copy of the foregoing The University of Pennsylvania's First Motion in Limine, and Memorandum in support thereof to be served by way of U.S. First Class Mail, postage prepaid, upon the following individual at the address indicated:

Gordon Roy Parker
4247 Locust Street, #807
Philadelphia, PA  19104

*Pro Se Plaintiff*

John M. Myers